UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANA BRIGGS, IAN SAMPSON, GRACE COOPER, and JACQUELINE GUATAQUIRA,<br><br>    Plaintiffs,<br><br>      v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as Acting Executive Associate Director for ICE Enforcement and Removal Operations; JOHN A. CONDON, in his official capacity as Acting Executive Associate Director for ICE Homeland Security Investigations; SAMUEL OLSON, in his official capacity as ICE Chicago Field Director; THOMAS HOMAN, in his official capacity as White House Border Czar; U.S CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. BORDER PATROL; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; FEDERAL BUREAU OF INVESTIGATION; KASHYAP P. PATEL, in his official capacity as Director of the Federal Bureau of Investigation,<br><br>    Defendants. | Case No.<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

57818228.1

Plaintiffs Dana Briggs, Ian Sampson, Grace Cooper, and Jacqueline Guataquira (together, "Plaintiffs") bring this Complaint seeking declaratory and injunctive relief against Markwayne Mullin, U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Todd M. Lyons, Marcos Charles, John A. Condon, Samuel Olson, Thomas Homan, U.S. Customs and Border Protection ("CBP"), Rodney S. Scott, U.S. Border Patrol, Michael W. Banks, U.S. Department of Justice ("DOJ"), Todd Blanche, Federal Bureau of Investigation ("FBI"), and Kashyap ("Kash") P. Patel (together, the "government") for violations of the First and Fourth Amendments of the U.S. Constitution and the Administrative Procedure Act, and allege as follows:

**INTRODUCTION**

1.      The federal government has been wrongfully arresting peaceful protesters, collecting their DNA, uploading their genetic profiles to government databases, and storing their DNA samples in federal labs—permanently. That is what happened to Plaintiffs, as a result of exercising their First Amendment right to criticize federal policy. The government arrested each of them without probable cause and took their DNA for no valid reason. And the government intends to keep Plaintiffs' DNA indefinitely, even though it never brought any criminal charges against two plaintiffs and quickly dropped minor charges against the others. This violates the First and Fourth Amendments of the Constitution.

2.      Dana Briggs is a 71-year-old Air Force veteran who was protesting at ICE's Broadview Detention Center when a federal agent yelled at him to get out of a public street. After he asked "Why?", he was shoved to the ground and arrested. Ian Sampson is a 27-year-old amateur photographer who brought his camera to document the Broadview protests. He was walking away from federal agents when one grabbed him from behind, threw him on the ground, dragged him several feet, put his knee on his head and back, and arrested him. Grace Cooper is a 30-year-old

community organizer who was standing in a designated free speech zone taking pictures of DHS agents when one of them suddenly arrested her. When Ms. Cooper asked why she was being arrested, DHS agents could not say. Jacqueline Guataquira is a 30-year-old graphic designer who was protesting when a DHS public affairs officer approached her recording her on a cell phone. On instinct, she knocked the cell phone out of his hands. When DHS agents later found out, they yelled, "Get her!" and she was arrested.

3. Each Plaintiff was detained and compelled to give the government a DNA sample. Mr. Sampson and Ms. Cooper were never charged. Mr. Briggs and Ms. Guataquira were eventually charged with misdemeanors that were later dismissed. Yet the federal government intends to keep their DNA forever.

4. The federal statute that authorized the government to take Plaintiffs' DNA in this context—the DNA Analysis Backlog Elimination Act of 2000, 34 U.S.C. § 40702—was not always so sweeping. As originally enacted, the statute was narrowly targeted: DNA collection was limited to individuals convicted of serious violent crimes. In the decades that followed, Congress steadily expanded the government's DNA collection authority—first to encompass convictions for additional violent offenses, then to all felonies, and finally, in 2006, to anyone *arrested* for *any reason at all*, no exceptions. With each expansion, the procedural and constitutional safeguards that had once constrained the DNA collection program eroded. Today, 34 U.S.C. § 40702 is being used to collect and permanently retain U.S. citizens' entire genetic blueprint when federal agents arrest protesters for any reason—or no reason at all.

5. The Constitution does not permit this.

6. The Fourth Amendment forbids the government from conducting warrantless, unreasonable intrusions into the human body. The Supreme Court has permitted DNA collection

from arrestees in only one set of circumstances—where an individual has been validly arrested with probable cause for a serious offense, as confirmed by a judicial officer at arraignment, where the collection serves the genuine (and limited) governmental interest in identifying the person in question, and where technological and procedural safeguards limit how else the genetic information can be used. *Maryland v. King*, 569 U.S. 435, 448, 462 (2013).

7. None of these conditions existed when the government collected Plaintiffs' DNA. Defendants lacked probable cause to arrest Plaintiffs—a fact confirmed by federal prosecutors who declined to charge and a federal judge who reviewed the evidence and found the arrests to be suspect. Moreover, the government arrested Plaintiffs for only minor offenses—nothing remotely close to the "serious" crimes of murder, rape, and arson contemplated under *King*. The government's own internal directives required the submission of Plaintiffs' DNA swabs for permanent databanking before any judicial officer could confirm whether the arrest was lawful. And the government did not need Plaintiffs' DNA to identify them. In fact, the government could not possibly have used Plaintiffs' DNA for that purpose, since the FBI does not provide results of its DNA analysis for at least six months. Finally, Plaintiffs' DNA samples and the profiles generated from them are far more informative than the DNA profiles at issue in *King*.

8. The government would have Americans think of DNA the way they think of fingerprints—as nothing more than an identifier. Though perhaps that was true in an earlier era of DNA technology, it is now demonstrably false. The genetic markers the FBI collects and the DNA technology it employs have expanded dramatically. Specifically, the government now has the capability to conduct "enhance[d] kinship analyses," to draw inferences not just about the person whose DNA was taken, but about their biological relatives, without their consent and without their being accused of any wrongdoing. When the government takes a person's DNA and stores it

permanently, it is not merely filing a name or a photograph in a database. It is acquiring a permanent biological record—which includes information about that person's family, race, ethnicity, and private health information—often based on nothing more than an arrest for a minor offense that produces no conviction, and in some cases no charge at all.

9. The government is simultaneously violating Plaintiffs' First Amendment rights. The government has told its agents, through senior leadership, that protesters who criticize government policies are to be aggressively confronted, and that agents have "absolute immunity" in those confrontations. The result: a wave of unlawful arrests, each accompanied by a DNA swab that the government retains indefinitely. These arrests, along with the government's dismantling of its own privacy oversight and its regular use of surveillance systems, reveal that DHS has built a coordinated program for the purpose of targeting and monitoring people who have expressed opposition to its immigration policies.

10. The DNA collected by DHS is one component of its program to track people who voice opposition at protests, alongside real-time facial-recognition scanning of protesters, bulk license-plate reader surveillance, and social media monitoring that maps an individual's associations and location history. DNA collection is no longer a booking procedure in service of a lawful arrest for the commission of a serious crime. It is part of a surveillance program that targets people for exercising their First Amendment rights. The government's chilling message is clear: If you protest government policies, we will arrest you, file away your DNA, and monitor you—and potentially your biological relatives—going forward.

11. The Constitution does not permit the government to convert participation in a protest into a basis for indefinite access to a person's most private biological information. Plaintiffs seek declaratory and injunctive relief to end these unlawful practices and to secure the destruction

of their DNA samples stored in federal laboratories and the expungement of their DNA profiles from federal databases.

## JURISDICTION AND VENUE

12. This action arises under the Constitution and laws of the United States, including the First Amendment, the Fourth Amendment, the DNA Analysis Backlog Elimination Act of 2000, 34 U.S.C. § 40702 (the "DNA Act"), and the Administrative Procedure Act, 5 U.S.C. § 706.

13. This Court has jurisdiction under 28 U.S.C. § 1331 and § 1343.

14. Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and the Court's equitable powers.

15. Venue is proper in this District under 28 U.S.C. § 1391(e) because a substantial part of the events occurred in this District and Plaintiffs reside in this District.

## PARTIES

16. Plaintiff Dana Briggs is 71 years old. He is an American citizen who lives in Rockford, Illinois. He is a United States Air Force veteran. He was never arrested before September 27, 2025. That morning, he went to the Broadview ICE Detention Center facility to join a peaceful protest against DHS's immigration enforcement practices. Federal agents arrested him, handcuffed him to a hospital bed, and transported him to another ICE facility in the middle of the night, where they compelled him to provide a DNA sample. He was then taken to a federal prison, where he was held for the rest of the weekend. A federal judge later reviewed video of the arrest and dismissed the charges against Mr. Briggs with prejudice. The government kept his DNA.

17. Plaintiff Ian Sampson is a 27-year-old American citizen. He lives in Chicago, where he works in accounting and financial services and is an amateur photographer. He plans to attend graduate school in the near future. He was never arrested before September 27, 2025. That evening,

57818228.1                                        6

he went to the Broadview facility to take pictures of the protest. Within 30 minutes of his arrival, and without warning, an agent grabbed him from behind, threw him to the ground, and arrested him. He was held at the Broadview ICE Detention Center for approximately five hours. During that time, federal agents compelled him to provide a DNA sample. He was never charged with an offense. The government kept his DNA.

18.     Plaintiff Grace Cooper is a 30-year-old American citizen. She was born and raised in Chicago, where she works as a community organizer for a local nonprofit organization. She is also an amateur photographer. Ms. Cooper was never arrested before October 3, 2025. That morning, she went to the Broadview facility to attend a demonstration against ICE immigration enforcement. She stood in the area that state and local authorities had designated specifically for protesters to exercise their First Amendment rights. Federal agents grabbed her, slammed her to the ground, and arrested her. Federal agents refused to say why she had been arrested and forced her to provide a DNA sample. Eventually, the agents drove her to a gas station and dropped her off without charges and without any explanation. The government kept her DNA.

19.     Plaintiff Jacqueline Guataquira is 30 years old. She is an American citizen who grew up in Des Plaines, Illinois, where she lives with her family. On the morning of October 3, 2025, she went to the Broadview ICE Detention Center to join a demonstration against federal immigration enforcement practices. She was standing in the designated free speech zone with other protesters when she noticed a DHS public affairs official approaching her while recording her and other protesters with an iPhone. On instinct, she knocked the phone away. For this, multiple agents forced her to the ground, arrested her, and took her into the Broadview facility, where she was held for approximately eight hours. During that time, federal agents compelled Ms. Guataquira to

provide a DNA sample. Four months later, the government dropped the charge against her. The government kept her DNA.

20. Defendant Department of Homeland Security (DHS) is the federal agency responsible for administering and enforcing the nation's immigration laws. U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) are each component agencies within DHS.

21. Defendant Markwayne Mullin is the United States Secretary of Homeland Security and is sued in his official capacity. As Secretary, he oversees DHS's functions and component agencies of DHS, including by setting policies governing arrests by ICE agents. Mr. Mullin maintains an office in Washington, D.C.

22. Defendant United States Immigration and Customs Enforcement (ICE) is a federal agency housed within DHS with headquarters in Washington, D.C. ICE has three operational component divisions: (1) Enforcement and Removal Operations (ERO), which arrests and removes non-citizens who present a danger to public safety or national security, as well as those who are not lawfully present in the country; (2) Homeland Security Investigations (HSI), which investigates federal crimes; and (3) the Office of the Principal Legal Advisor, which litigates immigration removal cases.

23. Defendant Todd M. Lyons is the Acting Director of ICE and is sued in his official capacity. As Acting Director of ICE, he oversees its functions, including setting policies governing arrests by ICE agents, as well as the collection and retention of DNA samples. Mr. Lyons maintains an office in Washington, D.C.

24. Defendant Marcos Charles is Acting Executive Associate Director of Enforcement and Removal Operations (ERO) within ICE and is sued in his official capacity. ERO employees

are among the federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples. Mr. Charles maintains an office in Washington, D.C.

25.     Defendant John A. Condon is the Acting Executive Associate Director for Homeland Security Investigations (HSI) and is sued in his official capacity. HSI employees are among the federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples. Mr. Condon maintains an office in Washington, D.C.

26.     Defendant Samuel Olson is the Field Office Director for ICE in Chicago and is sued in his official capacity. As the Chicago field director, he oversees the functions of ICE in Illinois, including their policies and practices relating to arresting individuals peacefully protesting and compelling them to provide DNA samples. Mr. Olson maintains an office in Chicago, Illinois.

27.     Defendant Thomas Homan is the White House "Border Czar" and is sued in his official capacity. In that role, he is responsible for federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples. Mr. Homan maintains an office in Washington, D.C.

28.     Defendant U.S. Customs and Border Protection (CBP) is a component agency of DHS with headquarters in Washington, D.C. CBP is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border without authorization.

29.     Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity. As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to arrests by CBP agents, as well as the collection and retention of DNA samples.

57818228.1

CBP employees are among the federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples. Mr. Scott maintains an office in Washington, D.C.

30. Defendant U.S. Border Patrol (USBP) is a component agency of CBP with headquarters in Washington, D.C. USBP is responsible for the interdiction and processing of those who, without authorization, attempt to enter or leave the United States at its border. Border Patrol employees are among the federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples.

31. Defendant Michael W. Banks is Chief of the U.S. Border Patrol and is sued in his official capacity. As chief of Border Patrol, he has authority over all Border Patrol policies, procedures, and practices regarding arrests and DNA collection and retention. Mr. Banks maintains an office in Washington, D.C.

32. Defendant United States Department of Justice (DOJ) is an agency of the United States government with headquarters in Washington, D.C. that is responsible for federal collection of DNA samples, including pursuant to 34 U.S.C. § 40702 and its implementing regulations.

33. Defendant Todd Blanche is the Acting Attorney General of the United States and is sued in his official capacity. As Acting Attorney General, Mr. Blanche has authority over the federal government's collection of DNA samples, including pursuant to 34 U.S.C. § 40702 and implementing regulations. Mr. Blanche maintains an office in Washington, D.C.

34. Defendant Federal Bureau of Investigation (FBI) is a federal agency and subordinate component of Defendant United States Department of Justice with headquarters in Washington, D.C. that is responsible for federal collection, analysis, processing, and retention of

57818228.1

DNA samples, as well as the creation and retention of DNA profiles, including pursuant to 34 U.S.C. § 40702, its implementing regulations, and 34 U.S.C. § 12591–12592.

35. Defendant Kash Patel is the Director of the FBI and is sued in his official capacity. As Director of the FBI, Mr. Patel has authority over the federal government's collection, analysis, processing, and retention of DNA samples, as well as the creation and retention of DNA profiles, including pursuant to 34 U.S.C. § 40702, its implementing regulations, and 34 U.S.C. § 12591–12592. FBI employees are among the federal officers who have engaged in a pattern and practice of arresting individuals who are peacefully protesting and compelling them to provide DNA samples. Mr. Patel maintains an office in Washington, D.C.

## FACTUAL ALLEGATIONS

**A.** **The government's collection of vast amounts of personal genetic data from individuals who were never charged with serious offenses violates the Fourth Amendment.**

36. Of all the information the government can collect about a person, DNA is in a category of its own. It identifies not just the complete genetic blueprint of an individual but also that of their biological relatives—people who have done nothing and consented to nothing. It can reveal ancestry, carrier status for heritable diseases, and health conditions the person may not even know they have. A DNA sample does not go stale. And what can be extracted from it expands with every advance in genetic science: a sample collected today may yield information tomorrow that no one can yet anticipate.

37. When the federal government first developed its national DNA database system in the 1990s, it expressly recognized that compelled collection and analysis of DNA raises serious privacy concerns. A National Research Council report explained that "Americans have generally been reluctant to allow the creation of national identification systems, and DNA profiling poses a

57818228.1                                                        11

special risk of invasion of privacy (concerning personal and medical traits)." At the same time, Congress and federal law enforcement officials emphasized that a DNA database could play a critical role in identifying perpetrators of serious violent crimes.

