UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

DANA BRIGGS, *et al.*,

*Plaintiffs*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-05238-JCD

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS***

*This Amended Memorandum of Law in Support of Defendants' Motion to Dismiss is submitted in place of the initial memorandum filed on October 5, 2026, ECF No. 56-1, which inadvertently omitted Defendants' attorney signature block. This is the only change in the memorandum.

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 3

A. Government Retention of Arrest and Other Criminal Records Generally .......... 3

B. History and Rationale of the DNA Identification System .......... 4

C. DNA Expungement Process .......... 7

D. Summary of Complaint Allegations .......... 7

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 10

A. PLAINTIFFS' COMPLAINT SHOULD BE DIMISSED FOR LACK OF JURISDICTION. .......... 10

1. Plaintiffs Lack Standing to Seek Prospective Relief Regarding a Future Law Enforcement Encounter or DNA Retention .......... 10

2. Plaintiffs Lack Standing to Seek Expungement of DNA Records Created During Their Arrests in 2025. .......... 16

3. Plaintiffs' Expungement Claim is Not Ripe Because Plaintiffs Have Not Exhausted the Statutory Remedy Established By Congress. .......... 19

4. Plaintiffs Cannot Gloss Over the Elements of Standing for Each Count . 23

B. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM .......... 26

1. Plaintiffs Fail to State Any Fourth Amendment Claims .......... 26

a. Plaintiffs Misread Maryland v. King--the DNA Act And Its Implementing Regulations Are Lawful Because They Prescribe Reasonable Searches .......... 27

b. Plaintiffs' Own Allegations Belie Their Allegations Regarding Probable Cause .......... 30

c. The Processing/Retention of DNA Samples For Identification Purposes Does Not Implicate the Fourth Amendment as Plaintiffs Allege in Counts II and III .......... 33

2. Plaintiffs Fail to State a First Amendment Claim (Count IV) .................. 37

3. Plaintiffs Fail to State APA Claims in Counts V and VI .......................... 40

a. Description of Claims ................................................................ 40

b. The Vast Majority of Plaintiffs' Claims Do Not Identify a Final Agency Action ............................................................................ 41

c. Plaintiffs' APA Claims Are an Impermissibly Broad Programmatic Attack ............................................................................... 43

d. DOJ Regulations 28 CFR § 28.12 and § 28.13 Are Authorized by Statute and Committed to Agency Discretion.............................. 45

4. PLAINTIFFS FAIL TO STATE AN ULTRA VIRES CLAIM ................ 47

V. CONCLUSION ........................................................................................... 48

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967) .......... 20, 21

*Abbott v. Sangamon Cnty. Ill.*,
705 F.3d 706 (7th Cir. 2013) .......... 32

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .......... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9, 37, 42

*Ashcroft v. Mattis*,
431 U.S. 171 (1977) .......... 14

*Ass'n of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007) .......... 46

*Barnes v. Felix*,
605 U.S. 73 (2025) .......... 32

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .......... 47

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 9, 42

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) .......... 11

*Better Mkts., Inc. v. Dep't of Just.*,
83 F. Supp. 3d 250 (D.D.C. 2015) .......... 46

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 41, 46

*Boim v. Am. Muslims for Palestine*,
9 F.4th 545 (7th Cir. 2021) .......... 9

*Boroian v. Mueller*,
616 F.3d 60 (1st Cir. 2010) .......... 23, 35

*Brandt v. Village of Winnetka*,
612 F.3d 647 (7th Cir. 2010) .......... 21

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
492 F.3d 89 (2d Cir. 2007) .......... 21

*Campbell v. Miller*,
373 F.3d 834 (7th Cir. 2004) .......... 12, 16, 36

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) .......... 39

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) .......... 13, 15

*Christensen v. County of Boone*,
483 F.3d 454 (7th Cir. 2007) .......... 9

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... *passim*

*City of New York v. DOD*,
913 F.3d 423 (4th Cir. 2019) .......... 42

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... *passim*

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .......... 45

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 45

*Daines v. IRS*,
No. 24-cv-1057, 2025 WL 2694788 (E.D. Wisc. Sept. 22, 2025) .......... 42

*Davis v. FEC*,
554 U.S. 724 (2008) .......... 24

*Davis v. Mississippi*,
394 U.S. 721 (1969) .......... 36

*DeJong v. Pembrook*,
662 F. Supp. 3d 896 (S.D. Ill. 2023) .......... 37, 38

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................... 10

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026) .................... 39

*Dist. of Columbia v. Wesby*,
583 U.S. 48 (2018) .................... 32

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .................... 47

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................... 23

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) .................... 10

*Goldhamer v. Nagode*,
621 F.3d 581 (7th Cir. 2010) .................... 12, 15

*Graham v. Connor*,
490 U.S. 386 (1989) .................... 32

*Green v. Berge*,
354 F.3d 675 (7th Cir. 2004) .................... 25, 27

*Gubala v. Time Warner Cable, Inc.*,
846 F.3d 909 (7th Cir. 2017) .................... 18

*Haskell v. Harris*,
745 F.3d 1269 (9th Cir. 2014) .................... 30, 33

*In re Aiken Cnty.*,
645 F.3d 428 (D.C. Cir. 2011) .................... 20, 25

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .................... 41

*J. Roderick MacArthur Found. v. FBI*,
102 F.3d 600 (D.C. Cir. 1996) .................... 16

*Johnson v. Quander*,
440 F.3d 489 (D.C. Cir. 2006) .................... 36

*Kalka v. Hawk*,
215 F.3d 90 (D.C. Cir. 2000) .......... 21

*Laird v. Tatum*,
408 U.S. 1 (1972) .......... 15, 17

*Lavite v. Dunstan*,
932 F.3d 1020 (7th Cir. 2019) .......... 37

*Lopez v. Davis*,
531 U.S. 230 (2001) .......... 46

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*,
924 F.3d 375 (7th Cir. 2019) .......... 12, 13, 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 10

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 41, 43, 44, 45

*Lyberger v. Snider*,
42 F.4th 807 (7th Cir. 2022) .......... 38

*Maryland v. Buie*,
494 U.S. 325 (1990) .......... 29

*Maryland v. King*,
569 U.S. 435 (2013) .......... *passim*

*Massey v. Johnson*,
457 F.3d 711 (7th Cir. 2006) .......... 37

*McKart v. United States*,
395 U.S. 185 (1969) .......... 21

*Mitchell v. Kirchmeier*,
28 F.4th 888 (8th Cir. 2022) .......... 38

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) .......... 27

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .......... 20

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ........................................................................................ 37

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) ........................................................................................ 11, 15

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................................................................ 41, 43, 44

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........................................................................................ 47

*Opati v. Republic of Sudan*,
590 U.S. 418 (2020) ........................................................................................ 46

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........................................................................................ 15

*Phillips v. U.S. Customs & Border Prot.*,
74 F.4th 986 (9th Cir. 2023) ........................................................................................ 16, 18

*Pryor v. Corrigan*,
124 F.4th 475 (7th Cir. 2024) ........................................................................................ 32

*Pub. Utilities Comm'n of Cal. v. United States*,
355 U.S. 534 (1958) ........................................................................................ 19

*Reno v. Cath. Soc. Servs., Inc.*,
509 U.S. 43 (1993) ........................................................................................ 21

*Ryburn v. Huff*,
565 U.S. 469 (2012) ........................................................................................ 32

*Sierra Club v. U.S. Army Corps of Eng'rs*,
446 F.3d 808 (8th Cir. 2006) ........................................................................................ 41, 44

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................................ 9, 17, 25

*Swanigan v. City of Chicago*,
881 F.3d 577 (7th Cir. 2018) ........................................................................................ 16

*Sweeney v. Raoul*,
990 F.3d 555 (7th Cir. 2021) ........................................................................................ 21

*Taha v. Int'l Bhd. of Teamsters, Loc. 781*,
947 F.3d 464 (7th Cir. 2020) ........ 42

*Tincher v. Mullen*,
No. 0:25-CV-4669, 2026 WL 2797318 (D. Minn. Sept. 18, 2026) ........ 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 18

*U.S. DOJ v. Reps. Comm. for Freedom of Press*,
489 U.S. 749 (1989) ........ 3, 4

*United States v. Amerson*,
483 F.3d 73 (2d Cir. 2007) ........ 23, 35, 36

*United States v. Benlizar*,
459 F. Supp. 614 (D.D.C 1978) ........ 23

*United States v. Briggs*,
810 F. Supp. 3d 994 (N.D. Ill. 2025) ........ 19

*United States v. Buller*,
2018 U.S. Dist. LEXIS 2202 (D.S.D.) ........ 30

*United States v. Crowell*,
374 F.3d 790 (9th Cir. 2004) ........ 35

*United States v. Davis*,
690 F.3d 226 (4th Cir. 2012) ........ 37

*United States v. Hinton*,
113 F. Supp. 3d 1277 (N.D. Ga. 2015) ........ 36

*United States v. Hook*,
471 F.3d 766 (7th Cir. 2006) ........ 25

*United States v. Lucido*,
612 F.3d 871 (6th Cir. 2010) ........ 35

*United States v. Mitchell*,
652 F.3d 387 (3d Cir. 2011) ........ 37

*United States v. Schnitzer*,
567 F.2d 536 (2d Cir. 1977) ........ 22

*United States v. Tuggle*,
4 F.4th 505 (7th Cir. 2021) .......... 34

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 11, 17

*Woodford v. Ngo*,
548 U.S. 81 (2006) .......... 22

*Woodruff v. Mason*,
542 F.3d 545 (7th Cir. 2008) .......... 37

**CONSTITUTIONAL LAW**

U.S. Const. art. III, § 2, cl. 1 .......... 10

**STATUTES**

5 U.S.C. § 551 .......... 41, 42

5 U.S.C. § 701(a)(2) .......... 46

5 U.S.C. § 704 .......... 41

18 U.S.C. § 111 .......... *passim*

18 U.S.C § 3282 .......... 7

28 U.S.C. § 534 .......... 3, 4, 34

34 U.S.C. § 12592 .......... *passim*

34 U.S.C. § 40702 .......... *passim*

34 U.S.C § 40706 .......... 4, 5

42 U.S.C. § 14132 .......... 4, 26

42 U.S.C. § 14135e .......... 26

47 U.S.C. § 551(e) .......... 18

DNA Analysis Backlog Elimination Act of 2000,
Pub. L. 106-546, 114 Stat. 2726 (2000) .......... 5

DNA Fingerprint Act of 2005,
Pub. L. 109-162, title X, 119 Stat. 2960 (2005) ..... 5

DNA Identification Act of 1994,
Pub. L. 103-322, title XXI, subtitle C, 108 Stat. 1796 (1994) ..... 4

**LEGISLATIVE MATERIALS**

151 Cong. Rec. 28857 (2005) ..... 7

151 Cong. Rec. S13756-58 (daily ed. Dec. 16, 2005) ..... 6

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Fed. R. Civ. P. 12(b) ..... 8, 9