38. The government sought to balance these competing concerns by narrowly limiting the scope and use of the DNA database it created. Early DNA collection laws focused on individuals convicted of serious violent offenses, and DNA profiles could only be used to match DNA evidence recovered from crime scenes with DNA profiles derived from convicted offenders.

39. That is no longer true. The government now routinely collects DNA from individuals who have not been convicted of any crime and, in many cases, will never even be charged with an offense. Meanwhile, the government also has expanded its use of that DNA far beyond identification. What began as a system based on a limited number of "uninformative" genetic markers that permit only identification of an individual has evolved into a more expansive set of markers and a more advanced technological system, capable of broader forms of inferential analysis, including familial relationships, ancestral or geographic origin, and predisposition for disease.

        **i.    The government's compulsory collection of DNA is a search and seizure under the Fourth Amendment.**

40. As was the case for Plaintiffs, DHS often compels collection of DNA using a buccal swab, also known as a "cheek swab." A buccal swab involves inserting a cotton swab into an individual's mouth and rubbing it firmly against the inside of their cheek. The swab collects DNA from saliva and epithelial cells, yielding high-quality genomic DNA.

41. According to DHS policy, after a cotton swab has been inserted into an individual's mouth to collect DNA from the inside of the individual's cheek, a DHS official must place the cotton swab containing the DNA sample in an envelope and submit it to the FBI for analysis.

57818228.1

12

42.     This practice is a search under the Fourth Amendment. *King*, 569 U.S. at 446; *see also Green v. Berge*, 354 F.3d 675, 676 (7th Cir. 2004) ("the taking of a DNA sample is clearly a search").

43.     Given "our society's concern for the security of one's person," the "compelled intrusion into the body" to obtain a sample of biological material plainly "infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989). Moreover, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [individual's] privacy interests." *Id.*

44.     The government's compelled intrusion into the body to collect DNA samples from saliva and epithelial cells is also a meaningful interference with an individual's possessory interest in their biological matter. *See Skinner*, 489 U.S. at 617 n.4. It is therefore a seizure within the meaning of the Fourth Amendment. *See id.*; *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

45.     After DHS collects a DNA sample and sends it to the FBI, the FBI processes the DNA sample to create from the sample a narrower numerical identifier called a "DNA profile," which the FBI uploads to searchable federal databases. Under the FBI's DNA sample analysis protocols, the creation of a DNA profile requires the FBI to extract the full genetic content of the DNA sample as a preliminary step. Only after the complete genetic code is extracted from a DNA sample can the FBI isolate and target the narrower genetic information to include in a DNA profile. Pursuant to FBI policy, the FBI retains the physical DNA sample indefinitely for testing, retesting, confirmation, quality control, and future testing.

46.     The government's "creation of a DNA profile" is a "sufficiently separate invasion of privacy" from the initial extraction of DNA that it is considered "a separate search under the Fourth Amendment." *United States v. Davis*, 690 F.3d 226, 246 (4th Cir. 2012); *see id.* at 233 ("We

assume, without deciding, that there was a separate Fourth Amendment violation in retaining [an individual's] DNA profile in the local CODIS database."); *United States v. Mitchell*, 652 F.3d 387, 407 (3d Cir. 2011) (en banc) ("The second 'search,'" separate from the initial creation of the DNA sample, "is, of course, the processing of the DNA sample and creation of the DNA profile for CODIS," which "also has the potential to infringe upon privacy interests").

47. The government's retention of DNA samples magnifies the infringement of a person's privacy and possessory interests because the sample itself may be subjected to additional testing and inspection in the future. Indeed, a buccal swab places "into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained." *Birchfield v. North Dakota*, 579 U.S. 438, 463 (2016). "Even if the law enforcement agency is precluded from testing" the DNA sample for any purpose other than identification, "the potential remains and may result in anxiety for the person tested." *Id.* at 464.

ii. **The government's compelled collection of DNA is reasonable only upon a valid arrest for a serious offense, after arraignment, in furtherance of a legitimate government interest, and where information derived from the DNA is highly constrained.**

48. The Fourth Amendment has been held to permit law enforcement to collect individuals' DNA in narrow, limited circumstances, none of which are applicable to Plaintiffs. In *Maryland v. King*, the Supreme Court upheld a Maryland statute authorizing DNA collection from individuals arrested and held in "valid police custody" for "a serious offense" that is "supported by probable cause," as confirmed at arraignment, where DNA collection serves a significant government interest, and information derived from the DNA is highly constrained. 569 U.S. at 443, 448.

49. The Supreme Court in *King* considered a "valid arrest" for a "serious offense" to be a "necessary predicate" for the collection of DNA from arrestees—this was "fundamental" to

its determination that the invasion of privacy interests inherent in compulsory DNA collection was reasonable. *Id.* at 461.

50.     The Fourth Amendment does not permit the government to collect DNA from individuals outside the narrow context authorized by *King*—in particular, it does not permit DNA collection (1) without a valid, individualized probable cause determination, or (2) from those arrested for minor offenses.

51.     The Supreme Court established these "valid arrest" and "serious offense" limitations in *King* in the context of widespread state statutory regimes that at the time largely limited the collection of DNA samples to those already convicted of, or arrested for, only the most violent of crimes, such as murder and rape, where the governmental interest in identification is necessarily greater.

52.     Indeed, at the time *Maryland v. King* was decided, the majority of states did not authorize DNA collection from arrestees at all. Most states limited DNA collection to individuals who had been convicted of a qualifying offense, not merely arrested. *See, e.g.*, Del. Code tit. 29, § 4713 (2012); Ga. Code § 24-4-60 (2012); Ind. Code § 10-13-6-10 (2012); Ky. Rev. Stat. § 17.170 (2012); Mass. Gen. Laws ch. 22E, § 3 (2012); Miss. Code Ann. § 45-33-37 (2012); N.Y. Exec. Law § 995-c (2012); 44 Pa. Cons. Stat. § 2316 (2012); Vt. Stat. Ann. tit. 20 § 1933 (2012); Wis. Stat. § 165.76 (2012).

53.     Several states authorized DNA collection upon arrest, but only for the most serious violent or sexual offenses—the category of grave crimes the Supreme Court had before it in *King*. *See, e.g.*, Ariz. Rev. Stat. § 13-610 (2012) (homicide, enumerated sexual offenses, and dangerous offenses only); 730 Ill. Comp. Stat. 5/5-4-3 (2012) (first degree murder, home invasion, and criminal sexual assault only, and only after indictment or judicial probable cause finding); Mo.

Rev. Stat. § 650.055 (2012) (burglary in the first or second degree, violent felonies, felonies perpetrated against children, and sexual offenses, for arrestees age 17 or older only); N.C. Gen. Stat. § 15A-266.3A (2012) (enumerated serious offenses including murder, rape, kidnapping, and armed robbery, and only upon warrant or probable cause determination); Tenn. Code Ann. § 40-35-321(e) (2012) (violent felonies only, after magistrate or grand jury probable cause determination); Utah Code § 53-10-403(2)(c) (2012) (enumerated serious offenses including violent felonies and specified sexual offenses only); Va. Code Ann. § 19.2-310.2:1 (2012) (violent felonies only, after magistrate or grand jury probable cause finding).

54. While other states authorized DNA collection upon arrest for any felony, *see, e.g.*, Ala. Code § 36-18-25 (2012); Cal. Penal Code § 296.1 (2012); Ohio Rev. Code § 2901.07 (2012), only one state—Louisiana—appears to have authorized collection upon arrest for certain specified dangerous misdemeanor offenses in addition to felonies. *See* La. Rev. Stat. § 15:609(A)(1) (2012) (allowing DNA collection for felonies and certain misdemeanors); La. Rev. Stat. § 15:603(10) (2012) (enumerated misdemeanor offenses including stalking, illegal carrying of weapons, hate crimes).

55. Zero states permitted what the federal DNA Act authorizes—collection of DNA from an individual arrested for *any crime*.

56. Today, states continue to place significant limits on DNA collection. For example, New Jersey law limits DNA collection to those arrested for murder, manslaughter, aggravated assault, kidnapping, luring or enticing a child, endangering the welfare of children, or sexual assault. *See* N.J. Stat. Ann. § 53:1-20.20. North Carolina law limits DNA collection to those arrested for specified dangerous crimes, including murder, sex crimes, kidnapping, arson, armed robbery, the manufacture or use of weapons of mass destruction, child abuse, and concealing a

57818228.1

non-natural death by dismembering or destroying remains, among other egregious acts. *See* N.C. Gen. Stat. § 15A-266.3A. Mississippi law limits DNA collection to those arrested only for "crimes of violence," which includes murder, aggravated assault, driving under the influence, manslaughter, human trafficking, rape, robbery, child abuse, the use of explosives, poisoning, and other obviously dangerous crimes. *See* Miss. Code Ann. §§ 45-47-1, 97-3-2. And Virginia law limits DNA collection to those arrested for certain violent felonies, including murder, mob crimes, abduction, malicious felonious assault, robbery, sexual assault, and arson. *See* Va. Code Ann. §§ 19.2-310.2:1, 19.2-297.1.

57.     No state statute currently authorizes DNA collection for crimes like disorderly conduct, trespass, failure to disperse, or resisting arrest that does not involve serious physical injury or a deadly weapon.

58.     Of note, the current Illinois DNA collection statute is far more protective of Fourth Amendment rights than its federal counterpart. Under Illinois law, DNA can be collected only from those arrested for first degree murder, home invasion, or sexual assault. *See* 730 Ill. Comp. Stat. 5/5-4-3(a-3.2). Moreover, the statute allows DNA collection only "after an indictment has been returned by a grand jury, or following a hearing" and "a judge finds there is probable cause" or where "an arrestee has waived a preliminary hearing." *Id*. Unlike its federal counterpart, Illinois law prohibits law enforcement from collecting DNA samples from arrestees until there has been an independent finding of probable cause by a judge or grand jury.

59.     The Supreme Court's limitations on DNA collections to a "valid arrest" for a "serious offense" were established in the context of a statute that prohibited an individual's DNA sample from being "processed or placed in a database before the individual is arraigned." *King*, 569 U.S. at 443. This is because during arraignments, "a judicial officer ensures that there is

probable cause to detain the arrestee on a qualifying serious offense." *Id*. Other state statutes at the time of *King* contained similar probable cause requirements. *See, e.g.*, 730 Ill. Comp. Stat. 5/5-4-3(a-3.2) (2012); Minn. Stat. § 299C.105(1)(a)(1) (2012); Tenn. Code Ann. § 40-35-321(e)(1) (2012); Vt. Stat. Ann., tit. 20, § 1933(a)(2) (2012); Va. Code Ann. § 19.2-310.2:1 (2012). The requirement that probable cause be determined by a neutral arbiter—such as a court or a grand jury—protects individuals from having their DNA collected without a lawful basis and ensures that law enforcement is only collecting DNA samples from individuals who have been arrested and detained consistent with the Fourth Amendment.

60. Laws allowing for the compulsory collection and analysis of DNA from those arrested based on probable cause for a serious offense, such as murder or rape, are grounded in a governmental interest in knowing the identity, criminal history, dangerousness, and risk to the public posed by an arrestee released on bail. *See generally King*, 569 U.S. at 450–54. That interest is bounded: it is an identification interest tied to the period of custody, not a general license to permanently bank genetic material for future investigative use. Where the government's actual purpose is not identification of a detainee during custody but rather the permanent accumulation of genetic profiles of individuals who have opposed its policies, the interest recognized by the Court in *King* is absent; it is replaced by a different, constitutionally impermissible interest.

    iii.  **Over time, Congress aggressively expanded compulsory collection of DNA.**

61. In 1994, Congress authorized the FBI to operate and maintain the National DNA Index System (NDIS) for DNA profiles generated from DNA samples collected by state and federal authorities. Several years later, the FBI launched a software program called the Combined DNA Index System (CODIS) to enable law enforcement agencies to store and compare DNA profiles across local, state, and national databases.

62. CODIS was created as a database of "convicted offender" DNA profiles to be used "in solving murders, sexually violent offenses, and other crimes." Consistent with this, in 2000, Congress enacted the DNA Act largely limiting compulsory DNA collection to persons convicted of serious violent crimes. The DNA Act criminalized the failure "to cooperate in the collection of [a DNA] sample" required under the statute.

63. As of 2004, the federal government had collected roughly two million DNA profiles.

64. Over the years, Congress has amended the DNA Act to expand the authority to collect DNA. In 2001, the government's authority to collect DNA was expanded to include individuals convicted of additional serious violent crimes. In 2004, Congress expanded the government's DNA collection authority yet again, to persons convicted of any felony, any sexual abuse crime, and any crime of violence (as well as any attempt or conspiracy to commit such crimes).

65. In 2006, Congress went far beyond the authority it had previously granted—and far beyond authority granted by any state government—to amend the DNA Act to permit the collection of DNA from *any* person arrested for *any* crime, regardless of the seriousness of the crime. 34 U.S.C. § 40702(a)(1)(A). Yet, the statute failed to provide for any judicial supervision to ensure that probable cause to detain the arrestee ever existed. Still, Congress continued to justify even this privacy intrusion—which authorized DNA collection from individuals arrested for such minor infractions as littering at a national park, *see* 36 C.F.R. § 2.14(a)(1); 18 U.S.C. § 1865(a)—as necessary to "allow State and Federal law enforcement to catch rapists, murderers, and other violent criminals whom it otherwise would be impossible to identify and arrest." Most state

governments also expanded their authority for compulsory DNA collection from persons convicted of serious violent crimes, to persons arrested for felony crimes and other serious offenses.

66. While the DNA Act requires the expungement of a DNA profile upon receipt of "a certified copy of a final court order establishing that the charge has been dismissed or has resulted in an acquittal or that no charge was filed within the applicable time period," 34 U.S.C. § 12592(d)(1)(A)(ii), the provision is inadequate.

67. The DNA Act's expungement provision addresses only the DNA profile—the limited numerical identifier entered into CODIS. The DNA Act says nothing about the physical DNA sample from which the profile is extracted. This matters because a CODIS DNA profile captures a limited amount of information, while the retained physical sample contains the entirety of a person's genome. The government's retention of the DNA sample therefore makes it available for future use—including to create another profile that sets forth more (or all) of a person's genetic information. Nothing in the DNA Act limits the government to any particular use of the physical DNA sample, requires destruction of the sample upon expungement of the profile, or restricts future analysis as technology advances.

68. Separately, expungement is not automatic. The burden falls entirely on the arrestee to initiate the process, obtain a certified court order, and submit it to the FBI—a procedure that requires time, expense, and awareness of rights that most arrestees do not have. Studies of actual expungement rates confirm the result: in most states, only a handful of the thousands of arrestee DNA profiles ever added to the database have been expunged. *See* Elizabeth E. Joh, *The Myth of Arrestee DNA Expungement*, 164 Univ. Pa. L. Rev. Online 51, 52 (2015).

69. Finally, for uncharged arrestees, the DNA Act permits expungement only after "no charge was filed within the applicable time period"—meaning the statute of limitations for the

offense of arrest must run to completion before the statutory right to seek expungement even ripens. 34 U.S.C. § 12592(d)(1)(A)(ii). Thus, for example, a protestor arrested but not charged for impeding a federal officer would have to wait five years to begin the burdensome process of seeking expungement, during which time their DNA profile is subject to continuous searches in CODIS.

70.     As of August 2014, the FBI had collected approximately 14 million DNA profiles—seven times the number of profiles collected just a decade earlier.

71.     The FBI recently reported that, as of November 2025, the federal government had amassed a total of almost 27 million DNA profiles. Indeed, the FBI is currently collecting almost 150,000 DNA profiles monthly—or approximately 1,800,000 per year.

### iv.     The government has converted CODIS from an identification tool into a surveillance database.

72.     When Congress authorized the creation of a national DNA database, it described the system as a tool for identifying perpetrators of serious crimes by comparing DNA recovered from crime scenes with DNA samples obtained from convicted offenders.