28 C.F.R. § 28.12 ..... *passim*

28 CFR § 28.13 ..... 8, 10, 41, 46

DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction,
73 Fed. Reg. 74932 (Dec. 10, 2008) ..... 6

DNA-Sample Collection From Immigration Detainees,
85 Fed. Reg. 13483 (Mar. 9, 2020) ..... 6

**OTHER AUTHORITIES**

*Biometrics and Fingerprints*, Law Enforcement Resources, FBI,
https://le.fbi.gov/science-and-lab/biometrics-and-fingerprints/codis-2 ..... 5

CDC, Wastewater Surveillance: A New Frontier for Public Health,
https://www.cdc.gov/advanced-molecular-detection/php/success-stories/wastewater-surveillance.html (Apr. 15, 2024) ..... 36

DNA Fingerprint Act of 2005, Expungement Policy, FBI,
www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy (last accessed Sept. 29, 2026) ..... 7

*Frequently Asked Questions on CODIS and NDIS*, FBI,
www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet (last accessed Sept. 29, 2026) ..... 5

*National Crime Information Systems*, U.S. Dep't of Just.,
https://www.justice.gov/tribal/national-crime-information-systems ..... 22

NIH, Tracking Diets via Wastewater,
https://www.nih.gov/news-events/nih-research-matters/tracking-diets-wastewater................. 36

## I. INTRODUCTION

The Complaint challenges the collection and processing of DNA samples obtained from Plaintiffs following their arrests while protesting at the Broadview ICE Processing Center in Illinois during the fall of 2025. In accordance with an express statutory authorization from Congress, 34 U.S.C § 40702, DNA samples are regularly collected from individuals such as Plaintiffs who are arrested on federal charges as a standard part of federal booking procedure on a par with fingerprinting. The Supreme Court upheld the constitutionality of this practice in *Maryland v. King*, 569 U.S. 435 (2013), concluding that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure" and that "taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." *Id*. at 465-66.

Plaintiffs seek to overturn the statutory framework Congress enacted to create and improve the DNA identification system. Plaintiffs ask this Court to narrowly constrict the *King* holding by alleging that their arrests were retaliatory and made without probable cause, in violation of the First and Fourth Amendments and the Administrative Procedure Act ("APA"). The relief Plaintiffs seek is prospective injunctive and declaratory relief that amounts to a reexamination, and significant narrowing, of the Supreme Court's decision in *Maryland v. King*. But this Court cannot rewrite Supreme Court decisions, and even if it could, the Complaint should be dismissed because Plaintiffs cannot establish Article III standing.

The Complaint fails to plausibly allege an imminently certain risk of future harm which is necessary to pursue prospective relief to enjoin or vacate DNA collection and analysis incident to a future arrest—especially in light of the end of Operation Midway Blitz. That Plaintiffs may

have been subject to an allegedly unlawful arrest in the past is insufficient to establish that the same Plaintiffs will be subject to similar misconduct again in the future. Plaintiffs can only speculate that they might be arrested again in the future and have their DNA collected as part of that hypothetical arrest. Accordingly, they lack standing to seek prospective relief prohibiting the federal government from collecting their DNA incident to a future arrest.

Plaintiffs also lack standing to seek prospective injunctive relief or expungement concerning their DNA that was collected incident to their arrests in the fall of 2025. An injunction prohibiting Defendants from using Plaintiffs' DNA records again in the future or expungement of those records is a form of prospective injunctive relief, but Plaintiffs cannot demonstrate that the mere existence of the DNA records causes them current, ongoing injury, or threatens to injure them in the future.

In any event, this Court is not the proper forum for Plaintiffs' expungement claim. Congress has expressly authorized an administrative scheme under which arrestees may have federal DNA records expunged. If a defendant is acquitted, the charges against him are dropped or dismissed or never filed, or his conviction is overturned, he may have his DNA record expunged and removed from the federal DNA database through an administrative process. *See* 34 U.S.C § 12592(d). The allegations in the Complaint establish that each of the four Plaintiffs is either currently eligible to have his or her DNA expunged through that process or will be eligible to request such relief upon the expiration of the applicable statute of limitations. On that basis, Plaintiffs' claims are not ripe for review. They should be required to avail themselves of the remedial process Congress established prior to raising a premature constitutional claim.

Alternatively, the Complaint should be dismissed as each Count fails to state a claim. Plaintiffs' three Fourth Amendment claims are directly contravened by the Supreme Court's

holding in *King*. Plaintiffs' First Amendment claim also fails because Plaintiffs have not plausibly alleged that their protected speech was a motivating factor for their arrests. Plaintiffs' two APA claims also should be dismissed as they do not identify any final agency action that is reviewable under the APA. The Complaint primarily cites generalized and unnamed policies that amount to an impermissible programmatic attack on the DNA identification system as whole. In the isolated instances when the Complaint names an actual final agency action (two DOJ regulations), the APA bars judicial review as those regulations were committed to agency discretion by law and, in any event, the regulations are fully consistent with the statutory authorization to collect DNA from federal arrestees. Finally, Plaintiffs' ultra vires claim should be dismissed as the Supreme Court has strictly limited the scope of such review and, in any event, the claim fails for the same reason as Plaintiffs' other claims.

For these reasons, as explained further below, Plaintiffs' Complaint should be dismissed.

## II. BACKGROUND

### A. Government Retention of Arrest and Other Criminal Records Generally

Since the early twentieth century, taking two forms of biometric identification information – fingerprints and photographs – has been a regular part of police booking procedures. *See King*, 569 U.S. at 457-59. Recognizing the value of such records, Congress created the FBI's identification division to collect and preserve criminal records in 1930. *See U.S. DOJ v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 751 (1989). The authorizing statute, currently codified at 28 U.S.C. § 534(a), requires the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records[.]" 28 U.S.C. § 534(a). While the government has always treated its records as confidential, Congress later incorporated the confidentiality of such records into the statute to limit dissemination. *See DOJ*, 489 U.S at 752; 28 U.S.C. § 534(b). However, "[a]rrests, indictments,

convictions, and sentences are public events that are usually documented in court records." *DOJ*, 489 U.S. at 753. Also, unlike records of DNA data, as discussed below, there is no expungement provision in 28 U.S.C. § 534 for fingerprints or other types of identifying information.

**B. History and Rationale of the DNA Identification System**

Scientific advances in the 1980s, followed by several statutes starting in the 1990s, allowed DNA to become a third form of biometric identification collected as a regular part of police booking procedures in addition to photographs and fingerprints. *See King,* 569 U.S. at 442-44. Congress enacted the DNA Identification Act of 1994, Pub. L. 103-322, title XXI, subtitle C, 108 Stat. 1796, 2069 (1994), which provided the statutory basis for the DNA identification system, now referred to as the Combined DNA Index System ("CODIS"). *See* 42 U.S.C. § 14132(a) (transferred to 34 U.S.C. § 12592); *King*, 569 U.S. at 444-45. CODIS makes DNA profiles generated at the state, local, and federal level available for law enforcement identification purposes on a nationwide basis. *See King*, 569 U.S. at 444-45. The authorized law enforcement identification purposes "go[] beyond ensuring that the proper name is typed on the indictment," *id.,* at 450, including generating leads related to identifying forensic DNA profiles from crime scenes by linking them to known DNA profiles collected from individuals pursuant to legal authority (*e.g.*, arrestees and convicted offenders). *See* 34 U.S.C. § 12592; *see also King*, 569 U.S. at 440, 450-55.

Recognizing that sensitive information can be discerned from DNA, Congress built into the system, from the very beginning, stringent protections for privacy and safeguards against potential misuse. First, Congress imposed a general legal limitation of the use of collected DNA samples and profiles that precludes their use except for specified law enforcement identification purposes. *See* 34 U.S.C. § 40706(b)) (restricting the use of DNA test results to the purposes specified in the Crime Control Act); § 40706(c) (imposing criminal penalties for misuse of

DNA). These privacy protections have been perpetuated and extended in subsequent enactments, up to the present. *See* 34 U.S.C. § 12592(b)(3), § 40706.

Second, CODIS has been designed and implemented in a manner that strictly limits the use of the DNA identification information. Thirteen "core loci" have been used from the start for DNA identification in CODIS. *See King*, 569 U.S. at 464. These are non-coding loci that have no known influence on an individual's traits, disorders, or dispositions. *See id.* at 442-45. Seven other loci were subsequently added following notification to Congress to facilitate identification in cases involving degraded DNA samples and to facilitate international law enforcement cooperation involving DNA identification. The seven additional loci, like the 13 original loci, are non-coding sites that do not disclose or compromise sensitive genetic information and have no known association to medical conditions or defects.[1]

The DNA Identification Act has been renewed and supplemented over time. For example, the DNA Analysis Backlog Elimination Act of 2000, Public L. 106-546, 114 Stat. 2726, authorized the collection of DNA samples from certain federal offenders and entry of the resulting profiles into the National DNA Index System ("NDIS"), which is one part of CODIS that contains the DNA profiles contributed by federal, state, and local participating forensic laboratories.[2]

The DNA Fingerprint Act of 2005, Pub. L. 109-162, title X, 119 Stat. 2960, 3084, brought the DNA identification system into its present form. The Act, whose objective is the creation of an "all-arrestee" DNA database, was the culmination of a series of enactments in which Congress progressively extended the scope of DNA sample collection and indexing, both

---

[1] *See Biometrics and Fingerprints, Law Enforcement Resources, FBI,* https://le.fbi.gov/science-and-lab/biometrics-and-fingerprints/codis-2 (last accessed Sept. 29, 2026).
[2] *See* Frequently Asked Questions on CODIS and NDIS, FBI, at www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet (last accessed Sept. 29, 2026).

with respect to the classes of persons subject to DNA identification in the federal jurisdiction, and with respect to the classes of DNA profiles that states may enter into NDIS. *See* 151 Cong. Rec. S13756-58 (daily ed. Dec. 16, 2005) (remarks of Sen. Kyl, sponsor of the DNA Fingerprint Act, explaining the value of including all arrestees in the DNA database).

The DNA Fingerprint Act assigned to the Attorney General responsibility for realizing its objective of an all-arrestee DNA database. "The Attorney General may, as prescribed by the Attorney General in regulation, collect DNA samples from individuals who are arrested, facing charges, or convicted or from non-United States persons who are detained under the authority of the United States." 34 U.S.C. § 40702(a)(1)(A). The Attorney General "may also authorize and direct any other agency of the United States that arrests or detains individuals or supervises individuals facing charges to carry out any function and exercise any power of the Attorney General under this section." *Id.*

The Attorney General carried out this responsibility by issuing a final rule in 2008. *See* DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction, 73 Fed. Reg. 74932 (Dec. 10, 2008) (codified at 28 C.F.R. § 28.12). As relevant here, the regulation provides:

> Any agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples from individuals who are arrested, facing charges, or convicted, and from non-United States persons who are detained under the authority of the United States.