73.     Consistent with that understanding, early CODIS implementation relied on analysis of 13 short tandem repeat ("STR") loci selected to generate DNA profiles that were unique to each individual profiled. At the time, the government represented that the 13 STR loci selected were uninformative with respect to health, appearance, or other sensitive traits.

74.     Over time, however, the government has expanded both the amount of genetic information included in the CODIS database and the purposes for which that information may be used, moving beyond the original identification-based model.

75.     In 2017, the FBI expanded the number of STR loci used in DNA profiles in CODIS from 13 to 20. In doing so, the FBI explained that the additional loci were selected in part because

they "enhance kinship analyses," thereby increasing the government's ability to identify biological relationships between individuals. The FBI undertook this expansion unilaterally; no Congressional authorization was obtained.

76. The FBI permits "moderate stringency" searches of CODIS by law enforcement, which, according to the FBI's own CODIS fact sheet, produce partial matches that allow for the conclusion "that a close biological relative of the [DNA profile on CODIS] may be the source" of DNA collected as evidence.

77. Scientific studies show that at present the CODIS loci can be used to infer medically relevant characteristics in addition to ancestry-related information. Moreover, the CODIS loci can be linked to broader genetic data to reveal other sensitive genetic traits.

78. The government has also expanded its use of DNA profiles in CODIS by relying on partial matches to generate investigative leads. CODIS is not limited to identifying matches between crime scene DNA and DNA from potential perpetrators, as originally contemplated. Rather, the system permits searches at varying levels of stringency and can generate partial or near matches between DNA profiles. Such partial matches can be used to identify biological relatives of individuals whose DNA was collected.

79. The availability and use of this partial-match searching means that CODIS is now capable of generating probabilistic and relational inferences from DNA data, rather than merely confirming the identity of a known individual. Such inferences, in addition to sweeping in genetic information about individuals—biological relatives—who were never arrested, also carry significant risks of unreliability, because they are not based on complete matches.

80. These developments reflect a fundamental shift in the use of DNA by the government. What was originally justified as a limited system for identifying perpetrators through

direct comparison of DNA profiles has evolved into a broader investigative framework that enables law enforcement to draw inferences about biological relationships, identify individuals through relatives, and generate leads through probabilistic analysis of genetic data.

81.     Neither the DNA Act nor its implementing regulations places any limits on the government's use, processing, or analysis of a DNA sample or profile. In particular, Congress has not restricted the government's ability to perform expanded processing of DNA samples or profiles it collects and retains indefinitely.

82.     The CODIS system is no longer the targeted identification tool it was represented to be. It is a growing, evolving database of sensitive biological information, with expanding analytical capabilities and an expanding pool of individuals whose genetic material is enrolled— many of whom, like Plaintiffs, have never been convicted of any crime.

**B.      DHS routinely compels collection of DNA for automatic analysis by the FBI and inclusion in federal and state databases, in violation of the Fourth Amendment.**

83.     When Congress first authorized DNA databanking in the 1990s, the governing statute assigned responsibility for collecting DNA samples to the Bureau of Prisons for individuals in federal custody and to federal probation offices for individuals under supervision. *See* 42 U.S.C. § 14135a(a)(1)–(2) (2000).

84.     In 2006, when Congress expanded federal DNA collection to include all individuals who were arrested, it authorized the Attorney General to collect DNA and simultaneously provided that the Attorney General could "authorize and direct any other agency of the United States" to collect DNA pursuant to the statute. 34 U.S.C. § 40702(a)(1)(A).

85.     In 2008, DOJ implemented that expansion through regulation, for the first time *requiring* federal agencies to collect DNA from arrested individuals. 28 C.F.R. § 28.12. The

57818228.1                                              23

regulation applies broadly to "any agency of the United States that arrests or detains individuals," including DHS.

86.     Consistent with DOJ regulations, DHS policies require collection of DNA samples from all individuals arrested on criminal charges, without exception, and without regard to whether an arrestee is a citizen. Specifically, ICE directives provide that "all persons arrested on criminal charges will have their DNA collected" and that "[t]here are no exceptions to the requirement to collect from subjects arrested on criminal charges." These policies apply uniformly across DHS components as part of standard arrest procedures.

87.     ICE and CBP policies further provide that individuals who refuse to submit to DNA collection must be advised that compliance is required by law and that refusal constitutes a criminal offense. ICE directives specifically instruct officers to notify noncompliant individuals that failure to cooperate with DNA collection is a federal offense and that they may be prosecuted for a Class A misdemeanor. If an individual continues to refuse, officers are required to document the refusal and refer the individual for prosecution.

88.     DHS policy and training materials make clear that DNA collection is integrated into routine post-arrest processing and booking procedures. Agents are instructed to collect DNA samples as part of normal post arrest procedures, alongside fingerprinting, photographing, and other biometric collection steps.

89.     DHS has adopted a standardized process for collecting and submitting DNA samples. Under this process, DHS officials use FBI-provided buccal collection kits to obtain a DNA sample and swab the inside of the individual's cheek (either by compelling the individual to self-swab or by swabbing the individual directly). The swab is then placed into a collection device and sealed in an evidence envelope, along with a completed DNA collection form. A DHS official

57818228.1                                          24

then mails the sample to the FBI, which processes the DNA sample, generates a DNA profile, and uploads that profile into CODIS. The DNA profile, once uploaded, is retained in CODIS indefinitely.

90. Under this process, DHS does not use the collected DNA in connection with the alleged offense for which the individual is being arrested.

91. While DHS collects and transmits DNA samples to the FBI for analysis and entry into CODIS, the FBI retains and maintains the DNA samples and resulting profiles as part of the federal DNA databanking system.

**C.     DHS is carrying out a policy of targeting protesters for arrest and surveillance.**

92. As described, Congress built a DNA collection program that began as a targeted tool for identifying dangerous violent criminals, but grew over time and through regulation into a mandatory regime that collects private genetic material from anyone arrested, for any offense, without any judicial check. What follows describes the conditions under which that DNA collection program was applied to Plaintiffs. In the months leading up to their arrests and compelled DNA collection, DHS underwent a rapid and dramatic expansion of its immigration enforcement operations: a hiring surge that more than doubled the size of ICE, a reduction of training that stripped recruits of instruction in constitutional limits on their authority, and a parallel expansion of surveillance capabilities directed not only at immigration enforcement targets but at people who openly opposed the agency's methods. It was in this context—a rapidly enlarged, undertrained enforcement force operating under official messaging that vilified protesters—that federal agents arrested Plaintiffs while they exercised their First Amendment rights, and triggered automatic, mandatory DNA collection.

### i. DHS has lowered its hiring standards to hire thousands of new ICE and CBP agents.

93. In 2025, the federal government announced its intention to deport 15 to 20 million immigrants. To advance this priority, the One Big Beautiful Bill Act, signed into law on July 4, 2025, provided DHS with more than $191 billion—nearly double the funding appropriated for fiscal year 2024—including more than three times the non-disaster grant funding from that year.

94. In particular, the government appropriated nearly $30 billion to ICE alone for workforce expansion, including approximately $8 billion specifically designated for a hiring surge targeting 10,000 new Enforcement and Removal Operations officers and 1,000 new Homeland Security Investigations agents by the end of 2025. CBP received a separate appropriation of $4 billion under the same legislation to hire 8,500 additional employees, and $285 million was set aside specifically for signing bonuses.

95. In January 2026, ICE announced that it had exceeded its targets: the agency hired more than 12,000 new officers and agents in less than a year, growing its workforce from approximately 10,000 to more than 22,000—a 120% increase. CBP's monthly hiring averages increased by 42.5% over the prior year, and hiring of Border Patrol agents, specifically, increased by 84%.

96. To attract enough applicants to meet its hiring goals within the required time frame, DHS loosened the eligibility requirements that had governed federal law enforcement hiring for decades. ICE lowered the minimum age for officers from 21 years old to 18, effective August 6, 2025, while simultaneously removing the upper age limit entirely, allowing individuals of any age to apply. ICE also received special "direct hire authority" to circumvent standard federal hiring procedures, bypassing normal competitive hiring requirements.

### ii. DHS has dramatically cut its training and vetting standards.

97. The speed of DHS's hiring was matched by a corresponding reduction in training and vetting. Before the 2025 surge, ICE recruits completed approximately five to six months of training at the Federal Law Enforcement Training Center ("FLETC") in Brunswick, Georgia—a program designed to ensure that officers understood constitutional limits on their authority, including the Fourth Amendment's requirements for lawful arrests and searches. Under the accelerated program, that training was first cut to thirteen weeks, then to eight weeks.

98. The reduction in training included cuts to programs that directly addressed DHS agents' authority and responsibilities when dealing with protesters like Plaintiffs. Before the 2025 hiring surge, ICE's own training materials recognized that officers would routinely operate in public environments where civilians were present, observing, and recording. The agency's basic training program required 584 hours of instruction over 72 days, and included instruction dedicated to the rights of protesters under the First Amendment, as well as training on lawful arrests.

99. Under the accelerated program implemented during the hiring surge, ICE cut approximately 240 hours of instruction from the 584-hour program, a reduction of roughly 41%. Among the specific courses eliminated or gutted:

- A two-hour course on the rights of protesters was cut to approximately ten minutes, folded into a broader lecture on the legal concept of seizure;

- Courses on constitutional law, lawful arrests, and the limits of officers' authority were cut or substantially reduced; and

- Legal instruction on "criminal vs. removal proceedings"—which teaches officers the distinction between the different legal frameworks governing their authority—was eliminated.

100. A former ICE assistant chief counsel who served as a legal instructor at FLETC described the practical consequence of these cuts with particular clarity in his congressional

testimony: "ICE is teaching cadets to violate the Constitution," he said, and "[w]ithout reform, ICE will graduate thousands of new officers who do not know their constitutional duty, do not know the limits of their authority, and do not have the training to recognize an unlawful order." He further warned that ICE's deficient training "can and will lead to unlawful arrests, violations of constitutional rights, and a fundamental loss of public trust in law enforcement."

### iii. DHS has increased surveillance of individuals who oppose DHS's immigration enforcement while simultaneously reducing internal mechanisms to ensure protection of individuals' privacy interests.

101. The government's immigration-related law enforcement efforts have been focused not only on mass deportation operations, but also on those who express opposition to such operations, even if they are U.S. citizens exercising their First Amendment rights.

102. Public reporting confirms that DHS components, including ICE and CBP, have deployed an expanding array of surveillance technologies to monitor individuals, including protesters and observers of immigration enforcement activity. For instance, ICE and CBP agents at Broadview were equipped with Mobile Fortify, a smartphone application that performs real-time facial recognition against a database of more than 200 million federal photographs; CBP has made a companion application, Mobile Identify, available to deputized state and local law enforcement. DHS also has invested in automated license plate readers capable of reconstructing the historical movements of any vehicle, as well as social media and cell phone location monitoring tools that map a person's movements, posts, and associations—and those of their friends and family. Together with entry of protesters' DNA profiles into CODIS, these tools constitute a comprehensive system for permanently tracking the identities, movements, associations, and genetic profiles of people the government has identified as adversaries.

103.    Meanwhile, the internal mechanisms that once provided at least minimal checks on DHS's surveillance programs have been dismantled. Privacy Impact Assessments—the agency's internal tool for evaluating the civil liberties implications of new surveillance programs—dropped from a peak of 24 filings in 2024 to just eight in 2025, and none have been filed in 2026. Three of DHS's top privacy officials—including CBP's top privacy officer—were removed in early 2026, after they objected to agency efforts to mislabel government records in ways that would have shielded them from public release. And DHS recently blocked the DHS Inspector General's access to agency records concerning the agency's management of biometric data and personally identifiable information.

**D.    DHS's policy of targeting protesters for arrest and surveillance has led to widespread violations of protesters' constitutional rights.**

104.    The events at the Broadview, Illinois ICE Detention Center in September and October 2025 illustrate in concrete terms the consequences of deploying a rapidly expanded, inadequately trained federal law enforcement force against civilians exercising their constitutional rights. The Broadview ICE Detention Center, located in a small Chicago suburb of approximately 8,000 residents, had been the site of peaceful weekly prayer vigils and protest activity for nearly two decades.

105.    In early September 2025, however, the government launched "Operation Midway Blitz," a federal immigration enforcement surge led by DHS. DHS assembled a multi-agency enforcement presence that prominently included agents from CBP and its subagency, Border Patrol—agencies whose statutory mandate is enforcement at and near the nation's borders. Then-Chief Border Patrol Agent Gregory Bovino was placed in operational command of the federal immigration enforcement presence in the Chicago area. That role brought Border Patrol agents

into direct and repeated contact with civilians who gathered outside the Broadview facility to protest the operation—contact for which Border Patrol agents have little to no relevant training.

106. The decision to place Border Patrol in operational command of a large-scale urban immigration enforcement operation was itself problematic. Border Patrol's traditional operating environment is immigration interdiction at or near the nation's borders—typically checkpoints, roving patrols, and aerial surveillance in rural or semi-rural terrain. The agency's enforcement units are not trained for interior urban enforcement or urban crowd management. That Operation Midway Blitz would bring Border Patrol agents into sustained, high-tension contact with civilians gathered outside the Broadview ICE Detention Center was entirely foreseeable. Protests had been a continuous feature of the facility's operations for nearly two decades, and they had grown substantially since the launch of the operation. Yet the agency placed in command had no training for that environment. A former Commissioner of U.S. Customs and Border Protection stated the point directly: Border Patrol agents are "not at all" trained to work in crowd control or urban policing environments.

107. Following the launch of Operation Midway Blitz on September 8, 2025, protests at the facility grew in size, and DHS's response to those protests escalated.

108. DHS agents repeatedly used excessive force against small groups of protesters who appeared to pose no threat to agents or to public security, and against clearly identifiable clergy, journalists, legal observers, and volunteer street medics. Agents deployed tear gas and fired projectiles directly into protest groups from the roof of the detention facility, often without warning. They interrogated protesters about who had covered the transportation costs for them to participate in the demonstration. And, as illustrated by Plaintiffs' experiences, they arrested

57818228.1                                              30

peaceful protesters and forced them to provide DNA samples even though they had committed no crimes, and certainly not serious ones.

        **i.     DHS has repeatedly targeted protesters and violated their constitutional rights.**

109.    DHS's policy of targeting U.S. citizens exercising their constitutional right to protest for arrest and surveillance in retaliation for their exercise of free speech did not begin or end with Operation Midway Blitz. Rather, DHS implemented this policy months before, and continues to do so:

- *June 2025—Los Angeles, California.* Alejandro Orellana, 29, a Marine Corps veteran and member of the community organization Centro CSO, was arrested in a pre-dawn home raid by FBI agents backed by National Guard troops. Federal prosecutors charged him with conspiracy and aiding and abetting civil disorder after he distributed face shields and bottles of water to demonstrators at an anti-ICE protest on June 9. U.S. Attorney Bill Essayli stated that his office had made it "a huge priority to try to identify, locate, and arrest those who are involved in organizing, supporting, funding, or facilitating these riots." A federal judge dismissed the case in July 2025 at the government's request.

- *July 2025—San Pedro, California.* Julian Cardenas, 31, was arrested and charged with conspiracy after he filmed a convoy of federal Border Patrol agents from his car. Federal agents stopped his vehicle, pulled him from it, and slammed him to the pavement. They arrested him and forced him to provide a DNA sample. Video recordings of the incident contradicted the government's account that he had interfered with the agents' vehicles. The government voluntarily dismissed the charges, citing "the interest of justice." Despite the dismissal, Mr. Cardenas has publicly stated that he has not tried to observe federal agents or participate in a protest since his arrest: "I don't want to be assaulted again. I don't want to wind up back in federal prison for something that I didn't do."