28 C.F.R. § 28.12(b); *see* 73 Fed. Reg. 74932 (explanation in 2008 rulemaking); *see also* DNA-Sample Collection From Immigration Detainees, 85 Fed. Reg. 13483 (Mar. 9, 2020) (explanation in subsequent rulemaking amending 28 C.F.R. § 28.12 to facilitate DNA sample collection from immigration detainees, in addition to criminal arrestees).

### C. DNA Expungement Process

In addition to authorizing DNA collection and analysis, Congress also created a process for individuals to seek expungement of DNA records in certain circumstances. The current version of the expungement provisions, enacted by the DNA Fingerprint Act of 2005, requires expungement for federal arrestees if the Attorney General "receives, for each charge against the person on the basis of which the [DNA] analysis was or could have been included in [NDIS], a certified copy of a final court order establishing that such charge has been dismissed or has resulted in an acquittal or that no charge was filed within the applicable time period." 34 U.S.C. § 12592(d). The "applicable time period" referenced in the statute is the limitation period for prosecuting the offense underlying the arrest (*see* 151 Cong. Rec. 28857 (2005) (remarks of Sen. Kyl)), which is five years for most federal crimes. *See* 18 U.S.C § 3282.

FBI has established procedures to expunge DNA records in accordance with 34 U.S.C. § 12592(d). Upon the submission of appropriate documentation, a qualifying individual may request a "complete removal of a DNA profile from" NDIS and "the destruction of the associated DNA sample(s) (*e.g.*, liquid blood sample, FTA card, non-FTA card, buccal collection device, extracted DNA, amplified DNA)." [3]

### D. Summary of Complaint Allegations

Plaintiffs are four individuals who were arrested while protesting at the Broadview ICE Processing Center in Broadview, Illinois in the fall of 2025. Compl. ¶ 2. Plaintiffs were arrested for violations of 18 U.S.C. § 111, which prohibits assaulting, resisting, or impeding federal officers. Compl. ¶¶ 18, 157, 199, 214. Plaintiffs claim they were each arrested without probable cause. *Id.* ¶¶ 1, 245, 254, 264. As part of their arrests, each Plaintiff had his or her DNA collected

---

[3] *See* DNA Fingerprint Act of 2005, Expungement Policy, FBI, at www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy (last accessed Sept. 29, 2026).

for processing. *Id.* ¶¶ 16-19. Two Plaintiffs—Ian Sampson and Grace Cooper—were never charged with any offenses based on their respective arrests. *Id.* ¶¶ 3, 17, 18. The other two plaintiffs—Dana Briggs and Jacqueline Guataquira—were charged with misdemeanors that were later dismissed. *Id.* ¶¶ 3, 16, 19.

The "lawsuit challenges the constitutionality of the DNA Act and its implementing regulations as applied to each Plaintiff." *Id.* ¶ 122. The seven-count complaint includes a combination of constitutional, APA, and ultra vires claims. Plaintiffs ask the Court to "Declare that the DNA Act, 34 U.S.C. § 40702, and its implementing regulations, 28 C.F.R. §§ 28.12-13, are unconstitutional as applied to the [] Plaintiffs' DNA" and "as applied to individuals" who "are arrested without probable cause" or under other circumstances the Complaint suggests are similar to the Plaintiffs. Compl., Prayer for Relief at 85; *see also* Compl. ¶¶ 237-247 (Count I), ¶¶ 252, 254, 262-63 (Counts II and III).

Plaintiffs also ask the Court to declare that the government's policies and practices regarding the arrests of individuals participating "in protest[s] of the government's federal immigration policy" and the subsequent collection and retention of DNA after such arrests, constitute violations of the First Amendment. Compl., Prayer for Relief at 85 and Count IV, ¶ 272. In addition, Plaintiffs ask the Court to vacate and set aside government regulations and policies that allow for or require the collection of DNA samples from any person arrested for any federal crime. *See* Compl., Prayer for Relief at 86, Counts V and VI (¶ 282 and ¶297), and Count VII (¶¶ 303-04).

## III. LEGAL STANDARD

Defendants bring this motion under Rule 12(b)(1), arguing lack of standing, and under 12(b)(6), arguing that Plaintiffs have failed to state a claim.

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Because federal courts possess limited jurisdiction, and jurisdiction is power to declare the law, the first step in any federal lawsuit is ensuring the district court possesses authority to adjudicate the dispute—in short, that it has jurisdiction over the subject matter." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 550 (7th Cir. 2021) (citation modified). Where a party seeks prospective equitable relief, it must make "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). While allegations of past injury might support a remedy at law, prospective equitable relief requires a claim of imminent future harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, under this standard, the court accepts the factual allegations within the complaint as true, drawing reasonable inferences and resolving ambiguities in favor of the pleader. *See Christensen v. County of Boone*, 483 F.3d 454, 457 (7th Cir. 2007). But this plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Legal conclusions, "'naked assertion[s]' devoid of 'further factual enhancement,'" and "a formulaic recitation of the elements of a cause of action" are legally insufficient to state a plausible claim. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). For Rule 12(b)(6) purposes, a court may consider not only the complaint itself, but also "documents

attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## IV. ARGUMENT

### A. PLAINTIFFS' COMPLAINT SHOULD BE DIMISSED FOR LACK OF JURISDICTION

#### 1. Plaintiffs Lack Standing to Seek Prospective Relief Regarding a Future Law Enforcement Encounter or DNA Retention

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" § 2, cl. 1. For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025). "[A]n essential and unchanging part of the case-or-controversy requirement" is the doctrine of standing—the idea that a plaintiff can invoke the judicial power only to decide real disputes and not to answer abstract questions. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"[S]tanding contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical[.]' Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 504 U.S. 555, 560-561 (citations omitted). *Accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Here, where Plaintiffs seek prospective relief – a permanent injunction, vacatur, expungement, and broad declaratory relief barring future application of the DNA Act, 34 U.S.C.

§ 40702, and its implementing regulations, 28 C.F.R. §§ 28.12-13, *see* Compl., Prayer for Relief at 84-87, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury'" are not sufficient. *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Standing for prospective relief "does not exist merely because [P]laintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in the grant of the application for stay). Plaintiffs must show a concrete, personal, and particularized threat of future injury without reliance on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414.

Plaintiffs lack standing to obtain prospective relief against a future arrest or DNA collection because they cannot establish a "real and immediate threat" that they will suffer the same injury again in the future. The *Lyons* decision is instructive. 461 U.S.at 105. Under *Lyons*, the question is whether any given plaintiff has alleged "a sufficient likelihood" such that the specific plaintiff will "again be wronged in a similar way[.]" *Id.* 461 U.S. at 111. Plaintiffs cannot make that showing.

That Plaintiffs were arrested in the fall of 2025 and subject to a DNA swab does not entitle them to rewrite standard arrest procedures going forward. Where, as here, Plaintiffs seek prospective relief from allegedly "unconstitutional behavior," claims of past harm are "too remote or attenuated to sustain [a court's] jurisdiction under Article III." *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (citing *Lyons*, 461 U.S. at 105-06).

The Supreme Court's decision in *Lyons* is instructive. 461 U.S. 95. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Id.* at 97.

Even though the plaintiff alleged that he had been subjected to excessive force "without any provocation or resistance on his part," the Court held that allegation was insufficient to establish standing for his claim to injunctive relief. *Id.* at 105 "That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages . . . , does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* The Supreme Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" even though the police department allegedly "routinely appl[ied] chokeholds" in such situations. *Id.*

Applying *Lyons*, this Circuit has repeatedly recognized that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law-enforcement conduct in the past. *See, e.g.*, *Goldhamer v. Nagode*, 621 F.3d 581, 584-85 (7th Cir. 2010) (stating that while there was "no doubt" plaintiff would have standing for damages for an unlawful arrest, it did not provide plaintiff standing to seek prospective relief); *Campbell v. Miller*, 373 F.3d 834, 835-36 (7th Cir. 2004) (noting that "[u]nless the same events are likely to happen again [] there is no controversy[.]". For example, in *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375 (7th Cir. 2019), the Seventh Circuit, applying *Lyons*, held the plaintiffs did not have standing "that would justify the equitable relief sought" because "the source of his injury [was] a single, isolated incident" and that the odds that he would be in the same circumstances as before "resulting in an encounter with the Sheriff's Department, and again be detained at ICE's request are not sufficient to make out a federal case for equitable relief." *Id*. at 396 (*citing Lyon*s, 461 U.S. at 105, 108) (cleaned up and internal citations omitted).

More recently, the Seventh Circuit relied on *Lyons* in staying an overbroad preliminary injunction prohibiting various law enforcement actions in a similar First Amendment retaliation case brought by a group of individuals protesting DHS's immigration enforcement at the Broadview facility and in greater Chicago. *See* Order, *Chicago Headline Club. v. Noem,* No. 25-3023 (7th Cir. Nov. 19, 2025) ("*Chicago Headline Club* Stay Order"), ECF No. 28. Like this case, the plaintiffs sought broad prospective relief to prohibit DHS from undertaking various law enforcement actions against them in the future. The Seventh Circuit reiterated that plaintiffs must show "that the past harm they allegedly faced is likely to imminently happen to them in the future." *Chicago Headline Club* Stay Order at 2) (citing *Lyons*, 461 U.S. at 105-06). "A fear that such harm will recur is insufficient, on its own, to show standing for injunctive relief." *Id.* The Seventh Circuit also noted that changed circumstances in Chicago—namely the end of Operation Midway Blitz—indicate that the "enhanced immigration enforcement initiative may have lessened or ceased," thus affecting "both the justiciability of this case and the propriety of injunctive relief." *Id*. In ultimately vacating the injunction, the Seventh Circuit concluded that "the district court's standing analysis appears to be in substantial tension with *Lyons*." *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1041 (7th Cir. 2026) ("[P]laintiffs suing for injunctive relief cannot establish standing by mere speculation.").

*Lyons* and its progeny foreclose standing here. Plaintiffs' claims arise from single arrests that occurred on September 27, 2025 (Briggs and Sampson) and October 3, 2025 (Cooper and Guataquira). Compl. ¶¶ 16-19. Like the one-time arrest in *Lopez-Aguilar,* those prior incidents do not establish that Plaintiffs will likely "again be wronged in a similar way." *Lyons*, 461 U.S. at 111. Plaintiffs do not allege that they were threatened with arrest before these isolated incidents, nor do they allege likely threat of re-arrest. The Complaint contains no allegations of actual and imminent

injury, and Plaintiffs do not even acknowledge the end of Operation Metro Blitz and its impact on the likelihood of their alleged injuries. *See Tincher v. Mullen*, No. 0:25-CV-4669 (KMM/DTS), 2026 WL 2797318 at *7 (D. Minn. Sept. 18, 2026) (dismissing complaint alleging DHS violated the First and Fourth Amendment rights of protesters in Minnesota for lack of standing because "Plaintiffs simply cannot allege an imminent risk of harm necessary to pursue prospective injunctive relief" following the conclusion of Operation Metro Surge in Minnesota). Accordingly, Plaintiffs have not adequately alleged a "real and immediate threat" of future arrest and an accompanying DNA swab to establish standing. *Id*. at 105. "Absent continuing, present adverse effects, [Plaintiffs'] past exposure to illegal conduct by the defendants does not amount to a present case or controversy for equitable relief." *Lopez-Aguilar*, 924 F.3d at 396 (citation modified).