- *October 2025—Portland, Oregon.* Three protest organizers, Beatriz Ibarra, Elijah Thahir, and Holly Brown, led a crowd through the streets of South Portland to the entrance of an ICE facility. There, federal officers marched out, dragged them to the ground, and arrested them. None of the three was told why they were being arrested, and none received any paperwork explaining the basis for their detention. Ibarra and Thahir were released without any paperwork or formal charges. Brown received only a citation upon release.

- *January 2026—Minneapolis, Minnesota*. Steven Saari, a Marine Corps combat veteran who served combat tours in Iraq and Afghanistan, went to the scene of an ICE shooting in Minneapolis, to observe what was happening. Federal agents surrounded him, aimed their weapons at him, and arrested him. Agents then forced him to provide a DNA sample by buccal swab. After approximately six hours in detention, Saari was released into sub-zero temperatures without charges.

- *February 2026—Minneapolis, Minnesota*. Jessica Kirby was observing federal immigration authorities from her car at a safe distance, driving carefully and leaving space between them. At least seven federal agents rushed out of their vehicles toward her with their guns drawn. An agent smashed her car window, arrested her, and took her to a DHS building. Agents took a DNA sample, and she was released later that evening. As of the date of this filing, it appears that no charges have been brought against Ms. Kirby.

- *February 2026—Portland, Maine*. Federal agents told observers who were filming immigration enforcement operations that they were "domestic terrorists" and would be added to a "database" or "watchlist." At least one observer was told by a federal agent: "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight."

ii. **Senior federal government officials have repeatedly made statements illustrating DHS's policy of targeting protesters for arrest and surveillance in retaliation for their exercise of free speech.**

110. Institutional hostility toward protesters was cultivated and broadcast by senior federal government officials and amplified through government communications channels. This posture sent a clear message to federal agents in the field—including the newly hired, undertrained ICE officers and the CBP agents operating far outside their traditional domain—that protesters were enemies to be confronted, not citizens with constitutional rights to privacy and free expression.

111. That message originated at the highest levels. On October 24, 2025—just weeks into Operation Midway Blitz and while Broadview protests were ongoing—White House Deputy Chief of Staff Stephen Miller delivered a direct address to ICE agents via a Fox News appearance that DHS's official account on X then amplified as a "REMINDER" to all agents. Mr. Miller told

them: "You have immunity to perform your duties, and no one—no city official, no state official, no illegal alien, no leftist agitator or domestic insurrectionist—can prevent you from fulfilling your legal obligations and duties."

112. Thereafter, in January 2026, Vice President JD Vance reiterated that message, declaring publicly that an ICE agent who had fatally shot a protester was "protected by absolute immunity" for "doing his job." Such statements served to embolden DHS agents in the field by signaling that they would not be punished regardless of what they did.

113. The hostility toward protesters has been further reinforced through official DHS communications that characterized protesters not as citizens with constitutional rights to be respected, but as criminals and terrorists. In an October 6, 2025, press release issued during Operation Midway Blitz, DHS described protesters in Chicago as "domestic terrorists" and "violent anarchists who seek to tear down America," and Secretary Noem told agents: "President Trump and I have your backs."

114. ICE has used its social media accounts to celebrate the arrests of protesters and to recruit new agents by glorifying excessive force. As one example, ICE's official Instagram account posted a photograph of agents in tactical gear pinning a person to the ground under the caption "JOIN.ICE.GOV"—framing aggressive physical enforcement against civilians as a recruitment advertisement. Along with the picture, the official DHS Instagram account posted: "FAFO," an acronym for "Fuck Around and Find Out." The post goes on: "We will NOT allow violent activists to lay hands on our law enforcement." However, the person depicted in the photograph was one of many people arrested by DHS agents but never charged with any crime.



115. Government social media posts celebrating the arrests of protesters reflect DHS's ongoing official policy of aggressively targeting protesters, monitoring their activities, and violating their constitutional rights.

116. More recently, on January 15, 2026, Border Czar Tom Homan announced that he was "pushing for" a database of individuals arrested at protests, pledging to "make them famous" by publicizing their identities to employers, neighbors, and schools.

117. Separately, a DHS memo circulated in January 2026 instructs DHS agents to "capture all images, license plates, identifications, and general information on hotels, agitators, protesters, etc., so we can capture it all in one consolidated form."

### iii. None of the arrests DHS made arising from protests of Operation Midway Blitz have resulted in conviction.

118. CBP records indicate that it arrested 92 individuals—including Plaintiffs—in connection with Operation Midway Blitz between September 2 and October 29, 2025, for non-immigration offenses. *See Chicago Headline Club v. Noem*, 25-cv-12173, Dkt. 284-40 (N.D. Ill.

Nov. 24, 2025) ("CBP Arrest List"). All the arrests were purported violations of the same statute, 18 U.S. Code § 111, which prohibits assaulting, resisting, or impeding federal officers. *See id.*

119.    Analysis of the CBP Arrest List reveals that 20 of the 92 non-immigration arrests made during Operation Midway Blitz were "declined" for prosecution outright, before any charge was brought or any arraignment was held. *See id.* Another 26 arrests apparently resulted in only a violation notice—the lowest possible federal disposition, basically a ticket—again, before any charge was brought or any arraignment held. Many other listed arrests state that an "Investigation [was] Pending"; in other words, no charges, no arraignment, no prosecution. Only 15 of the arrests led to criminal charges, and nearly all of those have been cleared through dismissals or acquittals.

120.    Of the 92 non-immigration arrests made in connection with Operation Midway Blitz, the government has secured *only one* conviction, and it had nothing to do with the protests at Broadview. The individual, who was arrested miles from the site of the Broadview protests, pleaded guilty to a superseding charge of misprision of a felony. As of the date of this filing, the government has not obtained a single criminal conviction from any of the protesters at Broadview.

121.    The protester arrests at Broadview were not legitimate arrests supported by probable cause. They were a means to intimidate people who were exercising their constitutional right to protest their government's immigration policies.

122.    Under the DNA Act and its implementing regulations, the government was required to collect and retain DNA from every one of the 92 people arrested—even though only *one* has resulted in conviction, and the vast majority have already been dismissed, declined, or resulted in a civil violation notice. This lawsuit challenges the constitutionality of the DNA Act and its implementing regulations as applied to each Plaintiff.

**E.      The government's collection and retention of Plaintiffs' DNA violates the Fourth Amendment.**

**i.      Plaintiff Dana Briggs**

123.      Dana Briggs is 71 years old. He lives in Rockford, Illinois. He is a decorated United States Air Force veteran and member of Common Defense, a national organization of veterans and military families. Mr. Briggs has engaged in peaceful protests for decades. Before September 27, 2025, he had never been arrested.

*Mr. Briggs was at Broadview to protest the government's immigration policies.*

124.      On Saturday, September 27, 2025, Mr. Briggs traveled from his home in Rockford to the Chicago area to attend a festival in Chicago. He then decided to go to the Broadview facility to participate in the protest against Operation Midway Blitz.

*DHS arrested Mr. Briggs for refusing to move out of the public street.*

125.      Just before his arrest, Mr. Briggs was standing in the public street outside the Broadview ICE Detention Center. He and other protesters were periodically told to move out of the street when DHS cars or trucks entered or left the facility. Each time, he and other protesters complied and moved out of the way.

126.      At around 5 p.m., a group of about 30 masked, heavily armed federal agents in tactical gear emerged from the facility gate, yelling that protesters in the public street should "move off the roadway" permanently. Seeing that no cars or trucks were waiting to pass though the street, Mr. Briggs refused to move, telling the agents that ICE was "impeding [the country's] progress." At the time, Mr. Briggs was wearing a "Vets against Trump" t-shirt.

57818228.1                                             36



127.    The federal agents advanced toward Mr. Briggs, yelling, "Clear out of the way!" Mr. Briggs again noticed that there were no vehicles waiting to use the street, and asked, "Why?" as he held up his cell phone to record the interaction. In response, a federal agent shoved Mr. Briggs in the chest with his fist and his riot control weapon. Mr. Briggs stumbled back a few steps and fell onto the pavement.









128.    As he fell, about six federal agents kept advancing toward Mr. Briggs with their weapons in a low ready position. One agent yelled, "Get up!" Another protester helped Mr. Briggs up to a sitting position, asking him if he needed an ambulance. When they reached Mr. Briggs, two

agents grabbed his left arm and began to forcibly detain him. Mr. Briggs asked another protester to take his cell phone from his free right hand. As he gave his cell phone to the protester, another federal agent reached for Mr. Briggs's phone with her hand, and Mr. Briggs swatted the agent's hand away lightly with his hand. Mr. Briggs did not intend to hit anyone; it was a reflexive reaction to being swarmed by multiple federal agents with weapons.

129. Two federal agents pushed Mr. Briggs all the way to the ground, forced his arms behind his back, and handcuffed him. As a result, he sustained cuts and bruises on both arms and wrists.

130. Federal agents then took Mr. Briggs to the Broadview Detention Center. Bystanders who moved to help him were pushed away. One of those bystanders said to the agents, "He was just standing there! You're arresting him? He's a veteran!"

***DHS compelled Mr. Briggs to give a DNA sample as part of arrest processing.***

131. Federal agents first took Mr. Briggs to an outdoor area, just past the Broadview facility's fence. He waited there seated on a folding chair for about 30 minutes. During that time, Mr. Briggs overheard federal agents discussing what charges they might bring against him and which agency should process the arrest. HSI agents then asked Mr. Briggs for his name and address, which Mr. Briggs provided. The agents also asked if he had any medical conditions. Mr. Briggs told them that he had a heart condition and would need to take medication that he had left at home.

132. The HSI agents then took Mr. Briggs inside the Broadview Detention Center, to a room toward the back of the building where two other men were detained. About one hour later, HSI agents took Mr. Briggs to Loyola University Medical Center in Chicago for medical treatment.

As they arrived at the Emergency Room front desk, someone yelled, "What the hell, you're arresting vets now?" Federal agents handcuffed him to the hospital bed while he was there.

133. After Mr. Briggs received medical treatment, at about 1:00 a.m., DHS agents transported Mr. Briggs to a DHS facility in Chicago. There, federal agents read Mr. Briggs his *Miranda* rights for the first time; then they took his photograph and his fingerprints.

134. Federal agents also ordered him to provide a DNA sample. They handed him a buccal swab and told him how to use it: Mr. Briggs was instructed to take the cotton swab, rub it against the inside of his cheek, and give the swab back to the agents.

135. Mr. Briggs complied and provided a DNA sample. He did not believe he had a choice. (He was correct; the DNA Act makes it a crime to refuse to provide a DNA sample after arrest.) He believed that if he refused, agents would take his DNA by force. Mr. Briggs had been knocked to the ground by federal agents—twice. He had bruises to show for it. Now, being processed in the middle of the night, he did not want to be manhandled again. No one told him he could refuse. No one told him he had any right to contest the collection. Mr. Briggs submitted the swab. The federal agent took it and placed it in an envelope.

136. Upon information and belief, pursuant to DHS, ICE, and CBP policies, federal agents submitted Mr. Briggs's DNA sample to the FBI. Pursuant to FBI policies, within approximately 120 days after receipt of Mr. Briggs's DNA sample, the FBI extracted the complete genetic content of Mr. Briggs's DNA sample, generated a DNA profile consisting of 20 STR loci based on the DNA sample, entered that DNA profile into CODIS, and uploaded it to the NDIS system, where it is now stored indefinitely and remains searchable by federal, state, and local law enforcement agencies across the country. His DNA sample will be held permanently by the FBI.

137.     Mr. Briggs was shoved to the ground multiple times, handcuffed to a hospital bed, and forced to give a DNA sample—all because he was peacefully exercising his First Amendment right to protest against what Mr. Briggs believed to be DHS's unjust practices. After all that, Mr. Briggs was taken to the Metropolitan Correctional Center in Chicago at around 4:30 a.m. He spent the rest of the weekend in federal prison without medication for his heart condition.

***The court dismissed charges against Mr. Briggs, but the government kept his DNA.***

138.     On Monday, September 29, 2025, the government issued a press release reporting that Mr. Briggs and four other individuals had been charged with "assaulting or forcibly resisting federal agents who were engaged in immigration enforcement operations in Broadview, Ill. over the weekend." DOJ Press Release, *Five Individuals Charged in Federal Court in Chicago with Assaulting or Resisting Federal Agents Engaged in Immigration Enforcement Operations* (Sep. 29, 2025). More specifically, Mr. Briggs was charged by complaint with "felony assault of a federal officer" by "allegedly ma[king] physical contact with an agent's arm." *Id.* That morning, Mr. Briggs was brought before Magistrate Judge Gabriel A. Fuentes and released on a $10,000 unsecured bond. His travel was restricted to the Northern District of Illinois. *See* Order, *United States v. Briggs*, No. 1:25-cr-00610, Dkt. 6 (N.D. Ill. Sept. 29, 2025).

139.     The government's prosecutions unraveled almost immediately. All five cases were dismissed before trial. *See United States v. Briggs*, 810 F. Supp. 3d 994, 997 (N.D. Ill. 2025). As to two of the cases, a federal grand jury refused to indict, returning a "no bill" on October 7, 2025. *Id.* at 998. As Judge Fuentes later remarked, grand jury no-bills were "virtually unheard of" in the Northern District of Illinois before Operation Midway Blitz. *Id.* at 999. These appear to be the only two cases (of the five) that the government presented to a grand jury. *See id.* at 998. The government dismissed those two complaints. *See id.* Also on October 7, the government dismissed

a third complaint "upon its disclosure that after the arrest, the government reviewed additional body-worn camera footage of the encounter and then decided to drop the charges." *See id.* A fourth complaint was dismissed on October 9, 2025, on grounds "that had to do with [the defendant's] medical or mental condition." *Id.*

140.    Rather than dismiss Mr. Briggs's case, on October 7, 2025—the same day the grand juries returned "no bills" against two other protesters—the government reduced Mr. Briggs's charge to a misdemeanor (which does not require presentment to a grand jury). *See* Information, *United States v. Briggs*, No. 1:25-cr-00610, Dkt. 9 (N.D. Ill. Oct. 7, 2025). Meanwhile, in a different case, the government submitted declarations relying on the five Broadview arrests as evidence of a need for additional law enforcement presence at the Broadview facility. That court found that the government's declarations describing the five Broadview arrests were not reliable: "In addition to demonstrating a potential lack of candor by these affiants, it also calls into question their ability to accurately assess the facts." *Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *3, *5 (N.D. Ill. Oct. 10, 2025).

141.    A few weeks before Mr. Briggs's case was scheduled for trial, the government moved for dismissal of the case, stating that "after a careful review of the matter" it "concluded that dismissal is a fair result." Minute Entry, *United States v. Briggs*, No. 1:25-cr-00610, Dkt. 41 (N.D. Ill. Nov. 20, 2025).

142.    Judge Fuentes did not simply grant the motion. In a nine-page opinion, Judge Fuentes dismissed the case with prejudice, relying in part on video footage produced by the government but restricted from public disclosure. In its order dismissing the case, the Court lifted that restriction, noting that "[v]iewers of the available videos may reach their own conclusions about it and about this prosecution." *Briggs*, 810 F. Supp. 3d at 999.

143.    In closing, Judge Fuentes remarked on "just how unusual and possibly unprecedented" it was for the federal government to "charge so hastily that it either could not obtain the indictment in the grand jury or was forced to dismiss upon a conclusion that the case is not provable, in repeated cases of a similar nature." *Id.* at 1000. With respect to Mr. Briggs's case specifically, Judge Fuentes pointed out that the government "sought to strike hard blows" and "swung and missed—multiple times." *Id.*

144.    The case is dismissed. Dana Briggs walks free. Yet, his DNA profile remains in the federal CODIS database, and the sample with his entire genome remains in an FBI lab. The government collected his DNA in the middle of the night, for a case in which, in a federal judge's words, the government "swung and missed—multiple times." Nevertheless, the government intends to retain Mr. Briggs's DNA indefinitely.