This is true regardless of whatever allegations Plaintiffs make regarding the impact that that the past arrests have on their future behavior. In *Ashcroft v. Mattis*, for example, the Supreme Court considered the situation where the plaintiff brought a wrongful death claim against police officers who shot and killed his son while attempting to escape arrest. 431 U.S. 171, 172-173 (1977). Although the plaintiff alleged that he feared for his other son who could become the subject of an attempted arrest in the future, the Court held he did not have standing because no "present right" was at stake. *Id*. at 172 & n.2. The Court reasoned that "[e]motional involvement i[n] a lawsuit is not enough to meet the case-or-controversy requirement; were the rule otherwise, few cases could ever become moot." *Id*. at 173.

Plaintiffs likewise cannot claim that current "government[] regulations, policies, and practices regarding DNA collection and retention" make the threat of future harm any more imminent. Compl. ¶ 280. In *Lyons* the police department allegedly *had* a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force."

*Lyons*, 461 U.S. at 105. But the Supreme Court reasoned that "it is no more than conjecture to suggest that in every [such situation] the police will act unconstitutionally and . . . it is surely no more than speculation to assert" the plaintiff would be arrested again. *Id.* at 108. So too here, because it must be assumed that "plaintiffs will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct[.]" *Id.* at 103 (citing *O'Shea* v. *Littleton*, 414 U.S. 488, 497 (1974) (internal citations removed))*;see also Vasquez Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J. concurring) (stating that plaintiffs lack standing because they "have no good basis to believe that law enforcement will unlawfully stop them in the future [or] that any stop of the plaintiffs is imminent." (emphasis omitted)).

Plaintiffs also cannot avoid Article III's requirements simply because their asserted injuries are framed in First Amendment terms. *Lyons* applies where a party's conduct involves First Amendment activity. *See Goldhamer*, 621 F.3d at 586 (applying *Lyons* to First Amendment challenge); *Chicago Headline Club*, 168 F.4th at 1041. Further, Plaintiffs cannot establish standing by alleging that their prior arrests "chilled" their intent to protest in the future. Compl. ¶ 161. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Further, Plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective chill" on protected speech. *Clapper*, 568 U.S. at 416-18 (quoting *Laird*, 408 U.S. at 13). Thus, even if Plaintiffs intend to continue their protest activities, they have failed to establish that they will themselves be retaliated against in the future.

Finally, the relief Plaintiffs seek is entirely out of proportion to the alleged injury. The "normal[] and adequate" remedy for a Fourth Amendment violation is retroactive individualized

relief, not a programmatic injunction constraining law-enforcement operations in the future. *Campbell*, 373 F.3d at 835 (stating that "[e]rroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc").

**2. Plaintiffs Lack Standing to Seek Expungement of DNA Records Created During Their Arrests in 2025**

Plaintiffs also lack standing to seek relief prohibiting Defendants from "from retaining, using, or disseminating DNA collected from Plaintiffs" during their arrests in 2025, or expunging those records for another reason. Compl., Prayer for Relief at 87. The Supreme Court and Seventh Circuit have held that the collection of information by government organizations does not establish injury-in-fact absent evidence of concrete harm to the individuals whose information is recorded. And in a variety of contexts, the mere retention of records, including records alleged to have been maintained in violation of law, is generally insufficient to establish standing. Plaintiffs have failed to plausibly allege that Defendants' retention and use of their DNA records in accordance with the statutory requirements imposed by Congress causes an imminent cognizable Article III injury.

In *Swanigan v. City of Chicago,* 881 F.3d 577, 584 (7th Cir. 2018), a plaintiff who had been misidentified as a bank robber (and claimed that the City had violated his due process and Fourth Amendment rights in the process) did not have standing to seek expungement of a "cleared-closed case file" that continued to label him as the bank robber. The Seventh Circuit found that it was "entirely speculative to suggest that a police officer might use the cleared-closed file to violate [the plaintiff's] rights in some unknown way" in the future. *Id.*; *see also Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 988, 992 (9th Cir. 2023) (holding that "the retention of the allegedly illegally obtained records at issue, without more, does not give rise to a concrete injury necessary for standing"); *J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600,

601, 606 (D.C. Cir. 1996) (finding no standing to seek expungement of FBI records because alleged injuries from continued retention of the documents are too speculative).

Plaintiffs here have failed to carry their burden of demonstrating that the records they seek to have enjoined or expunged cause them ongoing or future injury. Instead, Plaintiffs' alleged injuries come from a "fear [of] what the government will do with [their] DNA" or "what this means for [their] famil[ies'] safety" or "what the government might do with that information." Compl. ¶¶186, 204, 161. But simply wondering "what this means" does not come close to meeting the strict standard of a concrete injury. *Id.* ¶ 204. Nor does the allegation by one Plaintiff that "[s]he does not know how her genetic information might be used against her . . . and that uncertainty itself is its own source of distress." *Id.* These speculative allegations of future injury are far from being either "particular [or] concrete." *Steel Co.*, 523 U.S. at 109. Further, Plaintiffs' speculative fear that their DNA might be misused in some way is all the more conjectural given the strict statutory limitations Congress has imposed on use of DNA records and the potential criminal penalties for misuse. Therefore, these "[a]llegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore*, 495 U.S. at 158.

Plaintiffs' alleged injuries all boil down to the same thing—Plaintiffs' subjective fears that the government will somehow misuse their DNA identification profiles in the future. But Plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm[.]" *Clapper*, 568 U.S. at 416-18 (quoting *Laird*, 408 U.S. at 13). Plaintiffs' speculative "worries that the government may someday target them because of [] protest activity" does not provide standing because there is no present injury. Compl. ¶ 204. No matter how serious the risk of future injury might be, such alleged injuries are not concrete because the risk may never materialize, which "would ordinarily be cause for celebration, not a

lawsuit." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435-37 (2021) (holding certain members of a class action did not have standing based on the risk of future injuries).

Thus, the mere retention of records, even records alleged to have been maintained in violation of law, are insufficient to establish standing. In *TransUnion*, a class of plaintiffs alleged that a credit company wrongly identified them in credit reports as potential terrorists, drug traffickers, or other serious criminals in violation of a law requiring the agency to "follow reasonable procedures to assure maximum possible accuracy" in consumer reports. 594 U.S. at 418 (citation omitted). The Supreme Court held that the credit agency's unlawful maintenance of the inaccurate records, without more, did not inflict an injury in fact to the class members. The Court compared it to the situation where "someone wrote a defamatory letter and then stored it in her desk drawer. A letter that is not sent does not harm anyone, no matter how insulting the letter is. So too here." *Id.* at 434-37.

And in *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909 (7th Cir. 2017), the plaintiff claimed that his former cable provider violated a law requiring cable operators to "destroy personally identifiable information" when no longer needed for its original purpose, 47 U.S.C. § 551(e), and sought injunctive relief requiring the expungement of his information. The court "assume[d] at least tentatively that Time Warner had violated the statute" but held that "the absence of allegation let alone evidence of any concrete injury inflicted or likely to be inflicted on the plaintiff as a consequence of Time Warner's continued retention of his personal information precludes the relief sought" and compelled dismissal "for want of standing." *Gubala*, 846 F.3d at 910, 913; *see Phillips*, 74 F.4th at 995 ("In sum, there is no support for plaintiffs' claim that the government's unlawful collection and retention of records alone gives

rise to a concrete injury for purposes of standing."). These cases foreclose Plaintiffs' standing to seek prospective relief against their DNA records.

**3. Plaintiffs' Expungement Claim is Not Ripe Because Plaintiffs Have Not Exhausted the Statutory Remedy Established By Congress**

In the alternative, Plaintiffs' expungement request is not ripe. Congress has established administrative mechanisms for individuals to seek expungement of their DNA records, and the Court should require Plaintiffs to undertake those steps before adjudicating a premature constitutional issue. *See Pub. Utilities Comm'n of Cal. v. United States*, 355 U.S. 534, 539-40 (1958) ("If . . . an administrative proceeding might leave no remnant of the constitutional question, the administrative remedy plainly should be pursued.").

The DNA Identification Act of 1994 provides that the FBI "shall promptly expunge" the DNA record for any individual if the Attorney General "receives, for each charge against the person on the basis of which the [DNA] analysis was or could have been included in [NDIS], a certified copy of a final court order establishing that such charge has been dismissed or has resulted in an acquittal or that no charge was filed within the applicable time period." 34 U.S.C. § 12592(d). As noted earlier, FBI has established procedures to expunge DNA records in accordance with 34 U.S.C. § 12592(d), and Plaintiffs should avail themselves of that process.

Two of the four Plaintiffs are currently eligible to have their DNA expunged immediately upon request. Plaintiff Briggs received a final order dismissing the charges against him with prejudice. *See United States v. Briggs*, 810 F. Supp. 3d 994 (N.D. Ill. 2025). Similarly, the district court dismissed the charges against Plaintiff Guataquira at the government's request. *See United States v. Guataquira*, No. 25-CR-660 (N.D. Ill. 2026) (ECF Nos. 15, 18). Upon submission of the appropriate documentation of these orders, the FBI "shall promptly expunge" their DNA records. 34 U.S.C. § 12592(d)(1)(A).

The remaining two Plaintiffs—Sampson and Cooper—were arrested for violations violation of 18 U.S.C. § 111(a), but charges were never filed against them. Compl. ¶ 184 ("According to an HSI Incident Report dated October 8, 2025, the United States Attorney's Office for the Northern District of Illinois declined to prosecute Ms. Cooper[.]); *Id.* ¶ 157 (stating that no charges were ever filed against Sampson and charges were "Declined"). Accordingly, they will be eligible to seek expungement of their DNA records upon the expiration of the "applicable time period" to bring any such charges. 34 U.S.C. § 12592(d)(1)(A); *see* 18 U.S.C. § 3282 (establishing five-year time period to bring charges for non-capital offenses).

In light of the availability of this remedial process, Plaintiffs' expungement request is not ripe. Rooted in Article III limitations and prudential considerations, "[r]ipeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)); *see also Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) ("Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to[.]"). "Refusing to involve the courts in ongoing administrative matters both protects judicial resources and comports with the judiciary's role as the governmental branch of last resort." *In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011). As the Supreme Court explained in *Abbott Labs.,* "injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Labs*., 387 U.S. at 148.