145.    For decades before September 27, 2025, Mr. Briggs exercised his First Amendment rights on behalf of communities he believed were being treated unfairly. That had never resulted in his arrest. Although he very much wants to continue protesting, the experience of being knocked to the ground, arrested, and having his DNA taken—all for standing in the middle of a public street to protest the government's immigration policies—has made that harder. He is particularly troubled by the loss of control over his own biology. He believes the government should not have his entire genetic code, and he worries about how it will be used. Mr. Briggs is also acutely aware that the government now has genetic information about his family members, simply because of his arrest at a protest. As a result, Mr. Briggs is now more cautious about deciding whether and how to participate in different types of protests. If DHS agents are likely to be present, he is less likely to go. When he does go, he takes steps to avoid drawing attention to himself. Mr. Briggs now makes sure he knows someone at any protest he attends, writes down phone numbers of people he can

57818228.1                                      43

call if anything happens to him, and brings extra medication. After his arrest, Mr. Briggs now is also more careful about how he communicates with others. If he needs to talk about protest activity, he tries to do so only over secure messaging services or in person.

### ii.    Plaintiff Ian Sampson

146.    Ian Sampson is 27 years old and lives in Chicago, Illinois. He currently works in accounting at a financial services firm, but he has plans to pursue a graduate degree at the University of Illinois at Chicago. He is also an amateur photographer. Before September 27, 2025, Mr. Sampson had never been arrested.

***Mr. Sampson was at Broadview to document the protests.***

147.    By the evening of September 27, 2025, the protests outside the Broadview facility had become one of the most closely watched confrontations between citizens and federal agents in the Chicago area. Mr. Sampson brought his camera to the Broadview ICE Detention Center that day because he wanted to document what was happening in his community.

***DHS violently arrested Mr. Sampson without justification.***

148.    Mr. Sampson arrived at around 7:30 p.m. He walked along the public street toward the large fence in front of the facility to photograph what was happening. He could see a large number of officers on the other side of the fence. Shortly after he arrived, the fence opened and the officers started coming out.

149.    Federal agents said something in the direction of the crowd over a megaphone. However, Mr. Sampson could not make out what was being said. Multiple protesters present that evening also reported the same thing—that the agents' commands were "unintelligible." At one point, Mr. Sampson felt a federal agent pushing him. Although he heard agents yelling, he still could not understand what they were saying. Mr. Sampson interpreted the agents' aggressive

57818228.1                                        44

movements and pushing to mean that they wanted him to move off the public street and onto the grass. Mr. Sampson was trying to move in that direction when a federal agent pushed him. Mr. Sampson turned around and tried to get out of the way.

150.     Then, without warning, a federal agent grabbed him violently by his backpack and yanked him to the ground.



151.     Within seconds, the agent dragged Mr. Sampson along the ground for several feet, before flipping him onto his stomach and pressing his face to the ground. His arm was pinned under his torso. The agent put his knee on Mr. Sampson's back. At one point, the agent's knee moved to the back of Mr. Sampson's head. His face was smashed into the ground. The impact chipped one of his teeth. His head was bruised. Mr. Sampson could not breathe. When the agent eventually took his knee off Mr. Sampson and he could finally breathe, most of what he inhaled was tear gas. Throughout all of this, DHS agents were deploying tear gas all around.

***DHS compelled Mr. Sampson to give a DNA sample as part of arrest processing.***

152.     After arresting him, DHS agents took Mr. Sampson inside the Broadview facility. As he entered the facility, federal agents directed Mr. Sampson to give them his belongings, noting that they would hold them for the duration of his detention. At that point, Mr. Sampson realized

that his cell phone, which he had previously placed in his pocket, was missing. He informed the federal agents that his cell phone was missing, either lost when he was tackled or taken by the agents who arrested him. He demanded that it be returned to him, but the agents told him they did not have the cell phone.

153.    Mr. Sampson was led into a large room inside the facility and directed to sit on a bench. His hands were still restrained with zip ties. Mr. Sampson noticed agents from different federal agencies, including ICE, HSI, CBP, FBI, and DEA. A federal agent (Mr. Sampson could not tell what agency he was from) advised Mr. Sampson of his *Miranda* rights and asked for his name and address. When Mr. Sampson refused to provide the information, the agent said he would get it from his driver's license. Then, the agent took a photograph of him. After cutting his zip ties, the agent took Mr. Sampson's fingerprints. The agent then took Mr. Sampson to a locked room, where he waited along with approximately four other arrested individuals.

154.    After several hours had passed, a federal agent opened the locked room and called Mr. Sampson out. He handed Mr. Sampson a buccal swab and told him: "Here—do the cheek swab." The agent told him to take the cotton swab, rub it against the inside of his cheek, and give the swab back to the agents. Mr. Sampson believed he was being ordered to give a DNA sample; he did not believe he had a choice. (He was correct; under the DNA Act, Mr. Sampson would be guilty of a crime if he refused to provide his DNA.) Mr. Sampson complied, hoping to avoid further abuse. He gave the swab back to the agent and was returned to the locked room where they were holding the other men who had been arrested that day.

155.    Upon information and belief, pursuant to DHS, ICE, and CBP policies, federal agents submitted Mr. Sampson's DNA sample to the FBI. Pursuant to FBI policies, within approximately 120 days after receipt of Mr. Sampson's DNA sample, the FBI extracted the

complete genetic content of Mr. Sampson's DNA sample, generated a DNA profile consisting of 20 STR loci based on the DNA sample, entered that DNA profile into CODIS, and uploaded it to the NDIS system, where it is now stored indefinitely and remains searchable by federal, state, and local law enforcement agencies across the country. His DNA sample will be held permanently by the FBI.

156. Mr. Sampson was later returned to the locked room, where he was held for several more hours. He was released around 1:30 a.m. His cell phone was never recovered, despite multiple requests that DHS locate and return it.

***The government declined to bring charges against Mr. Sampson but kept his DNA.***

157. The government did not charge Mr. Sampson. It did not issue him a citation. The CBP List of Arrests states that Mr. Sampson was arrested for purportedly impeding or assaulting federal officers (18 U.S.C. § 111), but that charges were "Declined."

158. The HSI report summarizing the September 27 arrests lists Mr. Sampson among the approximately twelve individuals arrested by U.S. Border Patrol and charged by Homeland Security Investigations. But no charge was ever filed against Mr. Sampson.

159. Ian Sampson was grabbed from behind while walking away from federal agents, had a knee pressed into the back of his head and back, and was held for five hours in a federal detention facility—all for attending a protest to take photographs. He had done nothing to justify the arrest. Not surprisingly, the government never charged him with anything.

160. But his DNA profile is in the federal CODIS database. And his entire genome, contained in the buccal swab, is in an FBI lab. The government collected his DNA without his consent, without any charge, and without any legal basis. The government intends to retain it indefinitely.

57818228.1

47

161. Mr. Sampson went to Broadview to participate in peaceful protests of DHS's policies and to document those protests. He intends to keep doing so. But the experience of his arrest—federal agents grabbing him from behind while he walked away, pressing a knee into the back of his head, and taking his DNA without ever filing a charge—has chilled that intent. Recently, he woke up in the middle of the night remembering what it felt like to be unable to breathe under an agent's knee, only to inhale tear gas when the agent finally lifted his knee. What troubles him most is that the government now has his DNA. He considers this a profound violation of his privacy—not only his own, but his family's. His parents and sisters have done nothing, yet their genetic information now sits in a government laboratory. The possibilities of what the government might do with that information preoccupy him. Because of this, Mr. Sampson is now more careful about which protests he attends and deliberately stays back to avoid any potential contact with law enforcement. He has significantly increased his use of secure messaging to communicate about any planned protests. And since the arrest, Mr. Sampson takes care to turn off his cell phone or put it in lockdown mode whenever he might be near law enforcement, especially in airports.

### iii. Plaintiff Grace Cooper

162. Grace Cooper is 30 years old. She was born and raised in Chicago. She studied American Studies and Dance at Tufts University. She is the Lead Organizer at Austin Coming Together, an organization in Chicago's Austin neighborhood that coordinates a network of more than 50 nonprofit, faith-based, public, and private entities working to improve quality of life in that community. Ms. Cooper is also an amateur photographer.

***Ms. Cooper was at Broadview to protest DHS's immigration policies.***

163.     Ms. Cooper went to the Broadview ICE Detention Center on the morning of Friday, October 3, 2025. Ms. Cooper had never been to the Broadview facility before. She had heard that there were weekly Friday demonstrations that had been gathering outside the facility since Operation Midway Blitz began. Ms. Cooper went to publicly express her disagreement with DHS's immigration enforcement practices. And she took her camera to document the protests and DHS's response.

164.     Many agents from DHS were present at the Broadview facility that day. Then-DHS Secretary Kristi Noem was present as well, along with then-Chief Border Patrol Agent Gregory Bovino. (Both have since been removed from those positions.) Ms. Cooper felt that DHS was making the protests—and DHS's response to it—into a spectacle for the media. She noticed masked agents in armored vehicles. She also noticed several photographers and videographers wearing yellow vests identifying them as "DHS PAO" (DHS Public Affairs Office), who were taking pictures and video of the DHS agents and the protesters.

165.     In fact, early that morning, Secretary Noem recorded a video with a social media influencer that was publicly posted, telling him, "You look at these protesters out here, they don't care about America, they don't care about freedom, they don't care about what this country is and how special it is. Well, we're going to remind them today." In a different video recorded that same day by the same social media influencer and posted online, then-Secretary Noem can be heard speaking to DHS agents about the crowd of protesters outside the Broadview facility, telling them that they should "make sure that these individuals aren't allowed to conduct this kind of activity anymore. Sound like a plan?"

***DHS arrested Ms. Cooper but could not explain why.***

166. When she arrived at Broadview at around 8:15 a.m., Ms. Cooper observed that the protest itself was calm. People were gathered on either side of the facility's driveway; cars were able to go in and out.

167. About half an hour later, Ms. Cooper stood with a crowd of protesters tightly packed into what she understood to be the designated free speech zone—the area that state and local authorities had established the day before specifically for protesters to exercise their First Amendment rights.

168. Ms. Cooper noticed a group of about 35 DHS agents with military-style gear, face masks, and weapons coming toward the crowd of protesters. She took photographs and video recordings of the agents as they approached.





169.    When they reached the protesters, Mr. Bovino yelled, "One warning, one warning only. Move down the block, to the right, or you're going to be arrested!" A protester objected: "This is the zone we're allowed to protest in!" But Mr. Bovino insisted: "Nope. Down the block!" Two seconds later, before the protesters had time to move, Mr. Bovino turned to the DHS agents (and the DHS public affairs photographers) and ordered: "Get 'em!"—pointing to the protesters with his thumb.

57818228.1                                   51



170.     Turning back toward the protesters, Mr. Bovino added: "You're under arrest."

171.     A total of ten seconds elapsed between Mr. Bovino's "one warning only" and his order to "Get 'em!"

172.     Ms. Cooper immediately turned to leave; she did not want to be arrested. But it was very difficult to move in the crowd. Suddenly, a federal agent grabbed Ms. Cooper from behind, slammed her to the ground, and arrested her. Her camera was damaged. She was left with bruises on her chest and arms. Ms. Cooper remembers it as the most terrifying 90 seconds of her life.

173.     Ms. Cooper began to scream and cry as she was being arrested and taken into custody. She had done nothing wrong, so she did not understand what was happening. She

repeatedly asked the federal agent why she was being arrested and where he was taking her, but she received no response.

174.    A DHS agent took Ms. Cooper inside the Broadview facility grounds past the facility fence, to a holding area outside the building. She was one of the first people arrested that morning. Agents continued to bring other protesters from the demonstration to the same area.



175.    Earlier that day, Mr. Bovino had previewed the arrests of protesters gathered in the free speech zone. Speaking to a group of DHS agents about the crowd of protesters gathered in the designated free speech zones, Mr. Bovino told the agents they would "roll them all the way out of here. And when they resist, what happens?" Mr. Bovino answered his own question: "They get arrested. So it's now going to be a free arrest zone."

***DHS compelled Ms. Cooper to give a DNA sample as part of arrest processing.***

176.    Inside the Broadview facility, Ms. Cooper noticed FBI agents, along with ICE, HSI, and CBP agents. Ms. Cooper noticed the federal agents had brought DHS public affairs photographers inside the Broadview facility to take pictures of the people who had been arrested.

177. Men and women were separated. Ms. Cooper was placed in a room with other women who were arrested that day.

178. As federal agents brought others who had been arrested that day, Ms. Cooper kept asking why she had been arrested. The agents did not respond. Finally, an agent said to Ms. Cooper, "I don't know why you were arrested. Why don't you tell me?" In response, Ms. Cooper said that she was grabbed from behind when she was arrested, and she did not know why.

179. Later, Ms. Cooper overheard the agent who had arrested her discussing Ms. Cooper's arrest with another federal agent. They were reviewing video footage from that day apparently trying to figure out the basis for her arrest. The arresting agent said that Ms. Cooper may have been arrested because she had failed to follow orders, but he did not seem to know.

180. As the day went on, agents called each person in the room for processing. When it was Ms. Cooper's turn, an agent took her to a large room with at least 20 federal agents sitting at desks with computers or standing around doing other things. A federal agent asked Ms. Cooper how she heard about the protest, where she came from, and who "paid her" to attend. Ms. Cooper did not answer those questions, but she did provide her name. The agent took a photograph of her and took her fingerprints. Then, the agent told her to provide a DNA swab.

181. Ms. Cooper refused, telling the agent that she did not want to provide her DNA. But the agent told her: "You have to do it. It's just what happens when you're processed." Ms. Cooper again refused, saying she did not want to provide a sample of her DNA and asking whether she was required to provide it. The agent insisted, giving her the cotton swab and telling her she had to provide DNA. Ms. Cooper believed the agent and complied with his instructions.

182. Upon information and belief, pursuant to DHS, ICE, and CBP policies, federal agents submitted Ms. Cooper's DNA sample to the FBI. Pursuant to FBI policies, within

approximately 120 days after receipt of Mr. Cooper's DNA sample, the FBI extracted the complete genetic content of Ms. Cooper's DNA sample, generated a DNA profile consisting of 20 STR loci based on the DNA sample, entered that DNA profile into CODIS, and uploaded it to the NDIS system, where it is now stored indefinitely and remains searchable by federal, state, and local law enforcement agencies across the country. Her DNA sample will be held permanently by the FBI.

183. After processing, agents took Ms. Cooper out of the building without explanation. She asked where she was going. No one answered. They told her to "just get in the car." Agents dropped her off at a nearby gas station. They refused to give her any information about what she had been arrested for or the status of any case against her.

***The government declined to bring charges against Ms. Cooper but kept her DNA.***

184. The government did not charge Ms. Cooper. According to an HSI Incident Report dated October 8, 2025, the "United States Attorney's Office [for the] Northern District of Illinois declined to prosecute" Ms. Cooper, and she was "released from custody on 10/3/2025."

185. Grace Cooper was grabbed from a designated free speech zone while standing peacefully among other protesters, told by a federal agent that her DNA collection was mandatory, and then dropped off at a gas station without explanation, and her entire genome, contained on the buccal swab, is in an FBI laboratory. The government never charged her. But her DNA profile is in the federal CODIS database. The government collected it over her express objection. It will retain her DNA indefinitely.