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction[,]" *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) (citations omitted). In deciding whether a dispute is prudentially ripe, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149; *see also Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021). Here, both factors support the conclusion that Plaintiffs' expungement claim is not ripe.

The constitutional issues that Plaintiffs raise are not fit for judicial review because Plaintiffs have not exhausted the expungement remedy that Congress has provided by statute. As the Supreme Court has made clear, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States*, 395 U.S. 185, 193 (1969) (citation omitted); *see also Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89, 114 (2d Cir. 2007) ("The principle of constitutional avoidance is an integral part of the ripeness analysis in such cases, and tilts the balance in favor of finding a constitutional issue unripe for review."); *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000) ("Federal courts should not decide constitutional questions unless it is necessary to do so."). This Court need not resolve the constitutional issues in this case because there is an available administrative process that Congress has established to provide Plaintiffs with the very relief they seek in this lawsuit. *See Brandt v. Village of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010) (stating that courts must not decide cases "until the dispute is ripe, . . . and must avoid unnecessary constitutional adjudication"). Ultimately, exhausting the administrative DNA expungement process "promotes efficiency" by allowing the FBI to address the issue in a

manner that may be "resolved much more quickly and economically" than "litigation in federal court." *Woodford* v. *Ngo*, 548 U.S. 81, 89 (2006).

Additionally, withholding judicial review over the expungement claim will not cause a hardship to Plaintiffs. Plaintiffs Briggs and Guataquira may submit a request for immediate expungement because they have final orders dismissing the charges against them. The expungement statute requires that the FBI "shall promptly expunge" their DNA record upon the submission of the appropriate documentation. 34 U.S.C. § 12592(d). Therefore, the administrative process will be a much faster and more efficient mechanism to obtain the relief they seek than litigating this case to conclusion. Plaintiffs Sampson and Cooper can similarly seek relief through the administrative process after the applicable limitation period runs. The fact that their DNA record will be retained in the interim will not cause a hardship given the statutory restrictions on the use of those records and the fact that retention of those records does inflict any Article III injury. *See supra* at 4-5, 16-18. Moreover, any theoretical hardship Plaintiffs would claim is caused by having such records stored is belied by the fact that Plaintiffs have not sought expungement of any of their other records of arrest, such fingerprints or an electronic report noting the incident of arrest, such as would be stored in the National Crime Information Center.[4] Unlike DNA, there are no statutory restrictions on the use of these types of records, nor any administrative process for expungement. Nonetheless, when courts have dealt with expungement of these other arrest records, they have often declined to require expungement. *See e.g., United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir. 1977) (denying a motion to expunge and noting that although typical arrest records such as fingerprint may impose a substantial injury to an individual's reputation, "[r]etaining and preserving arrest records [also] serves the important

[4] See https://www.justice.gov/tribal/national-crime-information-systems

function of promoting effective law enforcement. . . In considering these equities, courts must be cognizant that the power to expunge is a narrow one, and should not be routinely used[.]") (internal citations omitted).

Circuit courts have generally applied the same rationale for retaining arrest records to the retention of DNA profiles. *See e.g.*, *United States v. Amerson*, 483 F.3d 73, 86–87 (2d Cir. 2007) (in affirming denial of expungement of a DNA profile, the Circuit noted "it is well established that the state need not destroy records of identification—such as fingerprints, photographs, etc.—of convicted felons, once their sentences are up. . . The same applies to DNA."); *Boroian v. Mueller*, 616 F.3d 60, 67 (1st Cir. 2010) (rejecting challenge to government retention of DNA by noting that other identification records such as fingerprints are routinely retained by the government and "may be expunged only in narrowly defined circumstances"). Even in the limited examples where courts have ordered expungement of arrest records like fingerprints, they have done so based on factors not at issue here—such as whether such records could impact the arrested person's "[o]pportunities for schooling, employment, for professional license[.]" *United States v. Benlizar*, 459 F. Supp. 614, 620, 625 (D.D.C 1978) (finding on balance that the arrest records should be expunged for the applicant whose conviction was tainted and overturned). But Plaintiffs here have not alleged any such hardships, nor could they as the statutory restrictions on the use of DNA records prevent any such use or public disclosure of those records. Moreover, whereas the case law concerning expungement generally deals with arrests records such as fingerprints that the government may retain indefinitely, Plaintiffs here all have or will have the opportunity to seek expungement through the administrative process.

**4. Plaintiffs Cannot Gloss Over the Elements of Standing for Each Count**

Standing also must be established separately for each form of relief sought. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *Lyons*, 461 U.S.

at 105–06, 109. Although Plaintiffs bring multiple counts, standing is not "dispensed in gross," and Plaintiffs must demonstrate standing for each count "[they] seek[] to press and for each form of relief that is sought." *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (citations omitted). Plaintiffs have not done that here. Instead, Plaintiffs make conclusory allegations for each claim that they "have suffered and will continue to suffer injury" without specifying in concrete and specific terms what that injury was, how the government's conduct allegedly caused it, and most significantly, how the requested relief will likely redress those injuries. Comp. ¶¶ 247, 257, 268, 277, 284, 298.

This failure is significant because Plaintiffs fail to establish how the alleged injury or injuries relates to each Count. The injury Plaintiffs allege they "will continue to suffer" appears to be based on the premise that the ongoing retention of the DNA records collected during their arrest causes an ongoing injury due to Plaintiffs' subjective fears of what the government will do with that information. As discussed above, that premise is faulty as Plaintiffs cannot "manufacture standing" through self-inflicted fear. *Clapper*, 568 U.S. at 416-18. Thus, Plaintiffs' allegation that "they will continue to suffer" does not meet the initial threshold of an injury in fact because an alleged injury must not be "conjectural or hypothetical." *Lyons*, 461 U.S. at 101-02 (citation omitted).

The injuries Plaintiffs allege they "have suffered" are presumably 1) the arrests themselves, which they allege were made without probable cause and 2) as alleged in Plaintiffs' Count II, the use of a buccal swab to compel collection of DNA. Compl. ¶¶ 16–19, 250. But the use of a buccal swab, "which involves a brief and minimal intrusion with virtually no risk, trauma, or pain" is not a concrete injury in and of itself. *King* at 438 (citations omitted). In comparison, it is "a far more gentle process than a venipuncture to draw blood [and] involves but

a light touch on the inside of the cheek[.]" *Id*. at 446. And even before the *King* decision, the Seventh Circuit upheld a Wisconsin state law requiring the warrantless retroactive collection of DNA from prison inmates because DNA collection "is only a minimal intrusion on one's personal physical integrity." *Green v. Berge*, 354 F.3d 675, 677 (7th Cir. 2004). And while prison inmates may have lesser expectations of privacy than the general public, "[t]he difference between those in custody and those under supervision is a distinction without a difference for the purposes of the DNA Act and the Fourth Amendment." *United States v. Hook*, 471 F.3d 766, 772 (7th Cir. 2006).

Thus, Plaintiffs do not, nor could they, allege that they were actually *injured* by the use of a buccal swab. At most, the use of a buccal swab is a search (which is reasonable for reasons discussed in Section IV.B.). While the arrests themselves would seemingly be "particular and concrete," *Steel Co.*, 523 U.S., at 109, Plaintiffs notably did *not* include a Count directly related to the arrests. That would be a Count with a clear concrete alleged injury and a clear government action. Instead, Plaintiffs' claims all involve alleged government actions that happened *after* the alleged illegal arrests. But Plaintiffs cannot simply borrow the clear concrete alleged injury or government action from the prior alleged illegal arrests to provide the injury or causality elements for standing on subsequent disparate claims.

For example, Plaintiffs' Count II involves the processing of Plaintiff's' DNA samples that were *already* collected. But at this stage, there is no contact with the Plaintiffs whatsoever, either in their persons or property. Thus, it is not even considered a search under *King*. As the Supreme Court explained, although the use of a buccal swab to collect a DNA sample from an arrestee's mouth is a Fourth Amendment "search," 569 U.S. at 446, the subsequent analysis of that sample and extraction of a DNA identification profile "pursuant to CODIS procedures" does not

independently "amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment" notwithstanding the legality of the initial search, *id.* at 465. Thus, the alleged illegal arrests do not establish the requisite elements for injury or causality. The same is true for each of Plaintiffs' other Counts. Without the arrests, Plaintiffs' only alleged injuries are hypothetical future harms for which there is no causal connection to the government's conduct other than through a highly attenuated and "speculative chain of possibilities[.]" *Clapper*, 568 U.S. at 410.

And even if Plaintiffs "could demonstrate injury in fact" through speculation, that "cannot satisfy the requirement that any injury in fact must be fairly traceable." *Id.* at 411. To obtain standing, Plaintiffs therefore must allege a "specific present objective harm" which they have not done. *Id.* at 418. When an alleged injury consists of a fear of "what the government might do with that information" obtained from DNA, causation is impossible because the government has not done anything. Compl. ¶ 161. Further, Plaintiffs' fear that their DNA records might be misused is all the more speculative given the myriad statutory prohibitions, including criminal penalties, on such unauthorized uses. *See, e.g.*, 42 U.S.C. §§ 14132, 14135e, 12592, 34 U.S.C. § 40702.

## B. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

### 1. Plaintiffs Fail to State Any Fourth Amendment Claims

When Plaintiffs were booked as part of their arrest, they provided a DNA sample that was sent to the FBI for processing. Compl. ¶ 45. From this single event, Plaintiffs bring three separate claims under the Fourth Amendment on the basis that "[t]he government's creation of a DNA profile is a sufficiently separate invasion of privacy from the initial extraction of DNA that it is considered a separate search under the Fourth Amendment." *Id.* ¶ 46 (citations omitted). As a

matter of law, that is incorrect (*see supra* at 25-26), but Plaintiffs' basis for each claim (and Defendants' analysis) is the same regardless. Plaintiffs' Fourth Amendment claims are based on a faulty analysis of *Maryland v. King*, which held that the government's collection, processing, and retention of DNA samples of arrestees for purpose of identification, as challenged here, does not implicate the Fourth Amendment.

***a. Plaintiffs Misread Maryland v. King--the DNA Act And Its Implementing Regulations Are Lawful Because They Prescribe Reasonable Searches***

While the taking of a DNA sample is a search, "the Fourth Amendment does not proscribe all searches, only those that are unreasonable." *Green*, 354 F.3d at 676-77; *see Nat'l Treasury Emps. Union v. Von Raab,* 489 U.S. 656, 665 (1989) (holding that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance").