186. Before October 3, 2025, Ms. Cooper had attended many protests. She briefly attended one protest since. But what happened on October 3 was traumatic: violently arrested without explanation while standing in a designated free speech zone, her DNA taken before the government even decided whether to charge her. It has directly and concretely affected her

wellbeing and her willingness to speak freely. Ms. Cooper's most immediate fear is what the government will do with her DNA. She worries the government will use her DNA to place her on a "domestic terrorist watchlist" and track her movements—at airports, during traffic stops, and in ways she cannot anticipate or contest. Ms. Cooper is a law-abiding citizen who did nothing more than exercise a constitutional right. She should not have been arrested for it. Now she fears her DNA will become a mechanism for the government to keep punishing her long after the fact. That fear has changed what she does. Ms. Cooper will not attend any further protests at ICE facilities, including Broadview, because she is afraid DHS will arrest her again. She uses secure messaging services when she communicates about her experience being arrested at Broadview. And given that she was arrested immediately after she took photographs and videos of DHS agents as they approached her, she now avoids being seen recording or photographing law enforcement.

### iv.    Plaintiff Jacqueline Guataquira

187.    Jacqueline Guataquira is 30 years old. She lives in Des Plaines, Illinois. She holds a Master of Arts in Art Education from the School of the Art Institute of Chicago. She has worked as an educator, community organizer, and graphic designer. She is a longtime immigrants' rights advocate.

***Ms. Guataquira was at Broadview to protest conditions at ICE's detention facility.***

188.    Ms. Guataquira went to the Broadview ICE Detention Center at around 7:00 a.m. on the morning of Friday, October 3, 2025—the same day then-DHS Secretary Kristi Noem and then-Chief Border Patrol Agent Gregory Bovino visited the facility. The weekly Friday demonstrations outside Broadview had become a gathering place for community members, neighbors, and advocates protesting Operation Midway Blitz. Ms. Guataquira was there to protest the mass arrests of immigrants throughout the Chicago area.

***DHS arrested Ms. Guataquira for knocking a phone out of a public affairs officer's hand.***

189.     At approximately 9:15 a.m., a line of DHS officers from multiple agencies—including CBP, Border Patrol, and ICE—advanced into a crowd of protesters gathered in the designated free speech zone outside the Broadview facility. According to DHS records, an individual identified as an ICE "Public Affairs Officer" was at the Broadview facility that morning "to document a site visit by DHS Secretary Kristi Noem."

190.     Ms. Guataquira was standing with the crowd in the designated free speech zone as the line of DHS officers moved toward her. According to DHS records, the public affairs officer "moved into the crowd" in the free speech zone along with the DHS officers, "filming the scene with an iPhone." As he approached her, Ms. Guataquira swatted the iPhone away, knocking it out of the public affairs officer's hand.

191.     The public affairs officer told Mr. Bovino that "the girl in the white shirt smacked my phone out, hit me." Mr. Bovino responded, "Oh, she did?" Mr. Bovino then gathered several DHS agents and pointed Ms. Guataquira out as she was standing in the crowd with her arms crossed.



192.    Mr. Bovino said, "See the girl in the white? Get me a couple of guys, we're gonna get her." The public affairs officer confirmed that the person they were looking to "get" was "the little girl next to the camera." Then, another agent in tactical gear yelled, "Get her!" At which point, DHS officers forced Ms. Guataquira to the ground, placed her in restraints, and took her into custody.



*DHS compelled Ms. Guataquira to provide a DNA sample as part of arrest processing.*

193.    After arresting her, federal agents first took Ms. Guataquira to an area just inside the Broadview facility fence (but outside the Broadview building). There, they lined Ms. Guataquira up with other people arrested that morning. Federal agents asked for Ms. Guataquira's name, and she gave it to them. Federal agents also asked Ms. Guataquira (and other protesters who had been arrested) how they heard about the protest, where they were coming from, and who paid them to attend. Ms. Guataquira did not answer those questions.

194.    Eventually, Ms. Guataquira was brought inside the Broadview ICE Detention Center, where she was held for approximately eight hours. Ms. Guataquira was led to a locked room for female detainees. She noticed agents coming in and out of the room. One agent explained

that, while they waited, the agents were looking through video footage and speaking to arresting agents to determine what happened and who would be charged.

195. At one point, Ms. Guataquira was taken to a large room for processing. Federal agents asked for her name and address, which Ms. Guataquira provided. A federal agent then took a photograph of her and took her fingerprints.

196. Next, a federal agent directed Ms. Guataquira to provide a DNA sample using a buccal swab. The agent instructed her to rub the cotton swab against the inside of her cheek and return it. Ms. Guataquira was not told she had any right to refuse. She was not told what the swab would be used for, where her DNA would go, or how long it would be retained. Believing she was required to provide her DNA (which she was), Ms. Guataquira complied.

197. Upon information and belief, pursuant to DHS, ICE, and CBP policies, federal agents submitted Ms. Guataquira's DNA sample to the FBI. Pursuant to FBI policies, within approximately 120 days after receipt of Ms. Guataquira's DNA sample, the FBI extracted the complete genetic content of Ms. Guataquira's DNA sample, generated a DNA profile consisting of 20 STR loci based on the DNA sample, entered that DNA profile into CODIS, and uploaded it to the NDIS system, where it is now stored indefinitely and remains searchable by federal, state, and local law enforcement agencies across the country. Her DNA sample will be held permanently by the FBI.

***The government dismissed charges against Ms. Guataquira but kept her DNA.***

198. Ms. Guataquira was released from DHS custody after roughly eight hours of detention.

199. On October 8, 2025, the government charged Ms. Guataquira by misdemeanor information on October 8, 2025 with one count of forcibly impeding a federal employee in the

57818228.1

59

performance of official duties, in violation of 18 U.S.C. § 111(a). The case was assigned to Magistrate Judge Heather K. McShain in the Northern District of Illinois. The designation sheet filed by the government classified the offense as a misdemeanor.

200. On October 8, 2025—the same day the misdemeanor charge was filed—CBP revoked Ms. Guataquira's Global Entry membership, citing that she no longer met "program eligibility requirements."

201. As part of her conditions of release, Ms. Guataquira was required to provide yet another DNA sample. In December 2025, Ms. Guataquira went to the federal courthouse in Chicago, where the U.S. Marshals compelled a second DNA sample. Again, Ms. Guataquira did not believe she had a choice.

202. Four months later, the government moved to voluntarily dismiss the case without prejudice. On February 18, 2026, the charges were dropped.

203. The government has dismissed the sole misdemeanor charge against Ms. Guataquira—which was only brought because she knocked a phone out of the hand of a public affairs officer taking video of her for DHS. Yet the government collected her DNA as part of an arrest that the government itself eventually declined to pursue. Ms. Guataquira's DNA profile is in the federal CODIS database. Her entire genome, contained on the compelled buccal swab, is in an FBI laboratory. The government intends to retain that DNA indefinitely.

204. Ms. Guataquira has spent years advocating for immigrant communities and participating in protests against policies she believes are unjust. She wants to keep participating in protests. But being arrested for swatting away a phone and having her DNA taken has deterred her from freely expressing her political views. Her deepest concern is what this means for her family's safety. Although she was born in the United States, her parents are foreign-born citizens. She

worries that the government may someday target them because of her protest activity—and use her DNA to identify them. She does not know how her genetic information might be used against her or the people she loves, and that uncertainty itself is its own source of distress. In light of this, Ms. Guataquira has changed her behavior in concrete ways. Since her arrest, she has deleted posts and photographs from social media sites out of fear that the government is monitoring her and may retaliate further. She is also far more careful about posting on social media since her arrest. She now communicates about her political views almost exclusively through secure messaging services. And when she cannot, she waits to speak in person—which sometimes means going weeks without meaningful conversations with friends and family.

**F.      The government's compulsory DNA collection from Plaintiffs falls outside the narrow limitations *Maryland v. King* approved, and the government's own conduct reveals that surveillance—not identification—is its actual purpose.**

205.    The Supreme Court has upheld compulsory DNA collection from arrestees under the Fourth Amendment only once, and only in narrow circumstances. In *Maryland v. King*, the Court held that collecting a buccal swab from a person arrested on probable cause for a serious offense was a "legitimate police booking procedure," and therefore a reasonable search under the Fourth Amendment. 569 U.S. at 465–66. The *King* majority identified the government interests justifying the search as the interest in accurately identifying who has been arrested, the interest in ensuring that a new detainee does not create safety risks for prison staff or the existing detainee population, the interest in ensuring that persons accused of serious crimes remain available for trial, and the interest in accurately assessing the danger the detainee poses to the public when deciding whether they should be released on bail. *Id.* at 450–53.

206.    The Supreme Court balanced the government's identification interests against the individual's legitimate expectations of privacy, which it found to be diminished for two reasons:

First, an individual who "has been arrested on probable cause for a dangerous offense that may require detention before trial" has a reduced expectation of privacy—and the Maryland statute prohibited DNA processing or databanking until after "a judicial officer ensures that there is probable cause to detain the arrestee on a qualifying serious offense." *Id.* at 443, 463. Second, the processing of the DNA samples did not intrude significantly on the individual's privacy interest because the 13 loci included in CODIS at the time were "not at present revealing information beyond identification"—and the Maryland statute prohibited the DNA testing for non-identification purposes, including testing for familial matches. *Id.* at 444, 464.

207. Thus, *King* was built on five necessary conditions: (i) a valid arrest supported by probable cause; (ii) a serious offense; (iii) pre-database judicial review at arraignment confirming that probable cause existed; (iv) a government interest in identification; and (v) diminished privacy concerns due to technical limitations and statutory protections. Plaintiffs' arrests satisfy none of these conditions. The analysis that follows addresses each condition in turn and then addresses what the government's actual interest in collecting Plaintiffs' DNA appears to be.

        i. **The arrests lacked probable cause—the threshold predicate for any DNA collection under *King*.**

208. The *King* holding rests on a necessary predicate that is entirely absent here: a "valid arrest" supported by "probable cause." 569 U.S. at 465. The Court was explicit. The constitutionality of DNA collection was premised, in significant part, on the lawfulness of the underlying detention. *Id.*

209. The arrests of Plaintiffs—and the vast majority of the other 88 Operation Midway Blitz-related arrests—were not supported by probable cause. That conclusion has been reached by federal prosecutors, grand jurors, and a federal judge.

210.    *The absence of successful prosecutions.* As of the date of this filing, the government has only obtained a single criminal conviction from the 92 non-immigration arrests CBP made in connection with Operation Midway Blitz. (As noted above, that arrest was not related to the protests at the Broadview facility.) Analysis of the CBP Arrest List reveals that, of those 92 arrests, 20 were declined for prosecution before any charge was brought. Another 26 resulted in nothing more than a violation notice before arraignment. Only 15 led to criminal charges, and nearly all of those have been cleared through dismissals or acquittals. As of the date of this filing, the government has secured only one conviction—not related to protesters' speech—though a guilty plea. A 1% conviction rate across 92 arrests, all purportedly for the same offense, is not a series of close calls. It is evidence that the underlying arrests lacked the legal predicate that *King* requires.

211.    *Judicial findings.* In dismissing Plaintiff Briggs's case with prejudice, U.S. Magistrate Judge Fuentes made findings that bear directly on probable cause across the Operation Midway Blitz arrests. He noted "just how unusual and possibly unprecedented" it is for the federal government to "charge so hastily that it either could not obtain the indictment in the grand jury or was forced to dismiss upon a conclusion that the case is not provable, in repeated cases of a similar nature." *Briggs*, 810 F. Supp. 3d at 1000. In a separate proceeding in which the government submitted sworn agent declarations describing the Broadview arrests to justify continued law enforcement presence, United States District Judge Perry found that those declarations were "not reliable"—a finding that calls into question the agents' capacity to accurately assess probable cause in the first instance. *See Illinois v. Trump*, 2025 WL 2886645, at *3, *5.

212.    *The Plaintiff-specific record.* The absence of probable cause is confirmed by the facts of each individual arrest. Plaintiff Briggs was shoved to the ground by agents after asking why protesters needed to clear the public street, knocked down a second time when agents

57818228.1                                    63

swarmed him as he was being helped up by bystanders, and arrested for allegedly making contact with an agent's arm as he instinctively reacted while being seized by multiple officers simultaneously. Judge Fuentes later described this as a prosecution where the government "sought to strike hard blows" and "swung and missed—multiple times." *Briggs*, 810 F. Supp. 3d at 1000. Plaintiff Sampson was walking away from agents when he was grabbed from behind and thrown to the ground, had a knee pressed into the back of his head, and was held for five hours—without charges ever being filed. Plaintiff Cooper was standing in a court-designated free speech zone when agents grabbed her; when she asked why she had been arrested, the arresting agent could not say. Plaintiff Guataquira was arrested because she knocked a phone out of the hand of a public affairs officer—a reflexive response that the government ultimately acknowledged did not sustain the charged offense.

        ii.      **None of the offenses for which Plaintiffs were arrested qualify as a "serious offense" under *King*.**

213.    Even assuming, contrary to the facts, that any Plaintiff's arrest was supported by probable cause, the DNA collection would still fail the *King* test because no Plaintiff was arrested for a "serious offense." The more serious the offense, the greater the government's interest in knowing whether the detainee has a dangerous criminal history, outstanding warrants, or connections to other serious crimes. A person arrested for threatening people with a shotgun—as was the case in *King*—presents a different institutional risk profile and has a diminished expectation of privacy than someone charged with impeding a federal officer by, for example, knocking an iPhone out of a public affairs officer's hand. The "serious offense" limitation ensures that the privacy intrusion is commensurate with the government's interest. It is not satisfied by minor offenses.

214. Plaintiffs Sampson and Cooper were not charged at all. Mr. Briggs was charged under 18 U.S.C. § 111(a), for failing to move out of a public street and swatting away an officer's hand as he was being held down. Ms. Guataquira was also charged under 18 U.S.C. § 111(a), for knocking a phone out of a public relations official's hand.

215. Such charges stand in stark contrast to the offenses recognized as "serious" in the *King* context. The Maryland statute at issue in *King* authorized DNA collection only for murder, rape, kidnapping, arson, sexual assault, and comparable violent felonies. 569 U.S. at 443. As set forth above, the overwhelming majority of state DNA collection statutes in place at the time of *King* limited collection to specific violent felonies—murder, rape, kidnapping, arson, armed carjacking, home invasion—that bear no resemblance to a charge for resisting or impeding a federal officer. Indeed, charges for similar or worse crimes, such as resisting arrest, disorderly conduct, or vandalism, were excluded from the lists of crimes qualifying as "serious offenses" that authorized DNA collection under state statutes.

> iii. **The government collected DNA from every Plaintiff before any judicial review of probable cause—a safeguard the *King* court specifically endorsed as essential.**

216. The Supreme Court's constitutional approval of DNA collection from arrestees in *King* depended also on the structural features of the Maryland statute that constrained the collection authority. Among those features, the Court specifically cited Maryland's requirement that DNA not be analyzed or placed in a database until after arraignment on an information or indictment. 569 U.S. at 463–64. The Court explained the rationale: arraignment is the proceeding at which "a judicial officer ensures that there is probable cause to detain the arrestee on a qualifying serious offense." *Id.* at 463. The pre-databanking arraignment requirement was a constitutional safety valve—a neutral check that prevented booking-time DNA collection from becoming a

mechanism for permanently banking the genetic material of people the government had no lawful basis to hold.

217. The federal DNA Act contains no equivalent safeguard. *See* 34 U.S.C. § 40702. The statute authorizes collection from individuals "who are arrested" without conditioning analysis or database entry on any subsequent judicial finding.

218. Under DHS policies for DNA collection from criminal arrestees, samples are automatically collected as part of standard post-arrest processing and submitted to the FBI by prepaid mail without any intervening judicial review. DNA samples are submitted regardless of whether charges are ever filed, regardless of what a prosecutor subsequently concludes about the arrest, and regardless of whether any neutral judicial officer ever confirms that probable cause existed.