In *Maryland v. King*, the Supreme Court considered the constitutionality of Maryland's DNA Collection Act. 569 U.S. 435 (2013). The case arose from King's arrest for menacing a group of people with a shotgun. *Id.* at 441. The DNA sample collected from him during booking led to his identification as the perpetrator in an unsolved 2003 rape case. *Id.* He moved to suppress the subsequently collected and analyzed DNA evidence on the grounds that the collection and use of his DNA information based on his unrelated arrest pursuant to the state statute violated the Fourth Amendment. *Id.*

In upholding his conviction, the Supreme Court broadly held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." *Id.* at 465. The Supreme Court concluded that "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like

fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." *Id.* at 465-66.

The Court's analysis notes that the reasonableness of collecting DNA from arrestees under the Fourth Amendment depends on balancing the legitimate governmental interests served by the search against its intrusiveness. *Id*. at. 448. On the side of government interests, the Court recognized that the government has a "well-established" interest in utilizing a "safe and accurate way to process and identify the person and possessions they must take into custody." *Id.* at 449; *see id.* at 450-56 (listing various interests served by DNA collection and identification, including linking an arrestee, like King, to forensic DNA profiles from other unsolved crimes). On the other side of the balance, the Court found that "the intrusion of a cheek swab to obtain a DNA sample is a minimal one" and "[t]he expectations of privacy of an individual taken into police custody 'necessarily are of a diminished scope.'" *Id*. at 461-64 (citation omitted). And since the arrestee is already in custody, "[t]he DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in the often competitive enterprise of ferreting out crime." *Id*. at 448 (citation omitted).

*King*'s analysis was not confined to the factual specifics of the Maryland law under review. Indeed, the Supreme Court was well aware of the variation in state and federal laws that authorize DNA collection incident to an arrest and expressly declined to issue a decision limited to the Maryland law at issue:

> Twenty-eight States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees. See Brief for State of California et al. as Amici Curiae 4, n. 1 (States Brief) (collecting state statutes). Although those statutes vary in their particulars, such as what charges require a DNA sample, *their similarity means that this case implicates more than the specific Maryland law. At issue is a standard, expanding technology already in widespread use throughout the Nation.*

*King*, 569 U.S. at 445-46 (emphasis added). Further, the Court observed that the "CODIS system has grown to include all 50 States and a number of federal agencies." *Id.* at 444-45.

The Supreme Court thus was fully aware of the broader implications of its decision and never limited (expressly or otherwise) its Fourth Amendment holding to the contours of the Maryland state law. Indeed, the Court recognized that its analysis would govern an "expanding technology already in widespread use throughout the Nation." *Id.* at 446. Additionally, *King's* balance of the government's legitimate interests in arrestee identification that applies at booking for a custodial arrest and the minimal privacy interests of arrestees in that context supports the conclusion that the federal DNA statute and its implementation regulations are constitutional for the same reasons.

While the Maryland law as issue required a judicial officer to subsequently confirm there was probable cause to detain the arrestee for a serious offense before a DNA sample could be taken, the Supreme Court's analysis did not include any assessment of whether there existed probable cause to arrest King nor of the severity of the crime he committed but instead began by recognizing that often "the public interest is such that neither a warrant nor probable cause is required[.]" *Id*. at 447 (quoting *Maryland* v. *Buie*, 494 U.S. 325, 331 (1990)). To be sure, with respect to the severity of a crime, the Court specifically noted the importance of proper identification of suspects detained on minor offenses. "It is a common occurrence that '[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals.'" *Id.* at 450-51 (noting that "Oklahoma City bombing [culprit] Timothy McVeigh was stopped by a state trooper who noticed he was driving without a license plate" and "[o]ne of the terrorists involved in the September 11 attacks was stopped and ticketed for speeding just two days before hijacking Flight 93").

This Court should accordingly reject Plaintiffs' attempt to limit *King* only to arrests that exactly match the contours of the Maryland state law at issue. *See Haskell v. Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014) (denying preliminary injunction to a small class consisting of individuals arrested for certain felonies that were not, in plaintiffs' view, covered by *King*); *United States v. Buller*, 2018 U.S. Dist. LEXIS 2202 *14 (D.S.D.) (ordering a defendant charged with a misdemeanor to provide a DNA sample because the Supreme Court did not explicitly limit *King* to only serious felonies "as it easily could have done"). Nevertheless, as explained below, to the extent the Court may consider the factual circumstances of Plaintiffs' arrests, Plaintiffs' allegations establish that they are consistent with *King*'s holding.

***b. Plaintiffs' Own Allegations Belie Their Allegations Regarding Probable Cause***

Plaintiffs seek to draw the Court's focus away from the reasonableness of the government's taking of buccal swabs following their arrests and direct it instead to the reasonableness of the government's earlier conduct in arresting them. Compl. ¶ 245 (Count I); ¶ 254 (Count II); and ¶ 264 (Count III) (claiming that Plaintiffs' arrests lacked probable cause). As the *King* decision demonstrates, however, the constitutional analysis of whether the taking of a buccal swab from an arrestee was reasonable is entirely different than the analysis of whether probable cause existed to effect an arrest. But even accepting Plaintiffs' factual allegations as true, they establish that federal officers had reasonable grounds to arrest each Plaintiff and, in fact, *had* probable cause to arrest Plaintiffs Briggs and Guataquira for violations of 18 U.S.C. § 111, which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer while the officer is engaged in the performance of his official duties.

*Plaintiff Briggs.* Briggs went to Chicago on September 27, 2025, first to attend a festival and then "to the Broadview facility to participate in the protest against Operation Midway Blitz." Compl. ¶ 124. The Complaint alleges that Briggs was standing in a public roadway and refused

to move when directed to do so by a federal officer. *Id.* ¶ 126. After a confrontation ensued, Briggs alleges he "swatted the agent's hand away lightly with his hand" when an officer reached for Brigg's phone. *Id.* ¶ 128. He was then handcuffed and detained. *Id.* ¶¶ 129, 132.

*Plaintiff Guataquira*. The Complaint notes that Guataquira went to the Broadview facility on October 3, 2025 around 7:00 a.m. *Id.* ¶ 188. "The weekly Friday demonstrations outside Broadview had become a gathering place" for protests against Operation Midway Blitz. *Id*. Guataquira alleges she was standing with the crowd in the designated free-speech zone at approximately 9:15 a.m., when an ICE public affairs officer moved into the crowd to film the scene with an iPhone. *Id.* ¶¶ 189-90. Guataquira alleges that as the officer "approached her, [she] swatted the iPhone away, knocking it out of the public affairs officer's hand." *Id.* ¶ 190. After the public affairs officer reported that Guataquira had smacked his phone out of his hand, other DHS officers placed Guataquira in restraints and took her into custody. *Id.* ¶ 192.

*Plaintiffs Sampson and Cooper*. The Complaint alleges facts suggesting an objectively reasonable police officer may have believed they had refused to obey lawful commands to move that would impede or interfere with the officers in the performance of their duties. When Sampson was at the Broadview facility on September 27, 2025, federal agents were yelling commands at the crowd through a megaphone, and Sampson could not understand what was being said, but interpreted the officers' behavior "to mean that they wanted him to move off the public street and onto the grass." *Id.* ¶¶ 147-149. While still on the street, Sampson was grabbed by an officer and placed under arrest. *Id.* ¶ 150. Similarly, Cooper was standing "with a crowd of protesters tightly packed" in what she initially understood to be the designated free-speech zone, but was told, "One warning, one warning only. Move down the block, to the right, or you're going to be arrested!" *Id.* ¶¶ 167, 169. Cooper says she turned to leave but "it was very difficult

to move in the crowd[]" and she was then arrested. *Id.* ¶ 172. While neither Plaintiff Sampson nor Cooper included any allegations regarding them "forcibly" impeding federal officers, Plaintiffs admit to a chaotic environment (*e.g.*, agents "deploying tear gas" during "clashes" with DHS officers, Compl. ¶ 151).

These are Plaintiffs' own factual allegations, which establish that at a minimum there was sufficient probable cause arrest Plaintiffs Briggs and Guataquira under 18 U.S.C. § 111.[5] Probable cause exists if the "totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty. Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). "Only a probability or substantial chance of criminal activity is required, not an actual showing of such activity." *Pryor v. Corrigan*, 124 F.4th 475, 486 (7th Cir. 2024). In conducting Fourth Amendment analysis, courts must be cognizant that officers are confronted with "tense, uncertain, and rapidly evolving" circumstances where they are forced to "to make split-second judgments[.]" *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *see also Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (quoting *Graham*, 490 U.S. at 397).

Considering the totality of the circumstances and viewing Plaintiffs' allegations from the standpoint of an "objectively reasonable police officer," *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018), there was probable cause to arrest Plaintiffs Briggs and Guataquira. Briggs admits he forcibly "swatted the agent's hand away" and Guataquira likewise admits to swatting a federal employee's hand with enough force to knock the phone out of his hand. Compl. ¶¶ 128, 118.

---

[5] Plaintiffs' other allegations regarding the manner of their arrests, for example, of being "slammed [] to the ground" (Compl. ¶172) do not negate that Plaintiffs were all arrested for probable cause and are not relevant to the analyses of their Fourth Amendment claims. Plaintiffs have not asserted an excessive force claim.

These actions easily fit within the broad categories of conduct (*i.e.*, to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer) that are prohibited by 18 U.S.C. § 111.

Plaintiffs also contend that the United States lacked probable cause because it "never brought any criminal charges against two plaintiffs and quickly dropped minor charges against the others." Compl. ¶ 1, *see also id.* ¶¶ 139, 157, 184, 202. But lack of charges or convictions is not indicative of a lack of probable cause. *See Haskell*, 745 F.3d, at 1274 (M. Smith, J., concurring) (rejecting plaintiffs' argument "that the filing of charges and a judicial probable-cause determination are conditions precedent to permissible DNA collection" as "unsupportable[,]" after *King*). Prosecutors routinely exercise their discretion whether to pursue, or not pursue, criminal charges of properly arrested individuals based on innumerable considerations. Judges and juries likewise routinely use their authority to hold defendants liable or not liable for those charges. Thus, while only some of those who are arrested are subsequently convicted, this unremarkable fact does not in any way invalidate the factual basis for the arrests, nor does it undermine the Supreme Court's Fourth Amendment analysis in *King*.