219. Here, every Plaintiff was compelled to provide DNA within hours of being arrested—which set in motion the automatic process of databanking that DNA before any judicial officer reviewed the legality of their arrest. Plaintiff Briggs was arrested on the evening of September 27, 2025, transported to the Metropolitan Correctional Center, and ordered to provide a DNA swab in the early morning hours of September 28, 2025, before being brought before a magistrate judge on September 29, 2025. Under DHS's policy, Mr. Briggs's DNA was collected and placed in a prepaid envelope for mailing to the FBI before any judge had reviewed the arrest. Plaintiff Guataquira was arrested on the morning of October 3, 2025, processed and swabbed the same day, and released that evening—five days before the government filed charges on October 8, 2025, and weeks before any arraignment proceeding. Pursuant to DHS policy, her DNA was collected and submitted to the FBI before charges were even filed. As to Plaintiffs Sampson and Cooper, there was no arraignment at all—not before DNA collection, and not after—because no

charges were ever filed. For these two Plaintiffs, the DNA profiles now in CODIS were deposited there based solely on a DHS arresting officer's on-the-spot assessment—an assessment that a federal prosecutor subsequently declined to adopt and that no judicial officer ever confirmed.

220.    This is not a procedural technicality. The timing requirement the *King* Court approved was designed to guard against the exact scenario presented here: the government using the mere existence of an arrest—one that could well be unjustified—as the basis for permanently collecting and retaining genetic material. The danger of disregarding the Supreme Court's probable cause requirement in *King* is compounded by mass law enforcement actions, like Operation Midway Blitz. If the government is allowed to proceed as it has against Plaintiffs, it could create a genetic database of innumerable, lawful protesters by improperly arresting, briefly holding, buccal swabbing, and releasing them.

          iv.     **The government's DNA sample processing occurred outside any custody period during which it could have served the identification purpose *King* approved.**

221.    The *King* rationale further presupposes that DNA sample analysis will occur as part of a "booking procedure" to identify the arrestee at the time of detention. 569 U.S. at 450–51. However, DHS's compelled collection of Plaintiffs' DNA could not have served that identification purpose at all.

222.    Under DHS policies, all DNA samples collected by ICE from criminal arrestees are submitted to the FBI Federal DNA Database Unit using prepaid return envelopes via U.S. mail. The FBI then extracts the genetic profile from the sample, visualizes 20 specific genetic markers, and uploads the resulting profile to NDIS/CODIS. Critically, per the Directive itself: "The FBI does not provide notice to ERO concerning the receipt or processing of the sample." The FBI's Federal DNA Database Unit's published procedures state that samples are checked in

57818228.1

approximately 120 days after receipt, and submitters are directed to wait a minimum of six months before even inquiring about sample status.

223.    As a result, no DNA result from any Plaintiff's sample could have been returned, processed, or acted upon during the period of custody. Each Plaintiff was detained for between approximately five hours and two days before release. Under governing DHS and FBI policy, the physical swabs were placed in prepaid envelopes and mailed to the FBI laboratory, where they would not be checked in for approximately 120 days after receipt—long after every Plaintiff's custody had ended. No Plaintiff was informed of any DNA result during custody. No custody decision—detention length, release, charging, bail, or classification—was stated or could have been based on DNA analysis. DHS itself would not have been notified of receipt or processing. The search produced no identification information during Plaintiffs' custody.

v.    **The government has expanded the information it includes in DNA profiles and the way it uses that information.**

224.    The *King* holding also rested on limitations in Maryland's DNA collection system that cabined the privacy intrusion to its identification purpose. None of those features is present in the federal DNA Act, as applied to Plaintiffs' profiles in the CODIS database today. The federal scheme is categorically different—and categorically more invasive—in each of the four respects the Supreme Court identified as dispositive in *King*.

225.    *The federal government uses 20 loci not 13.* The Supreme Court's reasonableness finding in *King* was expressly predicated on the limited informational content of a 13-locus STR profile. The Court held that the DNA loci analyzed came "from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee" and are unlikely to reveal any "private medical information." *King*, 569 U.S. at 464. That finding may have been accurate as to the 13-locus system in place in 2013. It does not describe the federal system to which Plaintiffs' profiles were

submitted. Effective January 1, 2017, the FBI unilaterally expanded the CODIS core loci from 13 to 20 through an internal process (notifying but not seeking authorization from Congress). The government's own publications confirm that the expanded 20-locus set was selected in part to "enhance kinship analyses." That is supported by scientific literature findings that the "13 CODIS core loci are not sufficiently powerful for kinship analyses, and 20 or more autosomal STR loci do perform better" for identifying parent-child and full-sibling relationships.

226. *The DNA Act does not prohibit non-identification testing.* The *King* Court placed independent weight on the Maryland statute's explicit prohibition on testing for anything other than identification: "A person may not willfully test a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle." Md. Pub. Saf. Code § 2-512(c). The Court held that this prohibition—and the companion requirement that "[o]nly DNA records that directly relate to the identification of individuals shall be collected and stored," § 2-505(b)(1)—allayed privacy concerns and made speculation about future misuse unnecessary. *King*, 569 U.S. at 465. No such limitation exists in the DNA Act or its implementing regulations. The federal statute authorizes collection and indexing of DNA profiles for broadly defined law enforcement purposes but contains no provision prohibiting the testing of DNA samples for information beyond identification.

227. *The DNA Act does not prohibit familial searching. King* also noted that the Maryland statute evaluated there explicitly prohibited using the statewide database to identify suspects through the DNA of their biological relatives: "A person may not perform a search of the statewide DNA data base for the purpose of identification of an offender in connection with a crime for which the offender may be a biological relative of the individual from whom the DNA sample was acquired." Md. Pub. Saf. Code § 2-506(d). Congress enacted no equivalent prohibition in 34

U.S.C. § 40702, 34 U.S.C. § 12592, or 28 C.F.R. Part 28. The federal statute's silence is not inadvertent: in promulgating the 2008 rule extending DNA collection to arrestees and detainees, DOJ expressly acknowledged public comments expressing concerns about familial searching in CODIS but declined to prohibit that use. 73 Fed. Reg. 74,932, 74,937-38 (Dec. 10, 2008).

228. *CODIS returns partial match results used to identify family members of individuals with DNA profiles*. Not only does the DNA Act lack a statutory safeguard prohibiting familial searching, the FBI permits—and federal law enforcement agencies perform—searches that identify biological relatives of individuals whose DNA has been profiled in CODIS. As FBI policies confirm, federal and state law enforcement agencies alike can perform "moderate stringency" searches in CODIS/NDIS, which return partial matches to identify biological relatives of individuals with DNA profiles in CODIS. Indeed, National Institute of Justice training materials instruct that "moderate stringency searches" in CODIS have "the potential to associate a crime scene profile to a relative of an offender profile," which would be identified as a "partial match" resulting from "a routine DNA database search."

229. Entry of Plaintiffs' DNA profiles into CODIS does not merely create the "unique identifying number" the Supreme Court evaluated under the Maryland statute's identification-only regime at issue in *King*. Unlike the Maryland scheme—which prohibited testing for anything beyond identification, explicitly prohibited familial database searches, and was evaluated against a 13-locus profile the Court found insufficient for non-identification analysis—the federal scheme imposes none of those limits. Currently, the federal DNA collection scheme uses a 20-locus profile, which the FBI deliberately calibrated for kinship analysis, and expressly permits partial matches to identify biological relatives of individuals with DNA profiles. And DNA technology continues to evolve. As the Federal Judicial Center's scientific publications acknowledge, "new research has

developed statistical methods which could be used to translate uninformative CODIS STR loci into highly informative, genome-wide SNP data," that "could enable predictions about health, appearance, and behavior." Federal Judicial Center, *Law Enforcement Databases: Limited Genetic Information and Varying Procedures for Use* (2024).

### vi. The government's actual interest in compelled DNA collection is surveillance, not identification.

230. DHS's compulsory DNA collection at Broadview was not an isolated practice. As discussed above, it was one component of a coordinated, rapidly expanding federal surveillance program.

231. *The facial recognition architecture already serves any identification need.* Since at least June 2025, ICE and CBP agents deployed at Broadview were equipped with Mobile Fortify, a smartphone application developed by NEC Corporation that performs real-time facial recognition against a database of more than 200 million federal photographs, returning a subject's full identity profile within seconds. CBP has also made a companion application, Mobile Identify, available for download on Google's App Store for state and local law enforcement agencies deputized to work with ICE. An identification function that can be performed in seconds with a phone already in the agent's pocket is not supplemented by DNA analysis that yields results months after custody ends. These are not complementary identification tools. Mobile Fortify identifies a person at a specific moment. A DNA profile stored in CODIS enables the government to connect that person's genetic material to any crime scene sample, anywhere in the country, forever.

232. *DHS has invested in bulk location and social media surveillance programs.* DHS has built a parallel infrastructure for tracking the physical movements and expressive associations of people in the United States, again without obtaining warrants. In May 2025, ICE spent $5 million on a Thomson Reuters subscription, giving it access to a nationwide network of automated

license plate readers capable of reconstructing the historical movements of any vehicle. Later in 2025, ICE spent an additional $5 million on a contract with PenLink for social media monitoring and phone surveillance products. PenLink's Webloc tool gathers the locations of millions of cell phones by collecting data from mobile data brokers and linking it with other user information. Its Tangles product links together a person's full social media activity—posts, location history, tags, photographs—with the activity of their friends and family. None of these tools serves an identification function at booking. Instead, together with CODIS enrollment, they constitute a comprehensive system for tracking the identities, movements, associations, and genetic profiles of people who voice objection to the government's immigration policies.

233.    *The government's own statements.* The government has not concealed what it is building or why. Border Czar Tom Homan announced that he was "pushing for" a database of individuals arrested at protests, pledging to "make them famous" by publicizing their identities to employers, neighbors, and schools. A DHS memo sent in January 2025 to agents temporarily assigned to Minneapolis asked them to "capture all images, license plates, identifications, and general information on hotels, agitators, protesters, etc., so we can capture it all in one consolidated form." Separately, DHS press releases characterized Chicago-area protesters as "domestic terrorists" and "violent anarchists." And ICE's official social media celebrated protesters' arrests and used them as recruitment advertisements, with the DHS Instagram posting "FAFO" alongside photographs of agents pinning protesters to the ground. These statements reflect DHS's policy of targeting protesters for arrest and surveillance in retaliation for their exercise of free speech. The government's significant investment in surveillance and its stated intent to use the technology against protesters is intended to deter people from objecting to the government's actions. And it has worked.

57818228.1                                                72

234.    *The dismantling of privacy oversight.* The government's removal of its own oversight mechanisms while aggressively expanding its biometric collection programs confirms that identification is not the driving interest. Privacy Impact Assessments—the agency's own tool for evaluating the civil liberties implications of new surveillance programs—dropped from twenty-four filings in 2024 to eight in 2025, and none have been filed in 2026. Three senior DHS privacy officials were ousted in early 2026 after objecting to agency efforts to mislabel government records. The DHS Inspector General, who launched an audit of the agency's management of biometric data, has reported that DHS "has systematically obstructed the work" of his office by blocking access to records, systems, and other necessary information. An agency that removes its own oversight mechanisms while aggressively expanding its biometric collection programs is not pursuing an identification interest. It is insulating a surveillance apparatus from scrutiny.

235.    The government had reliable means of identifying each Plaintiff at the time of DNA collection, including through questioning of Plaintiffs or review of their identification.

236.    Taken together, these facts establish that the DNA collection at Broadview was not a booking-time identification procedure. It was the genetic component of a surveillance program generally targeting people in the United States, including, in particular, citizens who protest federal immigration enforcement—a purpose that bears no resemblance to the interest the *King* Court approved, and one that the First and Fourth Amendments categorically forbid.

**CLAIMS FOR RELIEF**

**COUNT I**

**Fourth Amendment – The DNA Act and its implementing regulations are unconstitutional as applied to Plaintiffs**

237. Plaintiffs incorporate all preceding paragraphs.

238. The Fourth Amendment protects against unreasonable searches, including intrusions into the human body for the purpose of obtaining biological material.

239. Compelled collection of DNA constitutes a search under the Fourth Amendment. It is a particularly intrusive search because it extracts biological material containing vast amounts of personal information.

240. The government's collection of Plaintiffs' DNA was conducted without a warrant; without valid consent; and without a constitutionally sufficient justification.

241. The government's processing of each of Plaintiffs' DNA samples to create and retain separate DNA profiles constitutes a separate intrusive search under the Fourth Amendment. Furthermore, any subsequent processing of Plaintiffs' DNA samples after the creation of DNA profiles constitutes a distinct intrusive search under the Fourth Amendment.

242. The DNA Act, 34 U.S.C. § 40702, authorizes the Attorney General and other law enforcement agencies to collect DNA samples from individuals who are "arrested, facing charges, or convicted" for submission to the FBI. The DNA Act further authorizes the FBI to use DNA samples to create DNA profiles for inclusion in CODIS.

243. The regulations promulgated under the DNA Act, 28 C.F.R. § 28.12-13, require federal agencies to collect DNA samples from individuals who are "arrested, facing charges, or convicted" for submission to the FBI, and require the FBI to analyze DNA samples to create DNA profiles for inclusion in CODIS.

244.    The Supreme Court's approval of DNA collection in *Maryland v. King* was expressly limited to five necessary conditions: (1) a valid arrest supported by probable cause; (2) a serious offense; (3) pre-databanking judicial review confirming probable cause existed; (4) a government interest in identification; and (5) diminished privacy concerns due to technical limitations and statutory protections. The government's collection and processing of Plaintiffs' DNA pursuant to the DNA Act falls outside that narrow holding.

245.    The searches were unreasonable because: (1) the government arrested Plaintiffs without probable cause, and the DNA Act permits DNA collection for any arrest, regardless of probable cause; (2) the government arrested Plaintiffs for at most minor offenses, and the DNA Act permits DNA collection from individuals arrested for any offense; (3) consistent with DHS's DNA collection policies, the government sent Plaintiffs' DNA for automatic processing and databanking before any judicial officer could examine whether probable cause existed, and the DNA Act does not require any judicial oversight of the arrest before a DNA sample is collected, processed, or profiled; (4) the government did not use Plaintiffs' DNA for purposes of identification, and the DNA Act does not limit the purpose for which a DNA sample may be collected or used; and (5) the government is capable of extracting private medical and kinship information from Plaintiffs' DNA samples and profiles, and the DNA Act does not limit those uses.

246.    The government's compelled intrusion into Plaintiffs' bodies for the purpose of collecting and retaining Plaintiffs' DNA pursuant to the DNA Act and its implementing regulations violates the Fourth Amendment.

247.    Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

57818228.1                                    75

## COUNT II
### Fourth Amendment – Unreasonable Search

248. Plaintiffs incorporate all preceding paragraphs.

249. The Fourth Amendment protects against unreasonable searches, including intrusions into the human body for the purpose of obtaining biological material.

250. Use of a buccal swab to compel collection of DNA constitutes a search under the Fourth Amendment. It is a particularly intrusive search because it seeks to extract biological material containing vast amounts of personal information.

251. The government's collection of Plaintiffs' DNA was conducted without a warrant; without valid consent; and without a constitutionally sufficient justification.

252. The government's processing of each of Plaintiffs' DNA samples to create and retain separate DNA profiles constitutes a separate intrusive search under the Fourth Amendment. Furthermore, any subsequent processing of Plaintiffs' DNA samples after the creation of DNA profiles constitutes a distinct intrusive search under the Fourth Amendment.

253. The Supreme Court's approval of DNA collection in *Maryland v. King* was expressly limited to five necessary conditions (1) a valid arrest supported by probable cause; (2) a serious offense; (3) pre-databanking judicial review confirming probable cause existed; (4) a government interest in identification; and (5) diminished privacy concerns due to technical limitations and statutory protections. The government's conduct falls outside that narrow holding.

254. The searches were unreasonable because the government arrested Plaintiffs without probable cause, for, at most, minor offenses. Moreover, consistent with DHS's DNA collection policies, the government sent Plaintiffs' DNA for automatic processing and databanking before any judicial officer could examine whether probable cause existed.