***c. The Processing/Retention of DNA Samples For Identification Purposes Does Not Implicate the Fourth Amendment as Plaintiffs Allege in Counts II and III***

An arrest made without probable cause is unquestionably a violation of the Fourth Amendment. But Plaintiffs do not bring an unlawful arrest claim. Instead, their three separate claims under the Fourth Amendment relate solely to collection and retention of their DNA. On this subject, the *King* precedent is clear—the government's processing and retention of DNA for identification purposes does not "amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment[.]" *King*, 569 U.S. at 465. Plaintiffs may argue that "perhaps that was true in an earlier era of DNA technology" but

advances since then allow the government to obtain the individuals "private health information." Compl. ¶ 8. Plaintiffs may be correct regarding advances in DNA technology, but contrary to Plaintiffs' assertion, the government is restricted from obtaining such information by statute and only collects DNA information concerning "core loci" that have no known association to medical conditions or defects. *See supra*, n. 1. And irrespective of this limitation, the "government's use of a technology in public use" while not invading a person's person or place (in other words, "a place it [is] lawfully entitled to be") "d[oes] not run afoul of the Fourth Amendment." *United States v. Tuggle*, 4 F.4th 505, 511 (7th Cir. 2021). Plaintiffs' references to DNA technology providing family or "kinship analysis," *Compl.* ¶¶ 8, 75, 225, 229, misconstrues the government's actual use of DNA records at the federal level to aid in missing persons cases and is explicitly permitted by the DNA Act. 34 U.S.C § 12592(a)4.[6] But regardless, even if the government were engaged in the type of kinship analysis Plaintiffs allege by using publicly available technologies, doing so would still constitute a law enforcement identification use that does not implicate the Fourth Amendment.

Plaintiffs' focus on the alleged illegal arrests is misplaced. This is not a criminal case in which the government is seeking to introduce tainted evidence obtained through an invalid search. The DNA identification system is used for identification purposes only. Regardless of whether an arrest is valid or not, the government has a compelling interest in retaining those arrest records, whether it be fingerprints or DNA samples. *See* 28 U.S.C. § 534(a) (requiring the Attorney General to "acquire, collect, classify and *preserve*" criminal identification records (emphasis added)). Considering the mandatory language of the statute, some courts have questioned whether they possess jurisdiction to ever grant expungement. "Even where a

[6] The FBI's NDIS Operational Procedures Manual addresses how Missing persons records and how they are searched and is available at https://le.fbi.gov/file-repository/ndis-operational-procedures-manual.pdf/view

conviction has been set aside and expungement of judicial records deemed appropriate, expungement of executive records might not be. We maintain control over judicial records, but Congress has instructed the executive to maintain certain records." *United States v. Crowell*, 374 F.3d 790, 796 n.6 (9th Cir. 2004); *see United States v. Lucido*, 612 F.3d 871, 875 (6th Cir. 2010) (holding that as Congress ordered the Attorney General to preserve criminal records, a criminal court has no ancillary jurisdiction to order expungement).

DNA records are no different. *See United States v. Amerson*, 483 F.3d 73, 86 (2d Cir. 2007) ("[I]t is well established that the state need not destroy records of identification—such as fingerprints, photographs, etc.—of convicted felons, once their sentences are up . . . The same applies to DNA."). Probable cause is not required to simply maintain such records. As the *King* court noted, "[i]ndividual suspicion is not necessary. The routine administrative procedure[s] at a police station house incident to booking and jailing the suspect have different origins and different constitutional justifications than, say, the search of a place not incident to arrest." 569 U.S. 435, 436 (citations omitted; alteration in original). This is because "[a]n individual's identity is more than just his name or Social Security number . . . Identity has never been considered limited to [such and in] this respect the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides." *Id*. at. 450-51.

Numerous courts have held that retention and subsequent use of DNA does not constitute a search under the Fourth Amendment, separate from the initial taking of the DNA sample, creation of the DNA profile, and storage of that profile in CODIS. *See, e.g., Boroian v. Mueller*, 616 F.3d 60, 67-68 (1st Cir. 2010) ("[W]e join the other courts to have addressed the issue in holding that the government's retention and matching of Boroian's profile against other profiles

in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment."); *Amerson*, 483 F.3d at 86 (acknowledging that offenders' DNA profiles will be retained and "potentially used to identify" offenders after probation terms have ended, but concluding that "we do not believe that this changes the ultimate analysis"); *Johnson v. Quander*, 440 F.3d 489, 499 (D.C. Cir. 2006) ("[W]e conclude that accessing the DNA snapshots contained in the CODIS database does not independently implicate the Fourth Amendment."); *United States v. Hinton*, 113 F. Supp. 3d 1277, 1290 (N.D. Ga. 2015) (citing cases).[7]

Plaintiffs' contrary approach would lead to absurd results. For example, when health officials examine DNA in wastewater to understand diets or the emergence or evolution of disease,[8] have they conducted a Fourth Amendment search of whoever shed that DNA? No principle of law or logic supports such a bizarre rule. Under Plaintiffs' legal reasoning, however, the answer would appear to be yes. Similarly, if law enforcement seized a knife covered in blood from a person's home pursuant to a valid search warrant, would they need to obtain separate warrants to test the blood on the blade for DNA to compare to the victim or to dust the handle to see if there are fingerprints? Again, by the Plaintiffs' legal reasoning, that answer seems to be yes. But that would reduce the Fourth Amendment to a bureaucratic exercise creating absolute havoc. *See Campbell*, 373 F.3d at 835. But even if such analysis was considered a search or seizure, it is clearly reasonable. The two circuit court opinions Plaintiffs cite suggesting that in certain narrow circumstances DNA analysis could be considered a search, both concluded that

[7] *Cf. Davis v. Mississippi*, 394 U.S. 721, 727–28 (1969) (noting, without deciding, that the requirements of the Fourth Amendment could arguably be met by narrowly circumscribed procedures for obtaining the fingerprints of individuals for whom there is no probable cause to arrest).
[8] *See* CDC, Wastewater Surveillance: A New Frontier for Public Health, https://www.cdc.gov/advanced-molecular-detection/php/success-stories/wastewater-surveillance.html (Apr. 15, 2024); *see also* NIH, Tracking Diets via Wastewater, https://www.nih.gov/news-events/nih-research-matters/tracking-diets-wastewater.

the subsequent processing and collection of DNA were reasonable. *See Davis*, 690 F.3d at 233 (allowing DNA evidence to be used because the good-faith exception to the exclusionary rule applies); *Mitchell*, 652 F.3d at 416 (holding that the government's legitimate interest in the collection of DNA was reasonable and did not violate the Fourth Amendment).

**2. Plaintiffs Fail to State a First Amendment Claim (Count IV)**

Plaintiffs raise a single First Amendment claim, based on a theory that Defendants retaliated against them for engaging in protected First Amendment activity. *See generally* Compl. ¶¶ 269-277. As a preliminary matter, Count IV should be dismissed outright for Plaintiffs Briggs and Guataquira because officers had probable cause to arrest them for assaulting or impeding federal officers under 18 U.S.C. § 111. For First Amendment retaliatory arrest claims, a general "no-probable cause rule" applies. *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). Under this rule, "[a]bsent . . . a showing" that officers lacked probable cause for the arrest, "a retaliatory arrest claim fails." *Id.*

But all Plaintiffs have equally failed to plausibly allege a First Amendment retaliation claim on the merits. "To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter his free speech; and (3) his protected speech was at least a motivating factor for the deprivation." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008); *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). Simply alleging that Defendants knew of the protected speech, without more, "would not lead to a reasonable inference that [Plaintiffs'] speech motivated [their arrests] because a fairly 'obvious alternative explanation' [] exists." *DeJong v. Pembrook*, 662 F. Supp. 3d 896, 913 (S.D. Ill. 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).

Applying these principles, Plaintiffs have not plausibly alleged that their protected speech was a motivating factor for their arrests. To demonstrate a retaliatory animus, "a plaintiff might prevail by pointing to similarly-situated comparators, statements from arresting officers or other police officials, or a wide range of other objective evidence of retaliation" *Lyberger v. Snider*, 42 F.4th 807, 813-814 (7th Cir. 2022) (citation omitted). Plaintiffs have not done so here. Plaintiffs do not identify any statements by the arresting officers that would indicate a retaliatory animus. And Plaintiffs have not even alleged, nor could they possibly allege, that everyone who attended the protests at the Broadview facility was arrested such that their arrests were different from "similarly-situated comparators." Plaintiffs also have not plausibly alleged that they were somehow singled out for arrest because of their speech.

Most importantly, Plaintiffs fail to show that their arrests were not the result of some "obvious alternative explanation[.]" *DeJong*, 662 F. Supp. 3d at 913. Even assuming a lack of probable cause, there is an obvious alternative explanation for Plaintiffs' arrest: Defendants' understanding of their law enforcement duties. *See Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) ("If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" (citation omitted)).

Plaintiffs' own allegations suggest this obvious alternative explanation. Taken collectively, Plaintiffs allege a chaotic situation outside Broadview in which a "crowd of protesters" were "periodically told to move out of the street when DHS cars or trucks entered or left the facility." *Id.* ¶¶ 189, 165, 125. The crowd of protestors was of such a size that it was "very difficult to move" such that federal agents had to give orders "in the direction of the crowd over a megaphone" to which at least some protestors objected. *Id.* ¶¶ 172, 149, 169. Further,

according to allegations in the Complaint, federal agents believed they "needed to clear the public street" and on that basis yelled at protestors to "Clear out of the way!" *Id.* ¶¶ 212, 127. So even accepting Plaintiffs' assertion that they "had done nothing wrong," *id.* ¶173, the obvious alternative explanation that these facts suggest is that Plaintiffs were arrested because federal law enforcement officers sought to maintain a secure area and clear the street adjacent to a federal detention facility rather than to retaliate against Plaintiffs' speech. *See Dickinson v. Trump*, 174 F.4th 634, 643 (9th Cir. 2026) (rejecting First Amendment retaliation claim based on protest occurring outside DHS detention facility in Portland, Oregon where "the five plaintiffs (out of hundreds of protesters) were not intentionally targeted for their First Amendment activity but were rather unfortunate collateral casualties during a chaotic effort to quell disorder.").

Thus, Plaintiffs' First Amendment claim should be dismissed because Plaintiffs' own allegations establish "obvious alternative explanation[s]" to retaliatory animus. There is no dispute that the First Amendment protects individuals' rights to peacefully protest, and that individuals may exercise those rights without facing retaliation for doing so. But it is equally well-established that law enforcement may take reasonable steps to disperse crowds "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears[.]" *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). As the Ninth Circuit recently affirmed, "under the First Amendment, officers may disperse a crowd not only in response to an imminent threat of physical harm but also in response to imminent lawlessness, including a threat of riot, disorder, or interference with traffic." *Dickinson*, 174 F.4th at 647 (citation omitted).

### 3. Plaintiffs Fail to State APA Claims in Counts V and VI

#### *a. Description of Claims*

The Complaint alleges that federal authorities collected Plaintiffs' DNA samples pursuant to federal DNA-collection authority. Compl. ¶¶ 77–86. The Complaint then references, without specifics, several DOJ, DHS, FBI, CBP, and ICE "policies" that "govern," are "related" to or "relating to" "arrest" or the handling of "DNA samples," DNA profiles", and "DNA collection" from arrested individuals. *See e.g.*, *id.* at ¶¶ 21, 23, 26, 29, 31, 86, 87, 136, 155, 182, 197, 218, 222, 228, 245, 254. Count V alleges that these "regulations, policies, and practices regarding DNA collection and retention constitute final agency action." *Id.* ¶ 280.