255. The government has no legitimate interest in collecting the DNA of individuals who were arrested without probable cause or accused only of minor, non-serious conduct. Any interest in identification at the time of booking could not have been served by DHS's collection of Plaintiffs' DNA. Rather, the governmental interest served was increased surveillance.

256. The government's compelled collection of each Plaintiff's DNA was an unreasonable search in violation of the Fourth Amendment.

257. Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

## COUNT III
### Fourth Amendment – Unreasonable Seizure

258. Plaintiffs incorporate all preceding paragraphs.

259. The Fourth Amendment prohibits not only unreasonable searches but also unreasonable seizures, including the continued unreasonable retention of seized property.

260. The government seized Plaintiffs' DNA from their bodies without a search warrant or an interest sufficient to justify the seizure under the Fourth Amendment.

261. The government retains Plaintiffs' DNA profiles in federal databases and DNA samples in federal laboratories indefinitely.

262. This retention constitutes an ongoing seizure because Plaintiffs have a continuing possessory and privacy interest in their genetic material; and the government continues to exercise dominion and control over that material.

263. The continued retention of Plaintiffs' DNA is unreasonable because it is not tied to any valid conviction; it persists even where charges were never brought, were dismissed, or were for only minor offenses; it enables future investigative use unrelated to the original seizure; and it imposes a permanent invasion of privacy.

57818228.1

264. The government has no legitimate interest in retaining the DNA of individuals who were arrested without probable cause or charged with only minor offenses.

265. The DNA Act's expungement provision is inadequate because: (1) it does not provide for expungement of the DNA sample; (2) it entails a burdensome procedure that requires the arrestee to initiate the process, obtain a certified court order, and submit it to the FBI; and (3) for uncharged arrestees like Mr. Sampson and Ms. Cooper, the statute permits expungement only after "no charge was filed within the applicable time period." 34 U.S.C. § 12592 (d)(1)(A)(ii).

266. The government's indefinite retention of DNA is a particularly serious intrusion because it places an individual's most sensitive biological information under the government's permanent control and exposes it to future investigative use.

267. The government's ongoing retention of Plaintiffs' DNA therefore constitutes an unreasonable seizure that violates the Fourth Amendment.

268. Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

**COUNT IV**
**First Amendment – Retaliation and Chilling Effect**

269. Plaintiffs incorporate all preceding paragraphs.

270. Plaintiffs engaged in the core First Amendment activity of peaceful protest in a public place concerning events of public interest, including protest of federal immigration policy and the conduct of federal agents. Plaintiffs wish to engage in such protected First Amendment activity in the future.

271. Plaintiffs engaged in constitutionally protected acts of assembly in public places to protest current federal immigration policy and to observe and protest the conduct of federal agents. Plaintiffs wish to engage in such protected First Amendment activity in the future.

57818228.1

272. Federal agents, acting pursuant to policies established by the government, retaliated against Plaintiffs for engaging in constitutionally protected activity based on the content of their expression. Federal agents' retaliation against Plaintiffs pursuant to the policies established by Defendants will continue absent any relief.

273. The government's policies are motivated, at least in part, by individuals' participation in protected activity and were designed to retaliate against and deter such activity, and federal agents' actions pursuant to those policies are motivated, at least in part, by Plaintiffs' participation in protected activity and were designed to retaliate against and deter such activity.

274. The policies established by the government and implemented by federal agents impermissibly target Plaintiffs because of the viewpoint Plaintiffs have espoused and will espouse while engaging in the protected acts of peaceful assembly and protest. These policies and actions will chill Plaintiffs' future speech.

275. The policies established by the government and implemented by federal agents would chill a person of ordinary firmness from engaging in protected expression because they subject protesters to, *inter alia*, detention, arrest, DNA collection, and indefinite DNA retention, in retaliation for the expression of viewpoints disfavored by the government and for participation in the protected acts of peaceful assembly and protest.

276. The policies established by the government and implemented by federal agents therefore impose a uniquely severe burden on Plaintiffs' First Amendment rights and those of similarly situated individuals.

277. Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

**COUNT V**
**Administrative Procedure Act (5 U.S.C. § 706) – Contrary to Law**

278.    Plaintiffs incorporate all preceding paragraphs.

279.    The Administrative Procedure Act ("APA") makes unlawful federal agency action that is contrary to law, in excess of statutory authority, or arbitrary and capricious.

280.    The government's regulations, policies, and practices regarding DNA collection and retention constitute final agency action. In particular, DOJ regulation and DHS, ICE, and CBP policies requiring federal agents to collect a DNA sample from any person arrested for any crime, and automatically submit the DNA sample to the FBI, as described in Sections A.i and B of this Complaint, constitute final agency action. In addition, FBI policies requiring the agency to automatically process a DNA sample received from a law enforcement agency like DHS, generate a DNA profile consisting of 20 STR loci based on the DNA sample, enter that DNA profile into CODIS and upload it to the NDIS system, and store both the DNA sample and DNA profile indefinitely, as described in Sections A and E of this Complaint, constitute final agency action.

281.    The government's policies and practices of targeting protesters for arrest and surveillance, including as described in Sections C, D and E of this Complaint, constitute final agency action.

282.    The government's collection and retention of DNA is unlawful under the APA because it violates the First and Fourth Amendments to the Constitution.

283.    The government's policies and practices are also arbitrary and capricious because they authorize the collection and indefinite retention of highly sensitive genetic information from individuals engaged in protected activity, without sufficient justification and with ongoing potential for repeated use.

284.    Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

## COUNT VI
**Administrative Procedure Act (5 U.S.C. § 706) – In Excess of Statutory Authority**

285.    Plaintiffs incorporate all preceding paragraphs.

286.    The APA makes unlawful federal agency action that is contrary to law, in excess of statutory authority, or arbitrary and capricious.

287.    The DOJ regulations and DHS, ICE, and CBP policies and practices requiring federal agents to collect a DNA sample from any person arrested for any crime, and automatically submit the DNA sample to the FBI, as described in Sections A and B of this Complaint, constitute final agency action.

288.    Pursuant to the DNA Act, Congress permitted the Attorney General to collect DNA samples from arrested individuals: "The Attorney General *may*, as prescribed by the Attorney General in regulation, collect DNA samples from individuals who are arrested, facing charges, or convicted." 34 U.S.C. § 40702(a)(1)(A) (emphasis added). Under the DNA Act, Congress also permitted the Attorney General to "authorize and direct any other agency of the United States that arrests or detains individuals . . . to carry out any function and exercise any power of the Attorney General under this section." *Id.*

289.    Pursuant to that authority, DOJ promulgated regulations requiring federal agencies that arrest individuals to collect DNA samples from such persons: "Any agency of the United States that arrests or detains individuals . . . *shall* collect DNA samples from individuals who are arrested, facing charges, or convicted." 28 C.F.R. § 28.12(b) (emphasis added). In addition, DOJ regulations further require that each arrested individual "shall cooperate" in the collection of a DNA sample and authorize agencies to use "reasonably necessary" means to "detain, restrain, and

collect a DNA sample" from arrested individuals who refuse. *Id*. § 28.12(d). DOJ regulations further require federal agencies to "[f]urnish each DNA sample collected under this section to the Federal Bureau of Investigation, or to another agency or entity as authorized by the Attorney General, for purposes of analysis and entry of the results of the analysis into the Combined DNA Index System," *id.* § 28.12(f), and they require the FBI to process DNA samples, create DNA profiles, and maintain DNA profiles in CODIS, *id.* § 28.13. The DOJ regulations constitute final agency action.

290. DHS, ICE, CBP, and HSI policies and practices require federal agents to collect DNA from individuals who are arrested, as described in Section A.i and B of this Complaint. DHS, ICE, CBP, and HSI guidance instructs federal agents that DNA collection is mandatory and part of routine post-arrest or post-detention processing. DHS, ICE, CBP, and HSI agents are trained to advise arrested individuals that DNA collection is required by law and not optional. In practice, DHS, ICE, CBP, and HSI treat DNA collection as a booking procedure performed categorically on all arrested persons without individualized assessment. The DHS, ICE, CBP, and HSI policies and practices constitute final agency action.

291. FBI policies and practices require the FBI to automatically process DNA samples received from a law enforcement agency like DHS, generate DNA profiles consisting of 20 STR loci, enter DNA profiles into CODIS, upload DNA profiles to the NDIS system, and store both the DNA sample and DNA profile indefinitely, as described in Sections A and E of this Complaint. The FBI policies and practices constitute final agency action.

292. Through DOJ's regulations, and through related DHS, ICE, CBP, HSI, and FBI directives, policies, and operational practices, the government has established and implemented a DNA collection and retention regime requiring categorical DNA collection, processing, analysis,

indexing, and retention for all arrested individuals that exceeds the statutory authority granted by Congress under the DNA Act.

293. In adopting and implementing that regime, the government has interpreted the DNA Act to require or authorize blanket DNA collection from all arrested persons without individualized consideration. But the DNA Act does not compel the government to implement DNA collection as a universal, automatic booking procedure divorced from individualized judgment, offense severity, legitimate identification needs, or procedural safeguards.

294. Congress cannot delegate unconstitutional powers to DOJ, FBI, DHS, ICE, CBP, or HSI, nor did it intend to do so. Rather, Congress intended the DNA Act to fit within the Fourth Amendment's highly fact-intensive reasonableness framework, authorizing DOJ to promulgate regulations permitting (or requiring) DNA collection of arrestees under limited, context-specific circumstances.

295. By authorizing (but not requiring) DNA collection from arrestees, and delegating to DOJ the authority to promulgate regulations defining circumstances under which DNA could or should be collected from arrestees, Congress created a discretionary regime under which DNA could be collected from arrestees in appropriately limited circumstances, thereby avoid legislating a blanket rule for arrestee DNA collection that would violate the Fourth Amendment.

296. By construing the DNA Act to authorize or require blanket DNA collection and retention, the government has exceeded the authority delegated to it by Congress.

297. The regulations, policies, and practices described above are also arbitrary and capricious because they authorize the collection and indefinite retention of highly sensitive genetic information from individuals engaged in protected activity, without sufficient justification and with ongoing potential for repeated use.

298. Plaintiffs have suffered and will continue to suffer injury as a result of the government's unlawful actions.

## COUNT VII
### Ultra Vires

299. Plaintiffs incorporate all preceding paragraphs.

300. The government's actions exceed the authority granted by the Constitution.

301. Federal agencies may not conduct biometric searches outside constitutional limits.

302. The Fourth Amendment is inherently context-dependent and prohibits agencies from conducting biometric searches outside constitutional limits. Converting a permissive statute into a mandatory requirement tramples on the reasonableness requirement of the Fourth Amendment.

303. Further, DOJ regulations and FBI, DHS, ICE, and CBP policies exceed the authority granted by Congress. Congress cannot authorize biometric searches that fall outside of established constitutional limits and did not authorize agency promulgation of rules mandating blanket DNA collection in violation of *Maryland v. King*.

304. The government's conduct is therefore ultra vires and must be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

**A.** **Declaratory Relief**

Declare that the government's policies and practices of collecting DNA from Plaintiffs absent the circumstances approved of in *Maryland v. King* constitute unreasonable searches in violation of the Fourth Amendment to the United States Constitution;

Declare that the government's policies and practices of retaining Plaintiffs' DNA absent the circumstances approved of in *Maryland v. King* constitute ongoing unreasonable seizures in violation of the Fourth Amendment to the United States Constitution;

Declare that the DNA Act, 34 U.S.C. § 40702, and its implementing regulations, 28 C.F.R. § 28.12-13, are unconstitutional as applied to the collection and retention of Plaintiffs' DNA;

Declare that the DNA Act, 34 U.S.C. § 40702, and its implementing regulations, 28 C.F.R. § 28.12-13, are unconstitutional as applied to individuals who are (1) arrested without probable cause; or (2) arrested for minor offenses; or (3) compelled to submit DNA samples that are sent out for automatic processing and databanking prior to arraignment; or (4) compelled to submit DNA samples from which the government is capable of extracting private health and kinship information; or (5) compelled to submit DNA samples to serve the government's interest in surveillance; or (6) arrested for conduct protected by the First Amendment;

Declare that the government's policies and practices of (1) making arrests motivated, at least in part, by individuals' participation in protest of the government's federal immigration policy; (2) collecting their DNA incident to such arrests; and (3) retaining their DNA after such arrests, constitute violations of the First Amendment;

Declare that the government's policies and practices of (1) making arrests that impermissibly target individuals because of the viewpoints they have espoused and will espouse while engaging in the protected acts of peaceful assembly and protest; (2) collecting their DNA incident to such arrests; and (3) retaining their DNA after such arrests, constitute violations of the First Amendment;

Declare that the government's regulations, policies, and practices are unlawful and void under the Administrative Procedure Act because they are contrary to constitutional law, in excess of statutory authority, and arbitrary and capricious;

Declare that the government's actions in arresting Plaintiffs, collecting their DNA, and retaining their DNA indefinitely because they exercised their constitutional right to protest violate the First and Fourth Amendments to the Constitution;

## B. Injunctive Relief

Vacate and set aside DOJ regulations and FBI, DHS, ICE, CBP, and HSI policies that require, without regard to the limitations set forth in *Maryland v. King*, the collection of DNA samples and retention of DNA samples and profiles from any individual arrested under the authority of the United States;

Permanently enjoin DOJ, FBI, FBI, DHS, ICE, CBP, and HSI, their officers, agents, employees, and all persons acting in concert with them, from implementing, enforcing, or giving effect to DOJ regulations and FBI, DHS, ICE, CBP, and HSI policies that require, without regard to the limitations set forth in *Maryland v. King*, the collection of DNA samples and retention of DNA samples and profiles from any individual arrested under the authority of the United States;

Permanently enjoin DHS, ICE, CBP, or HSI, their officers, agents, employees, and all persons acting in concert with them, from collecting DNA samples from Plaintiffs under the circumstances described herein, including where: (1) Plaintiffs are arrested without probable cause; or (2) Plaintiffs are arrested for only minor offenses; or (3) the probable cause determination has not been confirmed by a judicial officer; or (4) the government's interest in collecting DNA is not primarily identification; or (5) the government is capable of extracting private kinship and

57818228.1

86

health information from collected DNA samples and profiles; or (6) Plaintiffs are engaged in protected First Amendment activity;

Permanently enjoin the government from retaining, using, or disseminating DNA collected from Plaintiffs under such circumstances;

Order the government to expunge and permanently destroy all DNA samples, profiles, and derivative records obtained from Plaintiffs, including removal from all federal databases such as CODIS;

Order the government to certify, in writing, that such expungement and destruction has been completed;

**C.      Other Equitable Relief**

Grant such other and further relief as the Court deems just and proper to remedy the violations alleged herein and prevent their recurrence; and

**D.      Costs and Fees**

Award Plaintiffs their reasonable attorneys' fees and costs pursuant to applicable law, including but not limited to 28 U.S.C. § 2412.

57818228.1

DATED: May 6, 2026

Respectfully Submitted,

JAMES A. MORSCH (No. 6209558)
ELIZABETH A. THOMPSON (No. 6304148)
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, IL 60601
(312) 876-7100
jim.morsch@saul.com
elizabeth.thompson@saul.com

   /s/ Carey R. Dunne
CAREY R. DUNNE*
KEVIN TROWEL*
MÓNICA P. FOLCH*
ZACK GOLDBERG*
MARTHA REISER*
FREE & FAIR LITIGATION GROUP
266 West 37th Street, 20th Floor
New York, NY 10018
(646) 434-8604
carey@freeandfair.org
kevin@freeandfair.org
monica@freeandfair.org
zack@freeandfair.org
martha@freeandfair.org

   /s/  Deirdre D. Von Dornum
DEIRDRE D. VON DORNUM*
ELEUTHERA SA*
SIAN LAST*
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
dvondornum@shertremonte.com
esa@shertremonte.com
slast@shertremonte.com

* *Application for Admission Pro Hac Vice*
*forthcoming*

57818228.1                                    88