Count V also alleges that the "government's policies and practices of targeting protesters for arrest and surveillance, including as described in Sections C, D and E of th[e] Complaint, constitute final agency action." *Id.* ¶ 281. The Complaint alleges in the headings for Section C and D that there is a DHS policy "targeting protesters for arrest and surveillance[.]" *Id.* (Section E references Plaintiffs' Fourth Amendment claims, suggesting that the government's DNA Identification System is used for surveillance.) The facts alleged in Section C and D consist of *ad hominin* attacks on DHS' hiring, training and vetting standards (*Id.* ¶¶ 93-100) and general "[i]nstitutional hostility" that has been allegedly cultivated through statements made by "senior federal government officials." *Id.* ¶ 110.

Count VI, similar to Count V, alleges that the "DOJ regulations and DHS, ICE, and CBP policies and practices … as described in Sections A and B of this Complaint, constitute final agency action." *Id.* ¶ 287. And that "DHS, ICE, CBP, and HSI policies and practices constitute final agency action." *Id.* ¶ 290. And "FBI policies and practices [also] constitute final agency action." *Id.* ¶ 291. But, unlike Count V, Count VI names two specific DOJ regulations: 28 CFR

§ 28.12 and § 28.13, and alleges that these two "DOJ regulations constitute final agency action." *Id.* ¶ 289.

***b. The Vast Majority of Plaintiffs' Claims Do Not Identify a Final Agency Action***

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (citation omitted). The APA instead only permits review of agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or challenge "at a high[] level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation . . . precludes . . . broad programmatic attack[s]"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("A broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704.").

All of the unnamed "policies and practices" to which Plaintiffs generally allude fail to meet this basic standard and should be dismissed. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations [there] must be enough to

raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 545. The Complaint does not identify which such "policies" are embodied in discrete agency actions of the type listed in § 551(13) and capable of judicial review. *See Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) ("naked assertions devoid of further factual enhancement" cannot suffice to plead a plausible claim for relief) (quoting *Iqbal,* 556 U.S. at 678)).

Although the discrete-action requirement is a statutory limitation of the APA, there is a practical element as well. Defining which specific agency action is being challenged signals to the courts and defendants where to even begin in analyzing the claim. "Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders or denials. [They] are woefully ill-suited, however, to adjudicate generalized grievances [that] ask[] to improve an agency's performance or operations." The APA's discrete-action requirement keeps courts "from entering such a quagmire." *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019).

To avoid such a quagmire in this case, Count V should be dismissed outright as it does not cite to a single reviewable "agency rule, order, license, sanction, relief" as defined under the APA, 5 U.S.C. § 551(13), but instead entirely consists of these unnamed "policies and practices" which may or may not exist or may or may not be final. *See Daines v. IRS*, No. 24-cv-1057, 2025 WL 2694788, at *4 (E.D. Wisc. Sept. 22, 2025) ("speculation and conjecture" cannot "plausibly alleg[e] the existence of" a policy, much less "the existence of a rule," "under the APA"). Count VI is similar, except for two named DOJ regulations. However, Count VI should also be dismissed in its entirety for the reasons discussed below.

Even if there were final agency action, Count V is redundant of Plaintiffs' constitutional claims and should be dismissed for reasons explained above. Count V is simply a repackaged version of the constitutional claims under the APA; it adds nothing beyond the claims already

asserted. Specifically, Count V alleges that the "government's collection and retention of DNA is unlawful under the APA because it violates the First and Fourth Amendments to the Constitution." Compl. ¶ 282. Whether asserted through the APA's cause of action or as an equitable constitutional claim for injunctive relief, Plaintiffs' First and Fourth Amendment claims fail on the merits.

Plaintiffs also fail to state an "arbitrary and capricious" claim under § 706 of the APA. *See id.* ¶ 283. Plaintiffs' conclusory, one sentence allegation cannot overcome the clear statutory authority Congress provided to the Attorney General to "collect DNA samples from individuals who are arrested, facing charges, or convicted[.]" 34 U.S.C § 40702(a)(1)(A).

***c. Plaintiffs' APA Claims Are an Impermissibly Broad Programmatic Attack***

Another reason that Courts require Plaintiffs to identify with some specificity what agency actions they are challenging is to "preclude[] a broad programmatic attack[.]" *SUWA*, 542 U.S. at 55. In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" or challenge, "at a high[] level of generality" agency conduct, which would impermissibly enmesh courts into pervasive oversight of an agency's "day-to-day operations." *See Lujan*, 497 U.S. at 891, 893, 894, 899.

Instead of challenging a discrete action, Plaintiffs here are effectively bringing a broad programmatic challenge to the DNA Identification System that has been established for years through statute and implementing regulations. Such challenges are impermissible under the APA. The Supreme Court's decision in *Lujan* squarely forecloses Plaintiffs' broad challenge here to the DNA Identification System. In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's ("BLM") "land withdrawal review program."

497 U.S. at 875. That "program" consisted of thousands of various actions, such as public land status determinations, that BLM undertook pursuant to the directives of the Federal Land Policy and Management Act. *Id*. at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id*. at 890. What the plaintiffs alleged was a "program" that was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* (citation omitted).

A unanimous Supreme Court reaffirmed this view in *SUWA*, in which the plaintiffs sought to compel the Secretary of Interior to take additional actions with respect to off-road vehicle use, arguing that the failure to take such action amounted to "agency action unlawfully withheld or unreasonably delayed" under Section 706 of the APA. 542 U.S. at 61 (citation omitted). In rejecting APA review in that case, the Court analyzed the definition of "agency action" in the APA and stressed that the five specific actions listed ("rule, order, license, sanction [and] relief") all "involve circumscribed, discrete agency actions," *id.* at 62 (citation omitted), and consequently, "agency action" does not include a broad challenge to the manner in which an agency implements its programs, *id.* at 63-64. Moreover, citing the Attorney General's Manual on the APA, the Court noted that the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'" *Id.* at 64 (emphasis omitted) (citation omitted). Consequently, the Court concluded that challenges to "[g]eneral deficiencies in [agency] compliance . . . lack the specificity requisite for agency action." *Id.* at 66.

Plaintiffs' Complaint suffers from the same flaws as *Lujan* and *SUWA*, as they attempt to aggregate dozens of disparate purported law enforcement policies and DNA collection actions into a single purported final agency action. The APA does not permit such a lawsuit. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." (citation omitted)). As in *Lujan* and *SUWA*, Plaintiffs here are not challenging a discrete "agency action" subject to review under the APA. Therefore, each of these claims should be dismissed pursuant to Rule 12(b)(6) for failing to plausibly allege a reviewable agency action. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024).

***d. DOJ Regulations 28 CFR § 28.12 and § 28.13 Are Authorized by Statute and Committed to Agency Discretion***

Although Plaintiffs' APA claims generally fail for not identifying a final agency action as described above, Count VI identifies two DOJ regulations that the Count alleges are in excess of their statutory authority. The basis for this allegation apparently rests on a single word. The Complaint emphasizes that whereas 34 U.S.C. § 40702(a)(1)(A) reads: The Attorney General *may*, as prescribed by the Attorney General in regulation, "collect DNA samples from individuals who are arrested, facing charges, or convicted," 28 C.F.R. § 28.12(b) reads: "Any agency of the United States that arrests or detains individuals . . . *shall* collect DNA samples from individuals who are arrested, facing charges, or convicted." Compl. ¶ 289-90 (alterations in original). In essence, the Complaint argues that the DOJ regulation should, like the statute, be permissive, not mandatory.

This is a misreading of the statute. The statute explicitly allows the Attorney General and, by extension, the DOJ to "collect DNA" samples through regulation. The Supreme Court has

"repeatedly observed" that "the word 'may' *clearly* connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quoting *Opati v. Republic of Sudan*, 590 U.S. 418, 428 (2020)) (emphasis in original). The use of the word "may" in § 40702(a)(1)(A) thus makes clear that that the collection of DNA from all persons arrested for federal crimes "is a tool that" the Attorney General "has the authority, but not the duty, to use." *Id.* (quoting *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (holding that Congress's use of "may" in statute authorizing DOJ to "reduce the sentence of a nonviolent offender who has successfully completed a drug treatment program" gives the agency the "the authority, but not the duty," to take action).

There is nothing unlawful about the Attorney General utilizing the full extent of the authority given to him by Congress to collect DNA from federal arrestees. "Choosing whether" to take action under a statute "is the quintessential type of action 'committed to an agency's absolute discretion.' " *Better Mkts., Inc. v. Dep't of Just.*, 83 F. Supp. 3d 250, 256 (D.D.C. 2015) (quoting *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C. Cir. 2007)); *see* 5 U.S.C. § 701(a)(2).

DOJ lawfully exercised that discretionary authority by issuing 28 CFR § 28.12, which regulates how federal agencies should collect DNA samples from arrested individuals. Similarly, DOJ lawfully issued 28 CFR § 28.13 pursuant to the authority granted in § 40702 requiring the FBI to carry out a DNA analysis of each sample and make it available through CODIS. Indeed, 34 U.S.C § 40702(b) expressly requires that the Attorney General "*shall* furnish each DNA sample collected" to the FBI "who *shall* carry out a DNA analysis on each such DNA sample and include the results in CODIS." (emphasis added). 28 CFR § 28.13 is thus a straightforward and clear directive that tracks the express statutory requirement in § 40702(b).

As the statute explicitly allows DOJ to issue these regulations, Plaintiffs' APA claim in Count VI fails.

### 4. PLAINTIFFS FAIL TO STATE AN ULTRA VIRES CLAIM

Plaintiffs' ultra vires claim (Count VII) should be dismissed. As a threshold matter, Count VII is merely a repackaged version of the Complaint's three Fourth Amendment and two APA claims (Counts I-III,V-VI) that collectively challenge the constitutionality of the DNA Act and its implementing regulations. But the Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass-and in court[,] as in football, the attempt rarely succeeds." (citation omitted)).

Such a claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"). Here, Plaintiffs are simply dressing up their Constitutional claims and their APA claims as an ultra vires claim. "That is a fairly common maneuver" which the Supreme Court has now squarely rejected. *Nuclear Regul. Comm'n*, 605 U.S. at 682.

In any event, the ultra vires claim fails on the merits for the same reasons as those described above given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' ultra vires review, which has an even 'narrower scope.'" *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified). This Court should dismiss these claims.

## V. CONCLUSION

For these reasons, the Court should grant Defendants' Motion to Dismiss and enter an order dismissing the Complaint.

DATED: October 7, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ANDREW WARDEN
Assistant Branch Director

*/s/ James A. Ryan*
JAMES A. RYAN
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Dept. of Justice
1100 L St. NW
Washington, DC 20005
(202) 598-5453
James.A.Ryan2@usdoj.gov

*Counsel for Defendants*